UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| VASSIOLIOS KURKORINIS, on behalf of himself and and any others similarly situated | ) ) ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | No. 8:22-cv-02402-VMC-TGW |
| | ) | |
| WALMART INC. | ) | |
| | ) | |
| Defendant. | ) | |

---

**RESPONSE TO SUPPLEMENTAL BRIEF FILED JUNE 6, 2024 (DOC 124)**

---

NOW COMES Dana Albrecht, *pro se*, and Responds to the Supplemental Brief (Doc 124) filed June 6, 2024; and further states:

# BACKGROUND

## Summary of Walmart

Walmart, incorporated in Delaware and headquartered in Bentonville, Arkansas, operates globally in retail, wholesale, and eCommerce across the U.S., Africa, Canada, Central America, Chile, China, India, and Mexico. Its operations are divided into three segments: Walmart U.S., Walmart International, and Sam's Club.

**Walmart U.S.** is the largest segment, with over 4,700 stores across all 50 states, Washington D.C., and Puerto Rico. It sells consumer products under the "Walmart" and "Walmart Neighborhood Market" brands, as well as online through walmart.com. In fiscal 2022, Walmart U.S. had net sales of $393.2 billion, accounting for 69% of Walmart's total net sales. Historically, it has had the highest gross profit and the largest contribution to Walmart's net sales and operating

income, with $470,295 billion in revenues in fiscal 2022, representing over 80% of Walmart's total revenues.

Walmart U.S. operates in three strategic merchandise units:

1. **Grocery**: Includes dry goods, snacks, dairy, meat, produce, deli, bakery, frozen foods, beverages, health and beauty aids, pet supplies, household chemicals, paper goods, and baby products.

2. **General Merchandise**: Encompasses electronics, toys, seasonal merchandise, automotive, hardware, paint, sporting goods, outdoor living, stationery, apparel, shoes, jewelry, accessories, housewares, small appliances, bed and bath, furniture, home organization, home decor, fabrics, and crafts.

3. **Health and Wellness**: Offers pharmacy services, over-the-counter drugs, medical products, optical services, and clinical services.

Walmart U.S. sells both brand name and private label products, including the "Marketside" brand of produce. The segment has seen increased net sales since 2020, with a rise of $23.3 billion (6.3%) in fiscal 2022 and $29.0 billion (8.5%) in fiscal 2021, primarily due to increases in comparable sales.

As of January 31, 2022, Walmart U.S. operates 340 stores in Florida and over 4,700 stores nationwide, including Supercenters, Discount Stores, Neighborhood Markets, and other small formats. Each provides grocery items to customers.

## Nature of the Action and Summary of Facts

Walmart claims to help customers save money and live better by serving about 230 million customers weekly. Its commitment to price leadership is a cornerstone of its business. However, Walmart employs deceptive practices to unfairly benefit financially at the expense of its customers' grocery dollars.

Walmart advertises grocery prices using price tags or stickers on or near the products, often on the store shelves. These stickers provide the product description, retail price, and unit price. Plaintiff and thousands of other customers have experienced four systemic deceptive practices by Walmart, leading to overcharges compared to the lowest advertised per pound/ounce price.

1. **Falsely Inflating Product Weight**: Walmart advertises products sold by weight with a per ounce or per pound price. Sale prices, called "Rollbacks," are marked down for 90 days with red signage. Customers expect to pay the lowest advertised price, but Walmart's Point of Sale (POS) system increases the product weight at checkout, inflating the final price.

2. **Mislabeling Weight of Bagged Produce**: Walmart sells bulk produce in bags with price stickers that falsely represent a higher weight than the actual product weight, leading to overcharges.

3. **Overcharging Sold-by-Weight Clearance Products**: Walmart reduces prices for nearing-expiry or overstocked products with yellow stickers. However, the "You Pay!" price is higher than the calculated per pound price, resulting in overcharges.

4. **Overcharging Sold-by-Weight Seafood Products**: Walmart advertises seafood with price stickers that falsely represent a lower per pound/ounce price than what is charged at checkout, resulting in overcharges.

These deceptive practices have occurred over the past four years. Customers rely on the accuracy of Rollback Stickers, Price Stickers, and Yellow Stickers for purchasing decisions, expecting these prices to be accurate and not misleading.

Walmart's deceptive conduct is systemic, driven by POS software programmed to falsify weights, unit prices, and product prices, indicating a fraudulent scheme. Walmart employees, when confronted, often cannot explain or correct the pricing errors, acknowledge prior issues, and fear job loss for admitting wrongful pricing conduct. Corrections, if made, only affect the immediate transaction. As a result, Plaintiff and other customers were overcharged for Sold-by-Weight Products, Bagged Produce, and Clearance Products, suffering actual damage.

Walmart's practices violate state consumer protection laws and common law in states where these products are sold. It should be the responsibility of the attorney generals of all theses states, or the Federal Trade Commission to enforce these consumer protection laws.

## Walmart's POS Systems

Walmart uses advanced point of sale technology to manage, track, and store sales and inventory data nationwide. Walmart employs legacy Point-of-Sale systems and next-generation Cloud Powered Checkout services. They also maintain transactional information databases like "Teradata" and the "Walmart Pay" application, collectively referred to as "Walmart's POS Systems."

Over a decade ago, Walmart stored massive amounts of shopper history in its computer network, holding 460 terabytes of data on Teradata mainframes. This data encompasses more information about products and customer buying habits than any other company, raising privacy concerns. Walmart's 3,600 U.S. stores serve roughly 100 million customers weekly, collecting data from checkout scanners and wireless hand-held units, which is stored indefinitely.

Walmart's Retail Link® reporting software, available to suppliers for over two decades, collects point of sale and inventory data, providing detailed sales information via SKU, per hour, and per store. Walmart maintains detailed purchase data per customer, including product UPCs, prices, purchase dates, and store locations. This information is used for return policies and loss prevention. For non-receipted returns, Walmart can look up purchases using credit/debit card details or online purchase information. They also track non-receipted return activity to prevent abuse.

Walmart's data maintenance is evidenced by its use in litigation, such as in *Farneth v Walmart Stores, Inc.*, Civil Action-Class Action, No. G.D. 13-11472, Allegheny County, Pennsylvania, Court of Common Pleas, where detailed transaction data, including customer names and addresses, was produced for court proceedings.

Law enforcement subpoenas Walmart's purchasing data, including from the "Walmart Pay" application, to assist in investigations. For example, in *United States v. Whipple*, 3:20-cr-00031, (E.D. Tenn.), Walmart provided law enforcement with specific purchase details and customer information from its databases.

## Summary of the Litigation and Settlement

### A. Investigation, Litigation, and Settlement Negotiations

The KDS FA Declaration outlines the investigation, litigation, discovery, and settlement negotiations conducted by Plaintiff and Class Counsel, though it's worth

questioning the thoroughness and efficiency of these efforts. Despite over a year of activities, overseen by mediator Robert A. Meyer, Esq., the settlement's effectiveness remains debatable.

In October 2022, following an investigation that may not have been as comprehensive as claimed, Plaintiff filed a Class Action Complaint alleging that Walmart overcharged customers for Weighted Goods and Bagged Citrus by not using the lowest advertised price at checkout and overcharging based on incorrect weight labels.

Class Counsel consulted industry experts and retained marketing expert Matthew E. Pohl for assistance. The choice of experts and their methodologies can and should be scrutinized. Extensive production requests were served to Walmart, leading to meetings and telephonic conferences through March 2023. Walmart responded with 64 pages of objections and narrative responses, raising questions about the adequacy of the initial requests. The ESI Protocol and Confidentiality Agreement were filed subsequently.

Walmart produced over 100 gigabytes of data, supposedly enabling Plaintiff's expert to calculate damages. The methodologies used and accuracy of these calculations can and should be scrutinized. Walmart also provided over four years of sales and transaction data for Bagged Citrus, data deemed crucial by Class Counsels for their damage analysis. However, this analysis should also undergo further scrutiny.

After responding to Walmart's motion to dismiss, which was partially granted, an Amended Complaint was filed in July 2023, reasserting nationwide class claims. Plaintiff countered Walmart's partial motion to dismiss in August 2023, yet the effectiveness of these legal maneuvers can be debated.

Settlement discussions began in late 2022 and continued into 2023, with two full-day mediation sessions in May and June 2023 leading to numerous exchanges of information. A settlement in principle was reached in September 2023, with the Court notified. Dual tracking of litigation and settlement continued with additional discovery. The Settlement Agreement was finalized and executed on November 15, 2023, followed by a motion for preliminary approval on November 16, 2023, and a supplemental submission on January 9, 2024.

**B. Preliminary Settlement Approval and Implementation**

On December 23, 2023, Angeion claims to have received a list from Walmart of individuals likely to have purchased Weighted Goods or Bagged Citrus products during the Settlement Class Period, including their names, email addresses, and customer ID numbers. On January 30, 2024, Angeion asserts that it also received from Class Counsel a list of 15 additional potential class members to be added.

Angeion states it analyzed the data, removing duplicates, resulting in 81,429,284 unique records. Each record was assigned a Notice Identification number. According to Angeion, they identified 134,141,561 unique email addresses linked to these records. The email addresses reportedly underwent a cleansing and validation process to correct errors and verify existence, reducing the number to 120,558,581 valid addresses.

On February 20, 2024, the Claims Administrator began distributing the "Email Notice" to email addresses associated with their "unique records," highlighting their use of extensive and complex methodologies to avoid spam filtering. Out of 81,429,284 notices, 6,204,468 reportedly bounced back. For 4,049,642 of these, Angeion states no further attempts were made due to a lack of additional valid addresses. For the remaining 2,154,826 bounced emails, notices were sent to secondary addresses, resulting in 3,749,990 additional emails. Over 81 million Email Notices were sent, allegedly completing the campaign on April 4, 2024, though the actual relationship of these notices to members of the class remains uncertain.

Starting April 8, 2024, "Reminder Emails" were issued to all allegedly valid email addresses, with over 69 million sent by April 30. Class counsel state the email marketing campaign was set to complete by May 12, 2024.

As of May 8, 2024, Class counsel states approximately $1.15 million has been spent on the Notice Plan and Claims Administration, with Class counsel also stating additional costs are estimated to range from $1.3 to $1.45 million.

**However, these additional costs to not take into account the potential liability of Class counsel and Angion for their possible violations of the CAN-SPAM Act.**

**Specific Potential Violations of the CAN-SPAM Act**

1. **Improper Identification of the Sender:** The emails sent to potential class members did not properly identify Class Counsel as the sender. Instead, the "From" field displayed a generic and misleading name, "Claims Administrator," with an email address of donotreply@walmartweightedgroceriessettlement.com, making it unclear who initiated the message. *(15 USC §7704(a)(1))*

2. **Failure to Disclose the Advertisement:** The emails failed to clearly and conspicuously state that the message was an advertisement. The content of the email focused solely on the features and benefits of the settlement, with no indication that it was a promotional message. *(15 USC §7704(a)(5)(A))*

3. **Lack of a Valid Physical Postal Address:** The emails omitted a physical postal address for Angeion. It only included physical postal addresses for Class Counsel, failing to provide a valid postal address for the marketer managing the campaign. *(15 USC §7704(a)(5)(A)(iii))*

4. **Non-Working Opt-Out Hyperlink:** To comply with the opt-out mechanism requirement, the email included the word "unsubscribe" that supposedly allowed recipients to unsubscribe from future emails. However, there was no functional link on the first email, and no way to click through to any website at all that would allow recipients to unsubscribe. *(15 USC §7704(a)(3)(A)(i))*

5. **Invalid Reply-To Address:** The various emailss "Reply-To" address was ineffective and directed to a non-monitored email address. This meant recipients could not communicate directly with Class Counsel to request the cessation of future emails. *(15 USC §7704(a)(3)(B))*

6. **Liability of Both the Business and the Marketer:** Class Counsel hired Angeion to handle their email campaign. Under the CAN-SPAM Act, both the business whose products are being promoted and the marketer managing the campaign can be held liable for these violations. Despite outsourcing the email campaign, Class Counsel retains responsibility for ensuring compliance with the law. Angeion, as the entity executing the campaign, also bears responsibility for adhering to CAN-SPAM requirements. *(15 USC §7706(a)(1) and §7706(a)(2))*

**Consequences**

The data analysis and email marketing campaign conducted by Angeion and Class Counsel have not only revealed significant issues but have also highlighted potentially severe and egregious violations of the CAN-SPAM Act. Initially, approximately 81 million "Notice" emails were distributed, each failing to comply with multiple legal requirements. These were followed by a second batch of 69 million "Reminder Emails," which were also sent in blatant violation of the Act. These emails did not properly identify the sender, failed to disclose that they were advertisements, lacked a valid physical postal address for Angeion, featured non-working opt-out mechanisms, and used an invalid reply-to address.

Moreover, Angeion's attempt to bypass ISP spam filters through extreme technical measures underscores a deliberate effort to circumvent regulatory compliance, further exacerbating the severity of these violations. Each of these emails is subject to penalties, with fines up to $51,744 per violation.[1]

Class Counsel and Angeion both face significant potential liability. Despite outsourcing the email campaign to Angeion, Class Counsel remains responsible for ensuring compliance with CAN-SPAM requirements, making both parties equally accountable for possible infractions. The financial implications are staggering, potentially resulting in fines amounting to **billions of dollars,** along with the possibility of additional sanctions from the FTC. This could lead to additional costly settlements and irreparable damage to their reputations.

The Notice Plan and Claims Administration have already incurred approximately $1.15 million, with projected additional costs ranging from $1.3 to $1.45 million. These figures do not account for the impending financial liabilities due to CAN-SPAM Act violations. The consequences are dire, and immediate corrective action is essential to mitigate further legal and financial repercussions and to restore trust among the recipients of these communications. *(15 USC §7706(g)(1))*

The Federal Trade Commission is generally responsible for enforcing the CAN-SPAM Act. *See, e.g.*, *United States v. ConsumerInfo.com, Inc.*, 8:23-cv-01494, (C.D. Cal.). However, there is also a private cause of action available to major Internet Service Providers **(ISPs)**. Nevertheless, most other individuals or entities lack standing. *See, e.g.*, *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009).

---

[1]   https://www.ftc.gov/business-guidance/resources/can-spam-act-compliance-guide-business

## Key Terms of the Settlement

On February 1, 2024, Walmart paid $45 million into the Class Settlement Fund. The Settlement Amount is non-reversionary, meaning none will revert to Walmart once the settlement is effective, though the fairness of this amount is debatable.

The Class Settlement Fund will cover Notice and Administration Costs, Taxes, and an Award of Attorneys' Fees, Costs, and Expenses approved by the Court. The remaining Net Class Settlement Fund will be allocated to Settlement Class Members according to the Plan of Allocation.

However, if the potential liabilities incurred by possible multiple and egregious violations of the CAN-SPAM Act are accounted for, **the entire $45 million Walmart paid into the Class Settlement Fund might be completely exhausted before so much as a single penny reaches any member of the Class.**

In any event, the Plan of Allocation is based on the number of Bagged Citrus and/or Weighted Goods purchased during the Settlement Class Period. Without documentation, Settlement Class Members can claim up to 50, 75, 100, or more than 100 products, eligible for payments of $10, $15, $20, and $25, respectively. With receipts, Class Members can claim 2% of the total price of documented purchases (up to $500). The equity and feasibility of these claims processes might be questioned.

Class Counsel has applied for a fee of 20% of the Class Settlement Amount plus $114,870.41 in costs and expenses, including interest accrued at the same rate as the Class Settlement Fund until paid, which some may argue is excessive.

Upon the Effective Date, Releasing Settlement Class Members will fully and forever release claims against Walmart regarding overpayment allegations for Bagged Citrus and/or Weighted Goods during the Settlement Class Period, though the completeness and fairness of this release might be scrutinized.

## Class Counsel's Recent Supplemental Brief in Further Support of Final Approval of  the Class Action Settlement and Fee and Expense Award

As of June 5, 2025, Class Counsel further state (Doc 124) that:

> The Notice Plan has been completed, and the opt-out and objection deadlines have passed. In the wake of disseminating over 150 million Settlement-related emails, consisting of over 81 million Email Notices and 75 million Reminder Email Notices, completing an extensive digital media campaign about the Settlement, and receiving widespread media coverage on the Settlement, the response from Settlement Class Members has been resoundingly positive. As of June 3, 2024, 3.9 million claims have been submitted (which remain subject to validation), only five objections were filed with the Court, and only 152 Class Members opted out of the Settlement Class. In addition, Class Counsel received two notices of intent to appear, indicating an intent to speak about the Settlement at the June 12, 2024 Final Approval Hearing. Such reaction and participation from the Settlement Class weigh heavily in favor of granting final approval of the Settlement pursuant to Fed. R. Civ. P. 23 and _Bennett v. Behring Corp._, 737 F.2d 982, 986 (11th Cir. 1984). See also FA Mot. § IV.

The problem, of course, is _anyone_ who receives these possibly illegal 81 million Email Notices or possibly illegal 75 million Reminder Email Notices _may be fooled_ by this _novel notice mechanism_, into believing they are a member of the class, when in reality, they _might not be a member of the class_.

Thankfully, this Court has already issued declaratory judgment for movant (Doc 109), that _mere receipt of both illegal notice emails **is sufficient to include movant in the class**_, thus relieving movant of any obligation to figure out when he last shopped at Walmart, or what he might have purchased.

## Class Counsel's Response to the Objections

Class counsel further state  (Doc 124) that:

> The Notice Plan was implemented, and the CAFA notice informing governmental authorities about the proposed Settlement was disseminated in accordance with 28 U.S.C. § 1715(b). The opt-out and objection deadline of May 22, 2024, has passed. As an initial matter, the minuscule number of objections, none of which are from a regulator or attorney general, supports final approval of the Settlement.

However, movant does not know if Class Counsel contacted the appropriate division(s) of the Federal Trade Commission (FTC) concerning their email notice

scheme, or whether the Federal Trade Commission (FTC) approved Class Counsel's email notice scheme that was implemented by Angeion.

Notably, however, in the event the FTC were somehow to disapprove of the email notice scheme, the FTC is not necessarily limited by the current scheduling deadlines set forth by this Court. *See, e.g. FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085 (D. Kan. 2011).

Respectfully submitted,

_____
DANA ALBRECHT
    *Pro Se*
131 Daniel Webster Hwy #235
Nashua, NH 03060
(603) 809-1097
dana.albrecht@hushmail.com

June 11, 2024.

## CERTIFICATE OF SERVICE

I certify that a copy of this response will be sent to all parties of record  via the ECF/CM system.

_____
DANA ALBRECHT

- 11 -