

**Wednesday,**
**January 19, 2005**

Part II

# Federal Trade Commission

16 CFR Part 316
**Definitions and Implementation Under**
**the CAN-SPAM Act; Final Rule**

**FEDERAL TRADE COMMISSION**

**16 CFR Part 316**

**[Project No. R411008]**

**RIN 3084–AA96**

**Definitions and Implementation Under the CAN-SPAM Act**

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Trade Commission ("FTC" or "Commission") issues its Statement of Basis and Purpose and final Rule pursuant to the requirement imposed by the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM" or "the Act") for the Commission, not later than 12 months after December 16, 2003, to "issue regulations pursuant to section 7711 [of the Act] defining the relevant criteria to facilitate the determination of the primary purpose of an electronic mail message."

**EFFECTIVE DATE:** May 19, 2004, except for § 316.3, which will become effective on March 28, 2005.

**ADDRESSES:** Requests for copies of the "primary purpose" provisions of the Rule and the Statement of Basis and Purpose should be sent to Public Records Branch, Room 130, Federal Trade Commission, 600 Pennsylvania Avenue, NW., Washington, DC 20580. Copies of these documents are also available at the Commission's Web site: *http://www.ftc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Michael Goodman, Staff Attorney, (202) 326–3071; or Catherine Harrington-McBride, Staff Attorney, (202) 326–2452; Division of Marketing Practices, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue, NW., Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:** The "primary purpose" provisions of the Rule implement the CAN-SPAM Act by defining the relevant criteria to determine the primary purpose of an electronic mail message. These provisions describe types of electronic mail messages that contain commercial content or what the Act terms "transactional or relationship" content, and establish different criteria for each type. These provisions also clarify that the definitions of certain terms taken from the Act and appearing in the Rule are prescribed by particular referenced portions of the Act. The Rule also includes a severability provision that provides that if any portion of the Rule is found to be invalid, the remaining portions will survive.

**Statement of Basis and Purpose**

**I. Background**

*A. CAN-SPAM Act of 2003*

On December 16, 2003, the President signed into law the CAN-SPAM Act.[1] The Act, which took effect on January 1, 2004, imposes a series of new requirements on the use of commercial electronic mail ("e-mail") messages. In addition, the Act gives Federal civil and criminal enforcement authorities new tools to combat commercial e-mail that is unwanted by the recipient and/or deceptive. The Act also allows state attorneys general to enforce its civil provisions, and creates a private right of action for providers of Internet access service.

In enacting the CAN-SPAM Act, Congress made the following determinations of public policy, set forth in section 7701(b) of the Act: (1) There is a substantial government interest in regulation of commercial electronic mail on a nationwide basis; (2) senders of commercial electronic mail should not mislead recipients as to the source or content of such mail; and (3) recipients of commercial electronic mail have a right to decline to receive additional commercial electronic mail from the same source.

Based on these policy determinations, Congress, in section 7704(a) and (b) of the CAN-SPAM Act, outlawed certain commercial e-mail acts and practices. Section 7704(a)(1) of the Act prohibits transmission of any e-mail that contains false or misleading header or "from" line information. Section 7704(a)(1) also clarifies that a header will be considered materially misleading if it fails to identify accurately the computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message in order to disguise its origin.[2] The Act also prohibits false or misleading subject headings in commercial e-mail messages.[3] It requires a functioning return e-mail address or similar Internet-based mechanism for recipients to use to "opt out" of receiving future commercial e-mail messages,[4] and prohibits the sender, or others acting on the sender's behalf, from initiating a commercial e-mail to a recipient more than 10 business days after the recipient has opted out.[5] In addition, the Act prohibits sending a commercial e-mail message without providing three

disclosures: (1) Clear and conspicuous identification that the message is an advertisement or solicitation, (2) clear and conspicuous notice of the opportunity to decline to receive further commercial e-mail messages from the sender, and (3) a valid physical postal address of the sender.[6] Finally, the Act specifies four "aggravated violations"—practices that compound the available statutory damages when alleged and proven in combination with other CAN-SPAM violations.[7]

The Act authorizes the Commission to enforce violations of the Act in the same manner as an FTC trade regulation rule.[8] Section 7706(f) authorizes the attorneys general of the States to enforce compliance with certain provisions of section 7704(a) of the Act by initiating enforcement actions in Federal court, after serving prior written notice upon the Commission when feasible.[9] CAN-SPAM also authorizes providers of Internet access service to bring a Federal court action for violations of certain provisions of section 7704(a), (b), and (d).[10]

---

[1] 15 U.S.C. 7701–7713.

[2] 15 U.S.C. 7704(a)(1).

[3] 15 U.S.C. 7704(a)(2).

[4] 15 U.S.C. 7704(a)(3).

[5] 15 U.S.C. 7704(a)(4).

[6] 15 U.S.C. 7704(a)(5).

[7] 15 U.S.C. 7704(b). The four such practices set forth in the statute are: Address harvesting, dictionary attacks, automated creation of multiple e-mail accounts, and relaying or retransmitting through unauthorized access to a protected computer or network. The Act's provisions relating to enforcement by the States and providers of Internet access service create the possibility of increased statutory damages if the court finds a defendant has engaged in one of the practices specified in section 7704(b) while also violating section 7704(a). Specifically, sections 7706(f)(3)(C) and (g)(3)(C) permit the court to increase a statutory damages award up to three times the amount that would have been granted without the commission of an aggravated violation. Sections 7706(f)(3)(C) and (g)(3)(C) also provide for this heightened statutory damages calculation when a court finds that the defendant's violations of section 7704(a) were committed "willfully and knowingly."

[8] Sections 7706(a) and (c) of the CAN-SPAM Act provide that a violation of the Act shall be treated as a violation of a rule issued under section 18(a)(1)(B) of the FTC Act. 15 U.S.C. 57a(a)(1)(B).

[9] 15 U.S.C. 7706(f). Specifically, the state attorneys general may bring enforcement actions for violations of section 7704(a)(1), 7704(a)(2), or 7704(d). The states may also bring an action against any person who engages in a pattern or practice that violates section 7704(a)(3), (4), or (5).

[10] 15 U.S.C. 7706(g). Section 7704(d) of the Act requires warning labels on commercial e-mail messages containing sexually oriented material. 15 U.S.C. 7704(d). In April, 2004, the Commission promulgated its final rule regarding such labels: "Label for e-mail Messages Containing Sexually Oriented Material" ("Sexually Explicit Labeling Rule"). 69 FR 21024 (Apr. 19, 2004). The Commission is integrating the provisions of that existing rule into the final Rule announced in this **Federal Register** Notice, renumbering certain provisions as follows: former 316.1(a) and (b) appear at 316.4(a) and (b) in the final Rule; former 316.1(c) [definitions] appears at 316.2 in the final Rule; and former 316.1(d) [severability] appears at 316.5 and applies to the entire final Rule, not only the Sexually Explicit Labeling Rule provisions.

Congress directed the Commission to issue regulations, not later than 12 months after December 16, 2003, "defining the relevant criteria to facilitate the determination of the primary purpose of an electronic mail message." [11] The term "primary purpose" is incorporated in the Act's definition of the key term "commercial electronic mail message." Specifically, "commercial electronic mail message" encompasses "any electronic mail message the *primary purpose* of which is the commercial advertisement or promotion of a commercial product or service (including content on an Internet Web site operated for a commercial purpose)." [12] In addition to the mandatory rulemaking regarding the determination of an e-mail message's "primary purpose," CAN-SPAM also provides discretionary authority for the Commission to issue regulations concerning certain of the Act's other definitions and provisions. [13]

### B. Advance Notice of Proposed Rulemaking

On March 11, 2004, the Commission published an Advance Notice of Proposed Rulemaking ("ANPR") that solicited comment on a number of issues raised by the CAN-SPAM Act, most importantly, the definition of "primary purpose." [14] In addition, the ANPR requested comment on the CAN-SPAM issues over which the Commission has discretionary rulemaking authority. [15] In response to the ANPR, the Commission received more than 13,500 comments from representatives from a broad spectrum of the online commerce industry, trade associations, individual consumers, and consumer and privacy advocates. [16] Commenters generally applauded CAN-SPAM as an effort to stem the flood of unsolicited and deceptive commercial e-mail messages that has threatened the convenience and efficiency of online commerce. Commenters also offered several suggestions for the Commission's consideration in drafting regulations to implement the Act, including the definition of "primary purpose."

### C. Notice of Proposed Rulemaking

On August 13, 2004, the Commission published a Notice of Proposed Rulemaking ("NPRM") proposing criteria to facilitate the determination of the primary purpose of an e-mail message. [17] In the NPRM, the Commission proposed rule provisions to divide all types of e-mail messages containing "commercial" content [18] into three categories: (1) Messages that contain *only* commercial content, (2) messages that contain both commercial content and content that falls within one of the categories listed in section 7702(17)(A) of the Act ("transactional or relationship content"), and (3) messages that contain both commercial content and content that is neither commercial nor "transactional or relationship." Messages in the first category were considered "single-purpose messages." The second and third categories were considered "dual-purpose messages." For each of these categories, the Commission proposed different criteria for determining when the "primary purpose" of such messages was commercial.

In response to this NPRM, the Commission received 226 comments from e-mail marketers and their associations, e-mail recipients, and others interested in CAN-SPAM's application to e-mail messages. [19] Based upon the entire record in this proceeding, the final "primary purpose" Rule provisions the Commission hereby adopts are very similar to the proposed Rule provisions. The final Rule provisions, however, contain some minor changes from the proposed Rule provisions. These modifications, discussed in detail below, are based upon the recommendations of commenters and careful consideration of relevant First Amendment law. Commenters' recommendations that the Commission has declined to adopt in its final Rule are also discussed, along with the Commission's reasons for rejecting them. [20]

## II. Discussion of the Final Rule

### A. Section 316.1—Scope of Regulations

Section 316.1 of the final Rule states, "[t]his part implements the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ('CAN-SPAM Act' [or 'the Act']), 15 U.S.C. 7701–7713." A number of commenters requested express findings that CAN-SPAM does not apply to their e-mail messages. [21] Section 7706(d) of the CAN-SPAM Act makes clear that the Commission has only the same jurisdiction and power under the Act as it has under the FTC Act. [22] The CAN-

---

[11] 15 U.S.C. 7702(2)(C). The Act authorizes the Commission to use notice and comment rulemaking pursuant to the Administrative Procedures Act, 5 U.S.C. 553, 15 U.S.C. 7711.

[12] 15 U.S.C. 7702(2)(A) (emphasis supplied). The term "primary purpose" is also used in the Act's definition of "transactional or relationship message." 15 U.S.C. 7702(17).

[13] 15 U.S.C. 7702(17)(B); 7704(c)(1)(A)–(C); 7704(c)(2); 7711(a).

[14] 69 FR 11776 (Mar. 11, 2004).

[15] The ANPR also solicited comment on questions related to four reports that the Commission must submit to Congress: a report on establishing a "Do Not e-mail" registry that was submitted on June 15, 2004; a report on establishing a system for rewarding those who supply information about CAN-SPAM violations that was submitted on September 16, 2004; a report setting forth a plan for requiring commercial e-mail messages to be identifiable from their subject line to be submitted by June 16, 2005; and a report on the effectiveness of CAN-SPAM to be submitted by December 16, 2005. The comments related to the "Do Not e-mail" registry and the reward system are discussed in the Commission's June 15, 2004, and September 16, 2004 reports. The Commission will consider the relevant comments received in response to the ANPR in preparing the remaining reports.

[16] Comments that were submitted in response to the March 11, 2004, ANPR are available on the Commission's Web site at the following address: *http://www.ftc.gov/os/comments/canspam/index.htm.*

[17] 69 FR 50091 (Aug. 13, 2004).

[18] Based on the Act's definition of the term "commercial electronic mail message," the NPRM proposed that content is "commercial" if it advertises or promotes a product or service. *See* 15 U.S.C. 7702(2)(A).

[19] Approximately 75 of these comments were submitted by industry representatives, 56 were submitted by consumers, and 3 were submitted by privacy groups. The remaining comments were form letters or other duplicate submissions. Appendix A is a list of the commenters and the acronyms used to identify each commenter who submitted a comment in response to the August 13, 2004, NPRM. These comments are available on the Commission's web site at the following address: *http://www.ftc.gov/os/comments/canspam2/index.htm.* References to comments are cited by the commenter's acronym.

[20] In response to the August, 13, 2004, NPRM, many commenters addressed issues relating to the Commission's discretionary rulemaking authority, in addition to addressing "primary purpose" rulemaking. The Commission is currently reviewing the comments addressing issues of discretionary rulemaking and is reserving action on those issues until a later time.

[21] *See, e.g.,* ASAE; Incentive; NADA; AAMFT; DMA–NF (regarding messages from nonprofit organizations); and ACA (regarding debt collection messages). In addition, Experian stated that the regulations' scope is tied to the definition of the term "sender," and requested clarification of that term with respect to compliance obligations of multiple advertisers in a single commercial e-mail message. In the ANPR, the Commission sought comment on the issue of multiple-sender liability, which it identified as one possible area of discretionary rulemaking under section 7711 of the Act. The Commission staff is currently reviewing comments addressing the multiple-sender issue, as well as all comments on all other possible issues that fall within the Commission's discretionary CAN-SPAM rulemaking authority, and is reserving action on these issues until later.

[22] Under 5(a)(2) of the FTC Act, the Commission lacks jurisdiction over "banks, savings and loan institutions described in section 18(f)(3) [of the FTC Act], Federal credit unions described in section 18(f)(4) [of the FTC Act], common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in Section 406(b) of said Act." 15 U.S.C. 45(a)(2) (footnotes omitted). In addition, the FTC does not have jurisdiction over any entity that is not "organized to carry on business for its own profit or that of its members." 15 U.S.C. 44.

Continued

SPAM Act does not expand or contract the Commission's jurisdiction or the scope of the final Rule's coverage. Limits on the FTC's jurisdiction, however, do not affect the ability of other Federal agencies, the States, or providers of Internet access service to bring actions under the Act against any entity within their jurisdiction as authorized.[23] Thus, many persons and entities not within the FTC's jurisdiction may still be subject to an enforcement action for violating the CAN-SPAM Act.

### B. Section 316.2—Definitions

The proposed Rule included definitions of a number of key terms, nearly all of which were defined by references to the corresponding sections of the Act. These terms include: "affirmative consent," "commercial electronic mail message," "electronic mail address," "initiate," "Internet," "procure," "protected computer," "recipient," "routine conveyance," "sender," "sexually oriented material," and "transactional or relationship message."[24] An additional term, "character," not defined in the Act, had been defined in the Commission's Sexually Explicit Labeling Rule proceeding, and was included in the proposed Rule with the same definition it had been given in that earlier proceeding.[25]

In the NPRM, the Commission set forth its rationale for defining by reference those definitions included in both the Act and the Rule, stating "that by referencing the definitions found in the Act, and any future modifications to those definitions, the Rule will accurately and effectively track any future changes made to the definitions in the Act."[26]

None of the small number of the NPRM comments concerning the definitions challenged the Commission's proposal to incorporate by reference definitions included in the Act. Several commenters urged modifications that the Commission theoretically could effectuate under the discretionary rulemaking authority of section 7711 of the Act.[27] The largest

number of comments on this section urged the Commission explicitly to exempt messages from not-for-profit entities from the definition of "commercial electronic mail message."[28] It is possible that a message from a nonprofit could meet the definition of "commercial electronic mail message" (e.g., an e-mail message sent by a nonprofit hospital offering medical screening in exchange for a fee). There is no reason that recipients of such an e-mail message should forfeit the protections afforded by CAN-SPAM. Moreover, it is possible—or even likely—that messages between a nonprofit and its members could constitute "transactional or relationship messages" under section 7702(17)(A)(v).[29] Thus, the Commission does not believe there is adequate basis or need to create an across-the-board exemption for e-mail messages initiated by nonprofit entities.

A few comments suggested definitions of the term "spam."[30] In the CAN-SPAM Act, Congress set forth a regulatory scheme built around the defined terms "commercial electronic mail message" and "transactional or relationship message." Because this structure is provided in the Act, it is unnecessary to define the term "spam" in the context of this rulemaking, and the Commission declines to do so.

ECFCU, without offering any definition of its own, recommended that the Commission define the phrase

"reasonably interpreting," used in section 316.3 of the Rule, "to alleviate different interpretations of this term."[31] The Commission believes that definition of this phrase is unnecessary as the plain language is sufficiently clear, especially in light of the fact that a "reasonableness" standard is a basic legal concept that is broadly understood.[32] Finally, two commenters, CIPL and Experian, asked the Commission to add definitions of the terms "advertisement" and "promotion," which are used in the Act's definition of "commercial electronic mail message." The Commission believes these terms are sufficiently clear and declines to add definitions of these terms.

### C. Section 316.3—Primary Purpose Criteria: Four Categories of e-mail Messages With Distinct Criteria for Each

As noted above, section 7702(2)(C) of the CAN-SPAM Act directs the Commission to "issue regulations pursuant to section 7711 of this [Act] defining the relevant criteria to facilitate the determination of the primary purpose of an electronic mail message." The term "primary purpose" comes into play in the Act's definition of "commercial electronic mail message," which is "any electronic mail message the *primary purpose* of which is the commercial advertisement or promotion of a commercial product or service (including content on an Internet Web site operated for a commercial purpose)."[33] Section 7702(2)(B) expressly excludes from the Act's definition of "commercial electronic mail message" messages that meet the definition of "transactional or relationship message,"[34] which also

---

Finally, the FTC does not have jurisdiction over the business of insurance to the extent that such business is regulated by State law. *See* section 2 of the McCarran-Ferguson Act, 15 U.S.C. 1012(b).

[23] Section 7706(b) and (c) of the CAN-SPAM Act authorize Federal agencies other than the FTC to enforce the Act against various entities outside the FTC's jurisdiction.

[24] Proposed Rule 316.2(a), (c)–(n).

[25] Proposed Rule 316.2(b).

[26] 69 FR at 50094.

[27] A handful of comments touched on the definition of "sender," advocating clarification of the multiple-sender issue raised in the ANPR.

Experian; NRF; Adknowledge (alternatively recommending clarification of the definition of "transactional or relationship message"); ESPC (recommending that the definition of "sender" be addressed in this proceeding because the term is related to the "standard associated with primary purpose"). MBA recommended that the Commission "explicitly state that verbal consent is sufficient to comply with the definition of 'affirmative consent' and that definition's requirement for a 'clear and conspicuous' requirement." Baker urged the Commission to expressly define expiration/renewal notices as transactional. As noted in the NPRM, the Commission anticipates addressing issues of discretionary rulemaking, including the definitions of the terms "sender," "affirmative consent," and "transactional or relationship message" in a future **Federal Register** notice, and does not address them here.

[28] *See, e.g.,* AE; Incentive; Independent (requesting clarification in the definition of "transactional or relationship messages" that e-mails sent by a nonprofit to its base constituency will not be considered commercial e-mail); ASAE; AAMFT; NAEDA.

[29] These messages will only be considered "commercial electronic mail messages," and thus subject to greater regulation than transactional or relationship messages, if (1) a recipient reasonably interpreting the subject line of the message would likely conclude that the message advertises or promotes a commercial product or service, or (2) the transactional or relationship content does not appear, in whole or in substantial part, at the beginning of the body of the message.

[30] Schomaker; Cleaver; Anonymous; Dickert.

[31] ECFCU.

[32] *See, e.g.,* the reasonableness element of the Commission's deception standard as articulated in *Cliffdale Assocs., Inc.,* (Deception Statement) 103 F.T.C. 110 (1984): "We examine the practice from the perspective of a consumer acting reasonably in the circumstances."

[33] 15 U.S.C. 7702(2)(A) (emphasis supplied). The Commission's authority to establish "primary purpose" criteria does not include the authority to modify the Act's definition of "commercial."

[34] Section 7702(17)(A) of the Act defines a "transactional or relationship message" as "an electronic mail message the primary purpose of which is—

(i) To facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender;

(ii) To provide warranty information, product recall information, or safety or security information with respect to a commercial product or service used or purchased by the recipient;

(iii) To provide—

(I) Notification concerning a change in the terms or features of;

(II) Notification of a change in the recipient's standing or status with respect to; or

incorporates the term ''primary purpose.'' Generally, CAN-SPAM applies only to messages that fall within the Act's definition of ''commercial electronic mail message.'' [35]

In the August 13, 2004, NPRM, the Commission's proposed criteria to facilitate the determination of when an e-mail message has a commercial primary purpose contemplated three categories of e-mail messages containing ''commercial'' content and applied different criteria to each category. The three categories proposed were: (1) e-mail messages that contain *only* commercial content, (2) e-mail messages that contain both commercial content and content that falls within one of the categories listed in section 7702(17)(A) of the Act (''transactional or relationship content''),[36] and (3) e-mail messages that contain both commercial content and content that is neither commercial nor ''transactional or relationship.'' The first category covered those e-mail messages with only commercial content—''single-purpose messages.'' The second and third categories covered ''dual-purpose messages.'' Commenters supported the proposal's distinction between single-purpose and dual-purpose e-mail messages, and between the two types of dual-purpose e-mail messages.[37] The Commission retains the three categories of messages containing commercial content in the final Rule's primary purpose criteria, and adds a fourth category—e-mail messages containing *only* transactional or relationship content—and provides a criterion for determining the primary purpose of such e-mail messages.[38]

The final Rule, however, slightly modifies the proposed Rule's description of what constitutes ''commercial'' content. Under the proposed Rule, ''commercial content'' was described as ''content that advertises or promotes a product or service.'' [39] This description is based on the Act's definition of ''commercial electronic mail message.'' Under the Act's definition, a commercial e-mail message is an e-mail message ''the primary purpose of which is the *commercial* advertisement or promotion of a *commercial* product or service (including content on an Internet Web site operated for a commercial purpose).'' [40] The key concept from the Act's definition—does the e-mail message advertise or promote a product or service?—was incorporated in the proposal but the repeated references to the term ''commercial'' were omitted.

Three commenters argued that the Commission had erred in dropping these additional inclusions of the term ''commercial'' from its proposed criteria, and urged the Commission to rectify this in its final Rule.[41] These commenters claimed that failing to include these references from the text of the Act could inappropriately broaden the scope of the Act by including individuals sending one e-mail message one time to a single recipient to sell a personal item.[42] These commenters also argued that omitting the word ''commercial'' would improperly bring within the Act's reach ''electronic mail messages that do not promote commercial products or services,'' such as messages from trade groups promoting seminars or other gatherings.[43] Contrary to these commenters' views, however, CAN-SPAM may apply to a trade association's e-mail messages promoting a seminar because a seminar may be considered a ''commercial product or service'' if attendees must pay an admission charge. Nevertheless, as will be discussed in detail below, a trade association's e-mail messages to its members or donors are likely ''transactional or relationship messages'' under the Act even if the messages consist primarily of the commercial advertisement or promotion of a commercial product or service. Commenters offered no other situations where adding the word ''commercial'' before ''advertisement or promotion'' and ''product or service'' alters the definition proposed in the NPRM.

The Commission is persuaded by these comments that the language of the Rule should adhere more closely to the language of the Act to avoid the possibility of overbreadth. Reviewing the matter in light of the comments, the Commission has concluded that the repeated inclusion of the modifying word ''commercial'' in section 7702(2)(A) of the Act is not merely tautological, but evidences an intention to ensure that the CAN-SPAM regulatory scheme would not reach isolated e-mail messages sent by individuals who are not engaged in commerce,[44] but nevertheless seek to sell something to a friend, acquaintance, or other personal contact.[45] To be consistent with the text of CAN-SPAM, under the final Rule, ''commercial'' content is ''the commercial advertisement or promotion of a commercial product or service.'' [46]

---

(III) At regular periodic intervals, account balance information or other type of account statement with respect to, a subscription, membership, account, loan, or comparable ongoing commercial relationship involving the ongoing purchase or use by the recipient of products or services offered by the sender;

(iv) To provide information directly related to an employment relationship or related benefit plan in which the recipient is currently involved, participating, or enrolled; or

(v) To deliver goods or services, including product updates or upgrades, that the recipient is entitled to receive under the terms of a transaction that the recipient has previously agreed to enter into with the sender.''

[35] One provision, section 7704(a)(1), which prohibits false or misleading transmission information, applies equally to ''commercial electronic mail messages'' and ''transactional or relationship messages''; otherwise, CAN-SPAM's prohibitions and requirements cover only ''commercial electronic mail messages.''

[36] See note 34 above.

[37] See, e.g., AAM (with some reservations); BMI; CASRO; ICOP; Reed; SIIA (asking for more guidance). But see Adknowledge; SIA; State Farm (claiming that the proposal's distinctions are inconsistent with the text of the Act and could result in improper regulation of messages that should be outside the scope of the Act). Other commenters argued that one standard should apply to all dual-purpose messages. See, e.g., DoubleClick; ESPC.

[38] See NBC; NetCoalition; NRF (advocating criteria for messages containing only transactional or relationship content). The Commission declines to adopt a fifth category for messages containing commercial content, transactional or relationship content, and content that is neither commercial nor transactional or relationship. See Experian; NBC. The criteria for messages containing both commercial and transactional or relationship content apply to messages of this type.

[39] Proposed Rule 316.3(a)(1). 69 FR at 50106.

[40] 15 U.S.C. 7702(2)(A) (emphasis supplied).

[41] See MPAA; Schwartz; SIA. In addition, many comments submitted by nonprofit entities argued that the Act's repeated references to ''commercial'' in the ''commercial electronic mail message'' definition reflect Congress's intent to exempt messages from nonprofits. See, e.g., AE; Incentive. The Final Rule's application to messages sent by nonprofit entities is discussed in greater detail below. As the Commission explained in the NPRM, the use of the term ''commercial'' in the Act shows intent to regulate messages whose primary purpose is to *sell* something, as distinguished from ''transactional or relationship messages'' and other non-commercial communications. 69 FR at 50100.

[42] See MPAA; Schwartz; SIA.

[43] Schwartz; SIA. See also MPAA.

[44] The Random House College Dictionary defines ''commercial'' as ''of, pertaining to, or characteristic of commerce; engaged in commerce.'' It defines ''commerce'' as ''an interchange of goods or commodities, especially on a large scale; trade; business.'' *Random House College Dictionary* 270 (Revised edition unabridged 1980).

[45] The Act's coverage of single business-to-business e-mail messages is an issue that several commenters addressed. The text of the Act has no business-to-business exemption and does not establish a minimum number of e-mail messages that must be sent before the Act applies. This may invite an interpretation that it regulates such messages as commercial, even when they are not sent in bulk. Nevertheless, a number of commenters advanced equitable arguments for an exemption from CAN-SPAM for isolated business-to-business commercial e-mail messages. See, e.g. MBNA. The Commission has not made any determination regarding this issue, which it intends to review when addressing discretionary rulemaking issues.

[46] See 15 U.S.C. 7702(2)(A). CAN-SPAM's definition of ''commercial'' content does not modify sections 4 and 5 of the FTC Act, which define ''commerce'' and establish the Commission's authority to prevent, among other things, ''unfair or
Continued

According to CAN-SPAM's definition of "commercial electronic mail message," "a commercial product or service" includes "content on an Internet Web site operated for a commercial purpose." [47] By incorporating specifically the Act's definition of "commercial electronic mail message," the final Rule also incorporates that definition's inclusion of "content on an Internet Web site operated for a commercial purpose." Thus, in the text of the final Rule, and throughout this **Federal Register** Notice, every reference to "commercial" content or "a commercial product or service" includes "content on an Internet Web site operated for a commercial purpose." Therefore, an e-mail message's reference or hyperlink to the address of a Web site that is operated for a commercial purpose is "commercial" content under the Act and the final Rule.

1. Section 316.3(a)(1)—Criterion for E-mail Messages That Contain Only Commercial Content

In the NPRM, the Commission proposed that "if an e-mail message contains only content that advertises or promotes a product or service ('commercial content'), then the 'primary purpose' of the message would be deemed to be commercial." Only a few commenters addressed this component of the proposed primary purpose criteria, and those commenters generally supported the Commission's approach.[48] Thus, the Commission adopts a final Rule provision that retains the proposed criterion for determining the primary purpose of an e-mail message containing only commercial content. As was explained above, however, the final Rule's version of this criterion slightly modifies the proposal's description of "commercial content." In the final Rule, commercial content is "the commercial advertisement or promotion of a commercial product or service." Under section 316.3(a)(1) of the final Rule, if an e-mail message contains only commercial content, the "primary purpose" of the message shall be deemed to be commercial.

2. Section 316.3(a)(2)—Criteria for E-mail Messages That Contain Both Commercial Content and "Transactional or Relationship" Content

In the NPRM, the Commission proposed that section 316.3(a)(2) would

set out criteria for determining the primary purpose of messages containing both commercial content and transactional or relationship content. The proposal was that this type of dual-purpose message would have a commercial primary purpose if: "(1) A recipient reasonably interpreting the subject line of the electronic mail message would likely conclude that the message advertises or promotes a product or service; or (2) The electronic mail message's [transactional or relationship content] does *not* appear at or near the beginning of the message." [49] These proposed criteria prompted a substantial number of comments. The Commission has determined to adopt final Rule provisions that retain both criteria, but to make slight modifications to each one. Under section 316.3(a)(2) of the final Rule, if an electronic mail message contains both commercial content [50] and transactional or relationship content, then the primary purpose of the message shall be deemed to be commercial if: (1) A recipient reasonably interpreting the subject line of the electronic mail message would likely conclude that the message contains the commercial advertisement or promotion of a commercial product or service; or (2) the electronic mail message's transactional or relationship content does *not* appear, in whole or in substantial part, at the beginning of the body of the message.[51] In other words, for such a message to be deemed to have a "transactional or relationship" primary purpose, the subject line must

---

[49] Proposed Rule 316.3(a)(2). 69 FR at 50106.

[50] As explained above, the final Rule's description of "commercial" content has been modified to be consistent with the Act's text. Thus, commercial content is "the commercial advertisement or promotion of a commercial product or service."

[51] Several commenters urged the Commission to adopt two additional categories of e-mail messages that may be regulated by CAN-SPAM: messages consisting solely of "transactional or relationship" content, and messages that contain commercial content, transactional or relationship content, and content that does not belong in either category (*e.g.,* informational content). *See* Experian; NBC; NetCoalition; NRF. The Commission has determined to add a fourth category of messages addressed in its primary purpose criteria: those containing only transactional or relationship content. That category and its criterion are discussed below. The Commission declines to adopt a fifth category for messages containing commercial content, transactional or relationship content, and content that is neither commercial nor transactional or relationship. Instead, the Commission has determined that such messages will be evaluated using the criteria for messages containing both commercial content and transactional or relationship content. Thus, the transactional or relationship content, which Congress has identified as especially important to recipients, must appear, in whole or in substantial part, at the beginning of the body of the message for the message not to be deemed to have a commercial primary purpose.

*not* contain a reference to a commercial advertisement or promotion of a commercial product or service *and* the transactional or relationship content *must* appear in whole or in substantial part at the beginning of the body of the message. Both criteria must be fulfilled if a message is to be deemed to have a purpose that is primarily transactional or relationship.

a. Sections 316.3(a)(2)(i) and (3)(i)—The Function of the Subject Line in Determining the Primary Purpose of e-mail Messages Containing Both Commercial Content and Transactional or Relationship Content, or Containing Both Commercial Content and Content That Is Neither Commercial Nor Transactional or Relationship

In the NPRM, the Commission stated: "[T]he subject line is important because consumers reasonably use the information it contains to decide whether to read a message or delete it without reading it. For this reason, *bona fide* e-mail senders likely use the subject line to announce or provide a preview of their messages. These e-mail senders, when they are advertising or promoting a product or service, will likely highlight that fact in their subject lines so that recipients may decide whether to read the messages." [52] The Commission continues to believe that the subject line is a reliable indicator of an e-mail message's primary purpose. The Commission also believes that the subject line criterion has the substantial benefit of being a clear test for e-mail senders to apply to their messages. Several commenters supported the subject line criterion.[53] Visa supported independent evaluation of the subject line "because it assists consumers in deciding whether or not to read a particular e-mail message." Visa agreed that *bona fide* e-mail senders "will highlight in the subject line the principal purpose of the e-mail message," although it recommended substituting a different criterion in place of the proposed net impression standard.[54] NCL stated that the subject line is the first thing a recipient sees and is often the sole basis on which a recipient decides whether to open the

---

[52] NPRM, 69 FR at 50095 (footnotes omitted).

[53] *See* CASRO (requesting additional guidance); NCL; Reed; Visa.

[54] Visa. While generally supportive of the evaluation of the subject line, Visa recommended that the Commission adopt a test for determining the primary purpose of an e-mail message that would evaluate whether the commercial content in an e-mail message was "more important than all other purposes," and "but for" the inclusion of such content, the message would not have been sent.

---

deceptive acts or practices in or affecting commerce." 15 U.S.C. 44 and 45.

[47] 15 U.S.C. 7702(2)(A).

[48] *See* CASRO; ESPC; Keyspan; NCL; Visa.

message or delete it.[55] Reed Elsevier, a publishing and information company, stated that this criterion "while subjective, provide[s] * * * guidance for compliance with the Act." For these reasons, the Commission has adopted a subject line criterion in the final Rule for all dual-purpose e-mail messages that closely tracks the proposed Rule's subject line criterion.[56]

Some commenters claimed that the subject line criterion did not provide enough guidance regarding how CAN-SPAM would apply to e-mail messages that contained commercial content but did not refer to this commercial content in the subject line.[57] Some commenters warned that this criterion should not—indeed, could not—*require* e-mail messages containing commercial content to refer to that content in the subject line.[58] The subject line criterion does not require senders to use a subject line that refers to the message's commercial content.[59] This is necessarily a fact-specific analysis, and a dual-purpose message may use a subject line that is not deceptive and yet does not refer to commercial content.

It is worth noting, however, that section 7704(a)(2) of CAN-SPAM prohibits the use of "a subject heading * * * [that] would be likely to mislead a recipient, acting reasonably under the

circumstances, about a material fact regarding the contents or subject matter of the message (consistent with the criteria used in enforcement of section [5 of the FTC Act])." [60]

CAN-SPAM's focus on subject lines that misrepresent the content or subject matter of the message is in accord with case law developed under section 5 of the FTC Act with respect to deceptive "door-openers." [61] The subject line of an e-mail message serves as a door-opener—an initial contact between a sender and a recipient that typically makes an express or implied representation about the purpose of the contact. Before the recipient views the body of an e-mail message, he or she typically may view the subject line that, as the designation "subject line" implies, announces what the e-mail message concerns. Some senders may be tempted to use misrepresentations in the subject line to induce recipients to

open their messages.[62] These senders would be well advised that CAN-SPAM prohibits using the subject line as an initial contact with consumers to get their attention by misrepresenting the purpose of the contact.

**(1) Commenters' Opposition to the Subject Line Criterion in Determining the Primary Purpose of e-mail Messages Containing Both Commercial Content and Transactional or Relationship Content**

In response to the Commission's proposal, many comments from e-mail senders opposed any standard by which the subject line alone could be the basis for determining the primary purpose of an e-mail message.[63] First, many of these commenters objected to the subject line criterion's focus on a recipient's reasonable interpretation of the subject line; they claimed this was an "unnecessarily subjective" standard.[64] These commenters argued that it would be difficult, costly, and time-consuming to determine how recipients would interpret the subject lines of the commenters' messages.[65] Although senders will need to spend some time evaluating their message's subject line, the Commission believes that these commenters exaggerate the difficulty and expense involved in determining whether recipients will likely interpret the subject line as indicating a message with commercial content. A subject line that indicates that the message contains a commercial advertisement or promotion of a commercial product or service will likely lead a recipient to conclude that the message is commercial, not "transactional or relationship." [66] A

---

[55] *But see* DoubleClick (stating that e-mail recipients rely more on the from line than the subject line when deciding whether to read a message). DoubleClick's data show that one-third of e-mail recipients surveyed consider the subject line to be the most important factor in deciding whether to open a permission-based e-mail. The Commission considers this data as support for its use of the subject line in its primary purpose criteria. It is reasonable to presume that an even greater percentage of consumers rely most on the subject line when deciding whether to open unsolicited messages from unfamiliar senders, when the from line is less useful to recipients.

[56] As explained above, the final Rule's description of "commercial content" has been modified to be consistent with the Act's text. Thus, commercial content is "the commercial advertisement or promotion of a commercial product or service."

[57] *See, e.g.,* Experian; KeySpan; NetCoalition.

[58] *See* Associations; CBA; DMA; Experian; PMA; Wells Fargo. Section 7711(b) of the Act, cited by these commenters, prohibits the Commission from "establish[ing] a requirement pursuant to section 7704(a)(5)(A) * * * to include any specific words, characters, marks, or labels in a commercial electronic mail message, or to include the identification required by section 7704(a)(5)(A) * * * in any particular part of such a mail message (such as the subject line or body)." This criterion, however, does not require any specific content in the subject line of e-mail messages, and is plainly consistent with the Act.

[59] Despite requests from CBA and DMA to add to the Rule's text a statement explaining this point, the Commission believes it unnecessary. *See also* NetCoalition (proposing three tests—"close alignment," "net impression," and "deceptiveness" for determining when a dual-purpose message's subject line should refer to commercial content). These tests do not add materially to the criterion adopted in the final Rule.

[60] Thus, CAN-SPAM specifically applies to the deception jurisprudence the Commission has developed under section 5(a) of the FTC Act. 15 U.S.C. 45(a). The express language of section 7704(a)(2) of CAN-SPAM tracks the deception standard developed in the Commission's cases and enforcement statements, thereby prohibiting subject line content that is likely to mislead a consumer acting reasonably under the circumstances about a material fact regarding the content or subject matter of the message. *Cliffdale Assocs., Inc.* (Deception Statement), 103 F.T.C. 164–5. The framework for analyzing alleged deception is explicated in an Appendix to this decision, reprinting a letter dated Oct. 14, 1983, from the Commission to The Honorable John D. Dingell, Chairman, Committee on Energy and Commerce, U.S. House of Representatives (1984) ("Deception Statement"). Under this framework, actual deception need not be shown, only that a representation, omission, or practice is likely to mislead. *Id.* at 176. *Thiret* v. *FTC,* 512 F.2d 176, 180 (10th Cir. 1975); *Ger-Ro-Mar, Inc.* v. *FTC,* 518 F.2d 33, 36 (2d Cir. 1975); *Resort Car Rental Sys., Inc.* v. *FTC,* 518 F.2d 962, 964 (9th Cir. 1975). The "acting reasonably under the circumstances" aspect of the analysis considers the representation from the perspective of the ordinary consumer to whom it is directed. *Cliffdale* at 177–8. A material fact "is one which is likely to affect a consumer's choice of or conduct regarding a product. In other words, it is information that is important to consumers." *Id.* at 182 (footnotes omitted). Note, however, that section 7704(a)(6) of the Act establishes a definition of "materiality" that is distinct from, but consistent with, the definition articulated in the Deception Statement. The section 7704(a)(6) definition applies only to section 7704(a)(1), which prohibits header information that is "materially false or materially misleading."

[61] "[W]hen the first contact between a seller and a buyer occurs through a deceptive practice, the law may be violated even if the truth is subsequently made known to the purchaser." *Cliffdale Assocs.* (Deception Statement), 103 F.T.C. at 180. *See also Carter Products, Inc.* v. *FTC,* F.2d 821, 824 (5th Cir. 1951); *Exposition Press, Inc.* v. *FTC,* 295 F.2d 869, 873 (2d. Cir. 1961), *cert. denied,* 370 U.S. 917 (1962); *National Housewares, Inc.,* 90 F.T.C. 512, 588 (1977); *Resort Car Rental,* 518 F.2d at 964; *Encyclopaedia Britannica, Inc.,* 87 F.T.C. 421, 497 (1976), *aff'd sub nom. Encyclopaedia Britannica, Inc.* v. *FTC,* 605 F.2d 964 (7th Cir. 1979), *cert. denied,* 445 U.S. 934 (1980).

[62] *See, e.g., FTC* v. *Brian Westby, et al.,* Case No. 03 C 2540 (N.D. Ill. Amended Complaint filed Sept. 16, 2003) (FTC alleged in part that Defendants used deceptive subject lines to expose unsuspecting consumers to sexually explicit material).

[63] *See, e.g.,* ESPC; MBNA; NAR; NBC; NetCoalition; SIIA. *See also* TrustE (stating that using the subject line as an independent criterion would "transform the subject line from a versatile means of communication with customers into a mere rigid legal compliance mechanism," and arguing that independent evaluation of the subject line is "superfluous" because it is highly improbable, though admittedly possible, that commercial content may appear in the subject line and body of an e-mail message, or only in the body of an e-mail message). The Commission believes that the subject line criterion uses what is already true about subject lines—that they highlight the content of a message and that legally they cannot be deceptive—to facilitate the determination of an e-mail message's primary purpose.

[64] MPAA. *See also* CBA; Courthouse; Experian; ICC; MBA; MBNA; SIIA; Visa; Wells Fargo.

[65] *See, e.g.,* Baker; Experian; MPAA.

[66] Applying the Act's definition of "commercial electronic mail message," a subject line also refers to commercial content when it refers to the

Continued

subject line that refers only to one of the categories listed in the Act's definition of "transactional or relationship message" would not lead a recipient to conclude that the message is commercial.[67] The Commission believes that this standard provides the necessary guidance to senders of dual-purpose e-mail messages so that they can, if they wish, compose their messages so that they will be regulated as transactional or relationship messages, and not as commercial messages.

A second group of commenters objecting to the subject line criterion argued that it fails as a "primary purpose" test because it looks at only one component of an e-mail message.[68] According to these commenters, any "primary purpose" test must look at the e-mail message as a whole. The Commission believes that the criteria articulated in section 316.3(a)(2) *do* give appropriate consideration to all relevant elements of an e-mail message. The subject line stands out as a separate part of a message that serves as a preview of the body of the message. As such, it is appropriate to tailor the criteria to accommodate this basic feature of e-mail communication. Congress required the Commission to "defin[e] the relevant criteria to facilitate the determination of the primary purpose of an electronic mail message." [69] The Commission's use of the subject line as one criterion for determining an e-mail message's primary purpose is consistent with this mandate. E-mail recipients can and do rely on a message's subject line as a preview of what the message is about.[70] CAN-SPAM's prohibition on

deception in subject lines ensures the reliability of the subject line as a signal of a message's purpose.[71] Because *bona fide* e-mail senders will use the subject line to highlight the content of their messages, and because CAN-SPAM mandates honest subject lines, then it is proper—and efficient—to conclude that one way to determine the primary purpose of an e-mail message is by looking at the subject line.

A third group of commenters argued that, if the Commission were determined to use the subject line in its criteria, it must look at whether the *primary purpose* of the subject line is commercial.[72] Some commenters in this group argued that this criterion should not look at whether a recipient reasonably interpreting the subject line "would likely conclude that the message contains the commercial advertisement or promotion of a commercial product or service," but should instead look at whether such recipient would likely conclude that the primary purpose *of the message* is commercial.[73] Given the limited space with which e-mail senders operate in the subject line, the Commission believes it is reasonable and practical for the criterion to consider whether a recipient reasonably interpreting the subject line would likely conclude that the message *contains* commercial content, not whether he or she would likely draw any conclusions about the message's *primary purpose*. It would be unworkable to adopt a test that required e-mail senders to weigh the relative importance of a subject line's different references. As explained above, CAN-SPAM ensures that the subject line is a non-deceptive, reliable indicator of an e-mail message's content. If an e-mail sender wants to send a message that will be treated under CAN-SPAM as a transactional or relationship message, the subject line criterion provides a roadmap to arrive at that result (*i.e.*, place only references to transactional or relationship content in the subject line). The same is true of the "placement" criterion discussed immediately below. Before e-mail senders initiate any message, they can know—and control—how their message will be regulated.

A fourth group of commenters claimed the subject line is not a reliable indicator because Internet service providers, by limiting the length of the subject line actually presented to a recipient, may alter how a subject line appears on a recipient's computer in a

manner that is beyond the sender's control.[74] These commenters were concerned that, due to such alteration, a recipient could conclude that the subject line of an e-mail message indicated that the message contained commercial content when the subject line did not so indicate when it left the sender's computer. According to the subject line criterion, that conclusion would mean that a dual-purpose message has a commercial primary purpose. These commenters submitted nothing that shows that, when a subject line refers initially to transactional or relationship content, the subject line could appear to refer to commercial content because of subsequent alteration by a recipient's Internet service provider. Although it may be possible for a subject line to be cut short because of the recipient's e-mail program, it is unlikely that this would change a subject line from referring to transactional or relationship content to referring to commercial content.[75] Moreover, one of the commenters raising this objection acknowledged that senders already take into account ISPs' subject line character limitations.[76] Thus, the Commission has determined not to change the subject line criterion.[77]

---

[67] One commenter, Baker, stated that it would seem "intolerable" for an e-mail sender to have to "worry about the distinction" between a subject line that indicates that a recipient's periodical subscription is about to expire (which would refer to transactional or relationship content) and a subject line that packages such a notification with a reference to a sales pitch to renew the subscription (which would refer to both commercial content and transactional or relationship content). Although CAN-SPAM provides that a notice about subscription status is transactional or relationship content, it does *not* establish that an offer to renew the subscription constitutes transactional or relationship content. As a result, the Act itself dictates this narrow distinction. It is therefore important to examine the subject line to determine the *primary* purpose of a dual-purpose message that refers to both subscription status and a renewal sales pitch. Senders may include the sales pitch in both the subject line and the message, but because this message would have a commercial primary purpose, the sender would have to give recipients an opportunity to opt out of future sales pitches.

[68] *See, e.g.,* ESPC; MBNA; MPAA.

[69] 15 U.S.C. 7702(2)(C).

[70] *See, e.g.,* NCL.

[71] 15 U.S.C. 7704(a)(2).

[72] *See* Associations; CBA; Experian; PMA; Wells Fargo.

[73] *See* BofA; Mastercard; NBC.

[74] *See* DoubleClick; ESPC; TRUSTe.

[75] If a long subject line refers to both transactional or relationship content and commercial content, the recipient would already reasonably conclude that the message contains an ad (and therefore is commercial). Therefore, if a portion of this long subject line is cut off, it would not change the conclusion.

[76] *See* TRUSTe.

[77] MPAA asserted a somewhat related argument that the subject line criterion should not apply when the original recipient of an e-mail message replies to or forwards that message. Specifically, MPAA posed the hypothetical of a message that is initially purely commercial (*e.g.*, a sales pitch) with a "commercial" subject line, but that subsequently takes on transactional or relationship content (*e.g.*, completion of the transaction introduced by the sales pitch) as the two parties to the message reply to each other. According to MPAA, the subject line criterion should not render such a message commercial even if the message retains its original "commercial" subject line. The Deception Statement, which is a lodestar of the subject line criterion's focus on "a recipient reasonably interpreting the subject line," states "when representations * * * are targeted to a specific audience, the Commission determines the effect of the practice on a reasonable member of that group." *See Cliffdale Assocs.* (Deception Statement), 103 F.T.C. at 178, 180. That passage of the Deception Statement provides guidance to senders of messages described by MPAA. While the subject line criterion still applies to business-to-business messages that are replied to or forwarded, senders of such messages may be able to show that a recipient reasonably interpreting the subject line of the message would not likely conclude that the message contains commercial content.

---

commercial advertisement or promotion of "content on an Internet Web site operated for a commercial purpose." 15 U.S.C. 7702(2)(A).

b. Section 316.3(a)(2)(ii)—''Placement'' Criterion for e-mail Messages With Both Commercial Content and Transactional or Relationship Content

Under the Commission's second proposed criterion governing e-mail messages containing both commercial content and transactional or relationship content, this type of dual-purpose message would have a commercial primary purpose if the transactional or relationship content ''does *not* appear at or near the beginning of the message.''[78] Several senders supported this test because it provides clear, objective guidance to marketers.[79] Others opposed it, typically because they felt it does not provide sufficient guidance, especially with respect to the ''at or near the top'' element.[80] A second criticism from a small number of commenters opposed to this approach was that they preferred to be able to provide commercial content first without having their messages be considered commercial e-mail messages.[81] In the final Rule, in response to comments addressing this approach and to provide the clearest standard, the Commission has modified the standard so that an e-mail message will be deemed to have a commercial primary purpose if the transactional or relationship content ''does *not* appear, in whole or in substantial part, at the beginning of the body of the message.''[82] The Commission believes that this placement test provides an objective standard for e-mail senders to comply with, allows for flexibility in message design, and ensures that recipients receive the most important content of a dual-purpose message first.[83] e-mail senders are not required to

*complete* their presentation of transactional or relationship content before providing any commercial content. Once they begin their message with at least some substantial transactional or relationship content, they may then provide commercial content. Use of the term ''substantial'' in this criterion does *not* refer to volume; there is no minimum number of ''transactional or relationship'' characters that must appear at the beginning of the body of the message. Rather, the term ''substantial'' refers to the *nature* of the content. To satisfy this criterion, the transactional or relationship content that appears at the beginning must be something recognizable as transactional or relationship content. For example, if a message's transactional or relationship content is account balance information pursuant to section 7702(17)(A)(iii), a statement providing the recipient's current balance would be substantial, and additional related information (*e.g.*, recent account activity) could be provided below commercial content. On the other hand, merely stating ''Your account'' at the beginning of the message would not be sufficiently substantial. Under this standard, recipients of these messages will be alerted to important transactional or relationship information without having to first wade through advertising.[84]

Finally, in referring to ''transactional or relationship'' content, the proposed Rule used the phrase ''content that *pertains to* one of the functions listed'' in a portion of the rule that tracked, verbatim, the statutory provision that sets out the transactional or relationship categories [15 U.S.C. 7702(17)]. The final Rule uses the narrower and more precise formulation ''transactional or relationship content as set forth in paragraph (c) of this section.''

c. Commenters' Proposals for Determining the Primary Purpose of Messages Containing Both Commercial Content and Transactional or Relationship Content

In the NPRM, the Commission asked commenters to propose alternative criteria to determine the primary purpose of messages containing commercial content and transactional or relationship content. Commenters responded with several proposals that the Commission had already considered and rejected in the NPRM. Some commenters also proposed

modifications to the Commission's existing proposal.

(1) Comments Arguing That the Inclusion of *Any* Transactional or Relationship Content Should Preclude Determination That the Message Has a Commercial Primary Purpose

Approximately 30 comments submitted by e-mail senders argued that dual-purpose messages *necessarily* do *not* have a commercial primary purpose if they contain certain transactional or relationship content, such as billing statements, legally required content, content sent in response to a request from the recipient, ''primarily editorial'' content, and subscription renewals.[85] One commenter simply stated that a message is a ''transactional or relationship message'' if it contains any transactional or relationship content regardless of where it is positioned.[86] CAN-SPAM clearly rejects the hard-and-fast approach advocated by these commenters, which is that any modicum of transactional or relationship content ought to place even an overwhelmingly commercial message beyond the ambit of the modest requirements that the Act imposes on commercial messages. The Act distinguishes between messages the ''primary purpose'' of which is ''commercial'' and messages the ''primary purpose'' of which is ''transactional or relationship.''[87] The concept that some analysis is necessary to determine the ''primary purpose'' of e-mail messages that blend commercial with transactional or relationship content is therefore embodied in the Act. Thus, the text of the Act itself contradicts the commenters' argument that the presence of transactional or relationship content in an e-mail message automatically prevents an e-mail message from being ''commercial.'' The Commission therefore declines to adopt a final Rule that would treat dual-purpose messages as transactional or relationship messages simply because they include any amount of transactional or relationship content appearing anywhere in the message.[88]

---

[78] NPRM, 69 FR at 50106. Of course, if a recipient reasonably interpreting the subject line of such a message would likely conclude that the message contains the commercial advertisement or promotion of a commercial product or service, the message would be deemed to have a commercial primary purpose regardless of where in the message the transactional or relationship content appears.

[79] *See* Keyspan; MBA; MBNA; VCU.

[80] *See, e.g.,* DoubleClick; Experian. Commenters also asked how this standard would apply to messages with ''side-by-side'' presentation of commercial content and transactional or relationship content. *See* NRF; MPAA.

[81] *See, e.g.,* MPAA.

[82] Three commenters requested that the Commission specify that this criterion looks at placement at the beginning *of the body* of the message (as opposed to simply ''the beginning of the message,'' which was proposed in the NPRM). *See* Experian; MBNA; NBC. For clarity, the Commission accepts this suggestion.

[83] CAN-SPAM's definition of ''transactional or relationship message'' includes specific categories of messages that Congress determined to be ones that consumers want to receive. These categories include vital information such as bank account statements, product recalls, transaction confirmations, and warranty information.

[84] A side-by-side presentation of commercial and transactional or relationship content could satisfy this standard.

[85] *See, e.g.,* AeA; Associations; Baker; BofA; CBA; DMA; ERA; MPA; PMA; Schwartz; SIIA; State Farm; Time Warner; Wells Fargo.

[86] Schwartz.

[87] *See* 15 U.S.C. 7702(2); 7702(17).

[88] Similarly, several commenters expressed concern that the Commission not prohibit or discourage dual-purpose messages. *See* DoubleClick; Experian; NBC; NRF; Visa. This concern is unfounded. The Commission does not have the authority to prohibit dual-purpose messages, and the final Rule's criteria for messages containing both commercial content and transactional or relationship content do nothing to
Continued

A number of commenters requested guidance regarding CAN-SPAM's regulation of periodicals (such as newsletters and catalogs) delivered via e-mail, many of which contain information and advertising.[89] The starting point to analyze the impact of CAN-SPAM on a periodical is to consider whether it is sent pursuant to a subscription. When a recipient subscribes to a periodical delivered via e-mail, then transmission of that periodical to that recipient falls within one of the "transactional or relationship message" categories. Specifically, it constitutes delivery of "goods or services * * *" that the recipient is entitled to receive under the terms of a transaction that the recipient has previously agreed to enter into with the sender.[90] This is true regardless of whether the periodical consists exclusively of informational content or combines informational and commercial content.[91]

When a sender delivers an unsolicited newsletter or other periodical via e-mail, and there is no subscription, the situation is materially different for purposes of CAN-SPAM than when such content is delivered with the consent of the recipient. In such a scenario, the content likely would not be "transactional or relationship" within the meaning of section 7702(17)(A)(v). Instead, if the message contains both commercial content and content that is neither commercial nor transactional or relationship, the criteria set out in section 316.3(a)(3) would apply. Under that standard, discussed in detail below, an e-mail message will be deemed to have a commercial primary purpose if either: (1) A recipient reasonably interpreting the subject line would likely conclude that the message contains the commercial advertisement or promotion of a commercial product or service; or (2) a recipient reasonably interpreting the body of the message would likely conclude that the primary purpose of the message is the commercial advertisement or promotion of a commercial product or service.

### (2) Comments Discussing a "Primary Purpose" Criterion Based on Sender's Intent, Such as a "But for" Standard

Some commenters responding to the NPRM advocated "primary purpose" criteria based on the sender's intent.[92] These commenters, repeating arguments the Commission rejected in the NPRM,[93] claimed that a standard based on the sender's intent would be an objective test for marketers.[94] The Commission

disagrees that a sender-intent standard is objective. To the contrary, the sender-intent approach is entirely subjective. As NCL stated: "[N]either recipients nor law enforcement authorities can look into the minds of senders in order to prove whether they intended the messages to be primarily for commercial or other purposes."[95] The Commission agrees with NCL, and notes that a "sender intent" standard would create a difficult problem of proof in law enforcement actions. Such a standard presents the potential for a loophole for spammers, which could nullify CAN-SPAM's protections for e-mail recipients. The Commission's criteria obviate such a loophole.

Some commenters argued that a "sender intent" standard would be more consistent with Congress's intent than the criteria the Commission proposed.[96] According to these commenters, Congress signaled its intent to focus on the sender's intent rather than the recipient's interpretation by using the term "purpose" in the Act. They criticized the Commission's approach as an improper "effect" test rather than a "purpose" test.[97] As the Commission noted in the NPRM, however, CAN-SPAM refers to the primary purpose of the *message*, not of the sender.[98] The primary purpose of an e-mail message may be fairly determined by looking at the sender's intent or the recipient's interpretation. The latter is the better choice because it is consistent with the Commission's approach to analyzing deception in advertising. The "recipient's interpretation" approach also eliminates a vast potential loophole for spammers.

### (3) Comments Proposing Substantial Modifications to the Commission's Proposed Criteria for e-mail Messages Containing Both Commercial Content and Transactional or Relationship Content

Many senders of commercial e-mail advocated their own "primary purpose" standards for e-mail messages containing both commercial content and transactional or relationship content. Some of these commenters proposed that an e-mail message should have to satisfy *both* of the Commission's criteria for this type of dual-purpose message for the message to be deemed to have a commercial primary purpose.[99] In other

---

discourage use of these messages. Moreover, despite the concerns of some commenters, CAN-SPAM does *not* give e-mail recipients the right to opt-out of important transactional or relationship content, such as billing statements. *See* AeA; Associations; CBA; DMA; ERA; PMA; Wells Fargo.

[89] *See, e.g.,* Adknowledge; CBA; CIPL; Courthouse; DMA; NAA; NADA; NAEDA; NCL; NetCoalition; Reardon; Reed.

[90] 15 U.S.C. 7702(17)(A)(v). Determining whether a periodical delivered via e-mail will be deemed to be "transactional or relationship" under 7702(17)(A)(v), however, requires consideration of the recipient's understanding of what he or she is entitled to receive under the terms of the agreed-to transaction. This is not to say that, at the time of the transaction, the sender must give an exhaustive description of what types of content will be included in a periodical that the recipient has requested to receive. The Commission believes that recipients reasonably expect—without having to be told—that a newsletter will contain advertising along with informational content. Nevertheless, the Commission believes that there are limits to such an expectation. If the content that a recipient has requested pursuant to 7702(17)(A)(v) is overwhelmed by commercial content that clearly exceeds what the recipient might reasonably have expected, then the sender cannot persuasively argue that the primary purpose of its message is to deliver content the recipient is entitled to receive under the terms of a previously agreed to transaction. In such a situation, where excessive commercial content could cause recipients to overlook important transactional or relationship content, it would be contrary to Congress's intent to regulate the e-mail message as transactional or relationship rather than commercial.

[91] If, however, an e-mail message consists exclusively of commercial content (such as a catalog or other content that is purely advertisement or promotion), then the e-mail message would be a single-purpose commercial message. This is because delivery of such advertising or promotional content would not constitute the "delivery of *goods or services* * * *" that the recipient is entitled to receive under the terms of a transaction that the recipient has previously agreed to enter into with the sender," as set forth in the relevant portion of the definition of "transactional or relationship message." 15 U.S.C. 7702(17)(A)(v) (emphasis added).

[92] *See, e.g.,* AIA; DMA; ERA; Experian; ICC; Mastercard; MBNA; MPA; PMA; Visa; Wells Fargo. As in the first round of comments, many of these commenters argued in favor of a "but for" sender-intent standard: a message would not have a commercial primary purpose unless the message would not have been sent but for its commercial content. *See, e.g.,* ERA; MBNA; Mastercard; ACLI; SIA. Under this standard, a message with both transactional or relationship content (*e.g.,* a billing statement) and advertising would never have a commercial primary purpose; according to these commenters, it would always be true that the transactional or relationship portion of the message would have been sent with or without accompanying ads. This standard, in effect, establishes that a message is by definition a transactional or relationship message if it contains *any* transactional or relationship content. The Commission declines to adopt this approach because it is clearly inconsistent with the text of the Act. ABM raised a different concern with the "but for" approach: "[I]f a 'but for' test were applied to the senders of electronic newsletters, who are certainly not intended to fall within the Act's ambit, they could very well fail * * *. Would they distribute these newsletters * * * 'but for' the advertising? In many cases, they would not." The final Rule's criteria do not regulate subscription-based newsletters—and most unsolicited *bona fide* newsletters—as commercial messages.

[93] *See* 69 FR at 50098.

[94] *See* ICC; Wells Fargo.

[95] NCL.

[96] *See, e.g.,* MBNA.

[97] *See* Adknowledge; AIA; Associations; CBA; DMA; Experian; MBNA; MPA; NBC; PMA; Time Warner; Wells Fargo.

[98] *See* 69 FR at 50098.

[99] *See* ACB; CBA; ESPC; Experian; Mastercard; MBNA; NBC; Wells Fargo. According to MBNA,

words, this type of dual-purpose message would have a commercial primary purpose only if (1) a recipient reasonably interpreting the subject line would likely conclude that the message contained commercial content, *and* (2) the transactional or relationship content did not appear, in whole or in substantial part, at the beginning of the body of the message.[100] Some advocates of this approach claimed it would be more consistent with Congress's intent than the Commission's approach.[101]

The Commission believes that its criteria better preserve recipients' right to opt out of messages that are ''primarily'' commercial and that they therefore better fulfill Congress's intentions. Under the commenters' approach, if the subject line referred to transactional or relationship content, the e-mail message would always be considered ''transactional or relationship.'' (As noted above, under their approach, both subject line *and* placement criteria must be met before the message would be considered commercial.) Yet, the e-mail message may open with a substantial amount of unsolicited advertising and close with an extremely small amount of transactional or relationship content. Recipients could easily overlook the important transactional or relationship content that is at the end (or buried in the middle) of a long message that contains an overwhelming amount of advertising. Recipients would understandably be frustrated if they did not have the right to opt out of these overwhelmingly commercial messages. e-mail senders could therefore continue to send these messages under the guise of transactional or relationship messages without giving recipients the right to opt out.[102] Because the Commission's approach examines the subject line and

placement independently, it treats these messages as ''commercial'' and therefore preserves recipients' right to opt out of these messages. Therefore, the Commission declines to adopt the commenters' suggested change to the criteria.

Other commenters proposed that the Commission reformulate the ''primary purpose'' criteria as a safe harbor.[103] As described by one of these commenters, ''[f]or e-mail messages containing both commercial and transactional or relationship content there could be a safe harbor whereby the message would be deemed not to have a commercial primary purpose if either: (1) The subject line of the e-mail referred to the transactional or relationship content, or (2) the transactional or relationship content appeared at or near the beginning of the e-mail message. * * * In the event that a marketer opted not to take advantage of the safe harbor, its dual purpose e-mail messages would be viewed on the basis of the net impression of the message as a whole on the reasonable consumer.'' [104]

Under this alternative, as long as the subject line included any reference to transactional or relationship content, a message would not have a commercial primary purpose even if a recipient reasonably interpreting the subject line would likely conclude that the message contained commercial content. A message would not have a commercial primary purpose even if it opened with a block of commercial content and closed with a mere line of transactional or relationship content, provided the subject line referred to transactional or relationship content. These results abandon CAN-SPAM's dual objectives to enable recipients to opt-out of unwanted commercial content and to ensure that recipients receive important transactional or relationship content. The Commission's criteria, on the other hand, protect the opt-out rights that CAN-SPAM created and encourage e-mail senders to present transactional or relationship content with sufficient prominence to ensure that recipients will notice it. At the same time, the Commission's criteria allow e-mail senders, before initiating any message, to determine with a fair level of certainty whether CAN-SPAM will regulate the message as commercial or ''transactional or relationship.'' These senders simply need to satisfy themselves of two things: that a recipient reasonably interpreting the subject line of the message will not likely conclude that the message

contains commercial content; and that the transactional or relationship content appears, in whole or in substantial part, at the beginning of the body of the message.

Some commenters suggested determining the primary purpose of messages containing both commercial content and transactional or relationship content by applying a ''net impression'' standard.[105] The Commission believes this is the appropriate standard for e-mail messages containing both commercial content as well as content that is neither commercial nor transactional or relationship. There are material differences between the two types of dual-purpose messages, however, that support applying different criteria to each type. Spammers are notorious for unsolicited messages combining commercial content and content that is neither commercial nor transactional or relationship—nonsensical, random words, quotations, aphorisms, and the like.[106] These messages require a flexible standard, such as the ''net impression'' approach, because a standard focusing only on a recipient's reasonable interpretation of the subject line and the placement of non-commercial content within the body of the message would simply give spammers *carte blanche* to evade CAN-SPAM. e-mail messages with transactional or relationship content, on the other hand, provide content that Congress has identified as important to recipients.[107] The most efficient way to ensure that recipients get this important content is to require that it be placed, in whole or in substantial part, at the beginning of the body of the message. Thus, the Commission declines to adopt criteria that would apply a ''net impression'' test to messages containing both commercial content and transactional or relationship content.

---

''[t]he net effect * * * would be to shift the presumption from favoring a commercial content finding to one more favorable to a finding of TRM [transactional or relationship message].''

[100] The Commission's approach is that a message has a commercial primary purpose if *either* of the two criteria is met.

[101] *See, e.g.,* CBA; MBNA.

[102] Alternatively, an e-mail message may contain a subject line that refers only to commercial content. If the transactional or relationship content is placed at the beginning of the body of the message, under the commenters' approach, this is a transactional or relationship message, and recipients do not have the right to opt out. However, recipients reading the subject line may expect the message to contain *only* commercial content. They may delete the message without reading it or only casually review the body of the message if they are not expecting anything more than just advertising. Again, they may inadvertently overlook the important transactional or relationship content. If this occurs, recipients may be frustrated by not having an ability to opt out of future similar messages.

[103] *See* Associations; ERA; ITAA; MPA; PMA.
[104] ERA.

[105] *See* DoubleClick; ESPC; NetCoalition; Experian; MPA. Under this approach, an e-mail message has a commercial primary purpose if the net impression created by the message is that it has a commercial primary purpose.

[106] In the NPRM, the Commission labeled these messages ''Shakespearean sonnet'' spam and discussed how its criteria would regulate such messages as ''commercial'' under the Act. *See* 69 FR at 50101.

[107] Moreover, unlike spammers, these senders already have a business relationship with their recipients, so the likelihood of consumer harm is reduced. *See* NPRM, 69 FR at 50096. As a result, an objective test is proper because there is little risk that these senders will abuse it.

3. Section 316.3(a)(3)—Criteria for e-mail Messages That Contain Both Commercial Content and Content That Is Neither Commercial Nor ''Transactional or Relationship''

In addition to the subject line criterion applicable to all dual-purpose messages, discussed above, the NPRM proposed a separate criterion to determine the primary purpose of a message that contains commercial content and content that is neither commercial nor ''transactional or relationship'' in nature. This criterion would come into play for messages with subject lines that likely would not prompt a recipient to conclude that the message advertises or promotes a product or service. In such a case, the primary purpose of the message still would be deemed to be commercial if a recipient reasonably interpreting the *body* of the message would likely conclude that the primary purpose of the message is to advertise or promote a product or service. The proposed Rule listed several factors illustrative of those relevant to this interpretation, including the placement of content that advertises or promotes a product or service at or near the beginning of the body of the message; the proportion of the message dedicated to such content; and how color, graphics, type size, and style are used to highlight commercial content.[108]

The following is an example of how the ''net impression'' criterion for the body of an e-mail message would be applied along with the separate subject line criterion. Consider a newsletter sent to consumers with whom the sender had no previous dealings. Because the newsletter is not sent pursuant to a subscription or similar arrangement whereby the recipient has agreed to receive such content, the message does not constitute transactional or relationship content.[109] Instead, the primary purpose of the message would be determined by considering whether (1) ''a recipient reasonably interpreting the *subject line* of the electronic mail message would likely conclude that the message contains the commercial advertisement or promotion of a commercial product or service,'' or (2) if ''a recipient reasonably interpreting the *body* of the message would likely conclude that the primary purpose of the message is the commercial advertisement or promotion of a commercial product or service.''

Based on the record in this proceeding, the Commission has adopted the proposed Rule provision with minor changes, including substituting, in section 316.3(a)(3)(ii), the phrase ''the commercial advertisement or promotion of a commercial product or service,'' in place of the phrase ''that advertises or promotes a product or service.''[110] Finally, the phrase ''at or near'' in section 316.3(a)(3)(ii) is replaced by the phrase ''in whole or in substantial part at'' to clarify the meaning of the placement factor in the net impression analysis.

A number of commenters responded to proposed section 316.3(a)(3)(ii). The general themes that emerged from the comments are discussed in detail below. A few commenters supported the approach taken in the proposed section 316.3(a)(3)(ii). These commenters acknowledged that it is important that the Rule not permit senders of e-mail messages to evade CAN-SPAM simply by adding ''padding'' to their messages to dilute their commercial nature and thereby escape regulation.[111] AeA noted that its ''member companies generally treat e-mails in this category as 'commercial,' and would follow CAN-SPAM requirements.''[112] Some of these commenters, while generally supportive of the approach taken in the proposal, recommended modification to portions of the net impression component of the test.[113]

The vast majority of commenters who addressed this issue did so with at least some reservations.[114] For example,

NFCU endorsed the approach, but recommended eliminating the reference to color, graphics, type size, and style as factors illustrative of those used in evaluating the net impression of a message.[115] Others noted with approval the use of the net impression standard in the proposed Rule, but recommended that the test be revamped to focus on the message as a whole, rather than singling out the subject line for special consideration, and then considering the net impression of the body of the message.[116] As discussed in detail above, the Commission has determined that independent evaluation of the subject line of an e-mail message is appropriate in determining the primary purpose of the message, and has therefore determined to retain this criterion, rather than merely including it as one of the factors to be considered under the net impression analysis.[117]

Other commenters expressed concern that the net impression test was flawed because it depends on the effect of the message on the recipient rather than the intent of the sender.[118] As noted in the NPRM, CAN-SPAM ''refers to the primary purpose of the *message*, not of the sender.''[119] Thus, the Commission is not bound to use a sender intent standard in setting forth criteria by which the primary purpose of an e-mail message is determined. Moreover, as discussed above, any test to determine the intent of a sender would be at least as subjective as the reasonable recipient standard.[120] It also would be contrary to the basic approach underlying consumer protection law, which typically evaluates the impact of marketing and advertising from a reasonable consumer's perspective.[121] Indeed, marketers have long been under an obligation to evaluate their advertising material from the reasonable consumer's perspective and determine what impression the material makes on consumers. The adoption of a reasonable recipient standard in this

---

[108] Proposed Rule 316(a)(3).

[109] That is, the message is not ''goods or services * * * that the recipient is entitled to receive under the terms of a transaction that the recipient has previously entered into with the sender.'' 15 U.S.C. 7702(17)(A)(v).

[110] As noted, similar modifications have been made in other portions of the Rule that describe ''commercial content.'' Specifically, in the preamble to 316.3(a)(3), the Commission has substituted the phrase ''the commercial advertisement or promotion of a commercial product or service'' for the phrase ''advertises or promotes a product or service,'' and in 316.3(a)(3)(i), the phrase ''message contains the commercial advertisement or promotion of a commercial product or service'' is substituted for the phrase ''advertises or promotes a product or service.''

[111] *See, e.g.,* NFCU: CASRO.

[112] AeA (noting, however, its request that the subject line of an e-mail message not be independently evaluated in determining the primary purpose of the message).

[113] *See, e.g.,* NFCU. (NFCU's concern is addressed below in the section discussing the net impression criteria.)

[114] One commenter urged that an e-mail message containing merely an incidental brand reference in the subject line not be deemed to be commercial. The standard set forth in the final Rule criterion regarding the subject line makes clear that the content of the subject line is evaluated from the perspective of a ''recipient reasonably interpreting the subject line of the electronic mail message'' and turns on whether such a recipient ''would likely conclude that the message contains the commercial

advertisement or promotion of a commercial product or service.''

[115] NFCU (expressing concern that these factors were sometimes beyond a sender's control. These arguments are discussed in detail below).

[116] DoubleClick; TrustE; ESPC.

[117] *See* discussion of subject line criterion above; NPRM, 69 FR at 50095.

[118] MBNA.

[119] NPRM, 69 FR at 50098.

[120] *See* discussion above of comments proposing that the primary purpose of an e-mail message be determined by evaluating the sender's intent.

[121] NPRM, 69 FR at 50096–97. *But see* MPAA (expressing the concern that relying on the impression of a reasonable recipient is vague and subjective).

Rule, then, is consistent with Commission precedent.

Some commenters suggested that if the Commission were to retain this standard, that a safe harbor be created as well to protect companies "that undertake a good-faith effort to comply with the rules * * *"[122] "The Commission declines to include a safe harbor in the final Rule because it is unpersuaded by the record or the circumstances that such a provision is warranted and necessary in this instance. A safe harbor is appropriate to prevent liability from being unfairly applied to an entity, which errs despite its genuine attempts to comply with the provisions of a rule, usually due to circumstances beyond its control, and would be subject to liability for what essentially amounts to a mistake, but for the safe harbor provision.[123] In the view of the Commission, the criteria for determining the primary purpose of an e-mail message are set forth with clarity in the final Rule, thus making it unlikely that a company striving to be in compliance will err in appropriately categorizing the content it sends via e-mail.

Finally, MPA criticized the proposal, opining that it will restrict senders of commercial and "other" content from referring to a product or service in the subject line or including third-party advertisements at or near the top of the message or in "exciting eye catching graphics and text" if they intend to avoid regulation as commercial messages under the proposed Rule.[124] MPA further criticized reliance on the factors "irrespective of the overall content of the e-mail when viewed in its totality." This reflects a misunderstanding of section 316.3(a)(3)(ii). Indeed, the net impression standard seeks expressly to evaluate the message *in its totality*, looking to the impression the entire e-mail message makes on a reasonable recipient. If a sender prominently places advertising near the top of the body of an e-mail message, and draws attention to this content (over the other content in the message), then the net impression of the e-mail message in its totality may be that the message is commercial. The consequence of this determination is

that the message will have to include an opt-out mechanism and otherwise comply with CAN-SPAM. However, nothing would prohibit the sender from formulating the message in a way that has a different result. Although this is necessarily a fact-based analysis, the Commission has derived the net impression standard from its traditional analysis of advertising under the FTC Act,[125] and believes it is one with which advertisers are already familiar and able to comply.

A few comments focused on the specific factors set forth in the proposed Rule as illustrative of those that can be used to determine the net impression of an e-mail message. These factors include the placement of content that advertises or promotes a product or service at or near the beginning of the body of the message; the proportion of the message dedicated to such content; and how color, graphics, type size, and style are used to highlight the commercial content.[126] CASRO endorsed these factors, stating that "[t]he structure of an e-mail message is the clearest and most direct manifestation of the sender's intent."[127]

NAR sought clarification of the net impression factor regarding placement of content that advertises or promotes a product or service at or near the beginning of the body of the message, noting that "it is now commonplace to create an e-mail message that is formatted like a Web page using similar multi-layered commercial and noncommercial text. Sidebars that contain commercial and noncommercial content and span the full length of the e-mail message are regularly used in web-like e-newsletter messages."[128] Similarly, NRF noted that it is common to place banner advertising lengthwise down one side of a dual purpose e-mail message, and expressed concern about whether the placement of these advertisements "at or near the top" of the message would mean that they would be viewed as commercial rather than transactional.[129]

As noted above in the section discussing the placement standard for e-mail messages containing commercial and transactional or relationship content, the Commission wishes to

provide the clearest possible standards in the final Rule to facilitate compliance. Thus, in response to the concerns raised by commenters regarding possible confusion over the proposed Rule's "at or near the top" placement factor within the net impression analysis, the Commission has modified this language. In the final Rule, the phrase "at or near the top" has been replaced by the phrase "in whole or in substantial part, at * * *." In addition, as noted above, the term "commercial" has been added as a modifier of the terms "advertisement or promotion" and "product or service," to conform the text of the final Rule to that of the Act.

NAR also sought clarification regarding the net impression factor that looks to the proportion of the message dedicated to such content. In its comment, NAR urged the Commission to provide compliance guidance that would elucidate the proportion of an e-mail devoted to commercial advertisement or promotion that would cause an e-mail message to be viewed as commercial. As noted in the NPRM, the Commission rejects a "rigidly mechanical 'proportion' standard for determining the primary purpose of a message" because such a standard could easily be evaded by those seeking to avoid regulation under CAN-SPAM.[130] Nonetheless, the Commission believes that the proportion of the message devoted to commercial content versus "other" non-commercial, non-transactional or relationship content is a factor relevant to the analysis a reasonable recipient will engage in to determine the primary purpose of a message. The greater the proportion of a message devoted to commercial advertisement or promotion of a commercial product or service, the more likely the balance will tip toward classification of the entire message as commercial.

NAR also requested clarification regarding the extent to which color, graphics, type size, and style will influence the determination that a particular e-mail message is commercial, and whether each would be considered independently or the factors would be considered as a whole.[131] As with the evaluation of advertising claims under FTC jurisprudence, these factors—color, graphics, type size, and style—will be evaluated as part of "the

---

[122] Verizon; Keyspan (incorporate sender's intent as a factor in the analysis, as well as adding safe harbor to protect those "not purposefully or intentionally trying to evade the CAN-SPAM Act.").

[123] *See, e.g.*, 16 CFR 310.4(b)(3) (do not call safe harbor in Telemarketing Sales Rule) and 16 CFR 310.4(b)(4) (call abandonment safe harbor in Telemarketing Sales Rule).

[124] MPA. *See also* ABM (seeking clarification that ancillary advertising sent along with "other" content in an e-mail message will not necessarily make a message commercial).

[125] 69 FR at 50096.

[126] Proposed Rule 316.3(a)(3)(ii).

[127] CASRO (but recommending explicitly adding sender intent as an additional net impression factor to discourage those who might deliberately structure a message to confuse recipients about its purpose, such as advertisements designed to look like surveys).

[128] NAR. *But see* CASRO (supporting the placement factor).

[129] NRF.

[130] NPRM, 69 FR at 50098.

[131] NAR.

entire mosaic, rather than each tile separately.'' [132]

NFCU recommended eliminating this criterion altogether because the formatting of the message text is beyond the sender's control in instances where, for example, an e-mail message sent in HTML format may be converted to plain text by the recipient's e-mail program, altering the sender's original formatting. The comments merely asserted that conversion of an e-mail message by an ISP or a recipient's e-mail program could result in a message that was non-commercial in its HTML form becoming commercial once it is converted to plain text. However, as NCL points out, ''no matter what media they use, marketers spend considerable time and resources trying to anticipate how consumers will react to all aspects of their advertisements, including the placement of information, type size and style, wording, color, graphics, etc.'' [133] Because senders want to effectively communicate their message to recipients, it seems likely that they consider the result if an e-mail message in HTML format is converted to plain text. Moreover, if an e-mail message is sent in HTML format, but then converted to plain text by the recipient's e-mail client, the text will be converted to the default font, color and size set by the client. There is no evidence to support the assertion that this conversion process could result in commercial text being *emphasized*. Thus, the Commission declines to eliminate from the net impression test the factor focusing on whether commercial content is highlighted.

A small number of commenters also addressed the issue of whether the identity of the sender should be considered in determining the primary purpose of an e-mail message. CASRO suggested adding the identity of the sender to the net impression factors in the Rule noting that ''[t]he sender's identity could provide critical information as to the nature of its business or non-commercial activities * * * .'' [134] NCL advocated a different approach: if a message containing commercial and ''other'' content is sent by a for-profit entity, then the message would be automatically deemed

commercial, but if it is sent by a not-for-profit, the primary purpose of the message would be determined by the impact of the message on a reasonable recipient. [135] The Commission finds that the comments provide insufficient basis to add an express statement in the final Rule that the identity of the sender will be a factor in the net impression analysis. However, it bears noting that the current factors are illustrative, and that other factors, including the identity of the sender, may be considered in making a determination as to the net impression of an e-mail message.

Finally, some commenters addressed the question of deceptive advertising format. In the NPRM, the Commission noted that it declined to evaluate the status of an e-mail message based solely on the intent of the sender, but highlighted the possibility that sender intent could be useful in ensuring coverage when a sender structures a commercial e-mail message in such a way as to deceive the recipient into believing that a message is non-commercial. NetCoalition strongly objected to the idea that sender's intent could impact on whether an e-mail message is commercial or not, stating ''[s]uch a test is inappropriate, because it undermines the Net Impression test, sows enforcement uncertainty, is unfair to senders by not rewarding senders who have positive intentions when sending messages, and could discourage companies from adopting a robust CAN-SPAM compliance program because of the fear that actions intended to comply with CAN-SPAM could be wrongly construed as 'deliberately structuring.' '' [136] On the other hand, CASRO advocated looking at sender intent in this context, noting that some e-mail senders deliberately structure their messages to appear to be legitimate surveys when, in fact, they are advertising or promoting products or services. [137] After considering the comments, the Commission declines to include sender intent as a component of the net impression analysis because the benefits of including such a provision are outweighed by the risk that such a factor could erroneously cause non-commercial messages to be categorized as commercial. For example, a *bona fide* periodical delivered via e-mail consisting of informational content sponsored by commercial content likely will not have a commercial primary purpose under the final Rule's criteria. If the sender's intent was part of this analysis, however, such a message could

be considered to have commercial primary purpose if the sender would not have transmitted the message without the commercial content. In such a situation, the commercial content could be considered essential, and, thus, it may appear that the sender intended the commercial content to be primary.

On the other hand, spammers may try to evade CAN-SPAM by presenting the commercial content of their e-mail messages in the guise of informational content, deliberately structuring their messages to create the mistaken impression in the minds of reasonable recipients that the messages do not have a commercial primary purpose. A spammer might try to argue that, applying the Commission's criteria, CAN-SPAM does not cover such a message, because a recipient reasonably interpreting the message would not likely conclude that the primary purpose of the message is commercial. The Commission believes this strategy may tempt some spammers, although it is unclear whether e-mail messages are as conducive to deceptive format ploys as are other media. [138] In any event, if a sender deliberately structures his message to create a false impression that the message does not have a commercial primary purpose, the message should be considered to have a commercial primary purpose under the final Rule's criteria. In the Commission's view, if a message's entire design is to disguise commercial content as non-commercial content, the message is commercial. [139]

---

[132] *Cliffdale Assocs.* (Deception Statement), 103 F.T.C. at 181, citing and quoting *FTC* v. *American Home Products*, 695 F.2d 681, 688 (3rd Cir. 1982). Entities subject to the final Rule may also find it useful to review the Commission's Dot Com Disclosure Guide (available online at *http://www.ftc.gov/bcp/conline/pubs/buspubs/dotcom/*) for guidance on the applicability of the Commission's net impression standard to online advertising media.

[133] NCL.

[134] CASRO.

[135] NCL.

[136] NetCoalition.

[137] CASRO.

[138] In other contexts, such as direct mail marketing, the Commission has sued marketers for violating the FTC Act because they disguised their sales pitches as informational content. The Commission recently filed a complaint against A. Glenn Braswell and four of his corporations alleging, among other things, that the defendants used deceptive advertising formats (including advertising material portrayed as an independent health magazine) to market their products. *See FTC* v. *A. Glenn Braswell, et al.*, No. CV 03–3700 DT (PJWx) (C.D. Cal. filed May 27, 2004). For other deceptive format enforcement actions brought by the Commission, *see FTC* v. *Direct Mktg. Concepts, Inc.*, Civ. No. 04–11136–GAO (D. Mass. filed June 1, 2004); *Mega Sys., Int'l., Inc.*, 125 F.T.C. 973 (consent order) C–3811 (June 8, 1998); *Olsen Laboratories, Inc.*, 119 F.T.C. 161 (consent order) C–3556 (Feb. 6, 1995); *Wyatt Mrktg. Corp.*, 118 F.T.C. 86 (consent order) C–3510 (July 27, 1994); *Synchronal Corp.*, 116 F.T.C. 989 (consent order) D–9251 (Oct. 1, 1993); *Nat'l. Media Corp.*, 116 F.T.C. 549 (consent order) C–3441 (June 24, 1993); *CC Pollen Co.*, 116 F.T.C. 206 (consent order) C–3418 (March 16, 1993) (consent order); *Nu-Day Enterprises, Inc.*, 115 F.T.C. 479 (consent order) C–3380 (Apr. 22, 1992); *Twin Star Productions*, 113 F.T.C. 847 (consent order) C–3307 (Oct. 2, 1990) (consent order); *JS&A Group, Inc.*, 111 F.T.C. 522 (consent order) C–3248 (Feb. 24, 1989).

[139] *See* final Rule 316.3(a)(1): ''If an electronic mail message consists exclusively of the commercial advertisement or promotion of a commercial product or service, then the 'primary purpose' of the message shall be deemed to be commercial.''

The Commission will use other tools in its law enforcement arsenal, specifically section 5 of the FTC Act, to combat the practice of using a deceptive advertising format in e-mail.

a. Alternate Approaches Suggested by Commenters

A handful of alternative proposals were suggested by commenters. MBNA suggested framing the test in terms of when messages are non-commercial and non-transactional/relationship rather than in terms of when they are commercial.[140] Specifically, MBNA recommended that the primary purpose of an e-mail message be deemed to be non-commercial if the "other" (*i.e.*, non-commercial, non-transactional/relationship) content is referenced in the subject line, and begins to appear at or near the beginning of the message. The test proposed by MBNA includes the inverse of the subject line criterion in the proposed Rule, but eliminates the net impression criterion in favor of a placement standard, such as that used in evaluating e-mail messages containing commercial and transactional or relationship content.

The final Rule determines whether an e-mail message is commercial based on a reasonable recipient's interpretation of the subject line, and, if necessary, the net impression made by the body of the message. Therefore, if the subject line of a dual-purpose message only references the "other" content included in the message, then the recipient could not reasonably interpret the subject line as commercial. Rather, a recipient would reasonably view it as "other." Substituting the inverse test proposed by MBNA would not materially modify this analysis, but rather would add a duplicative criterion for determining when a subject line refers to "other" content. The Commission declines to add this criterion as it is unnecessary.

The Commission also rejects MBNA's suggestion regarding the use of a "placement only" test in lieu of the net impression standard. As discussed above, the placement criterion is used to evaluate dual-purpose e-mail messages that involve commercial content and transactional or relationship content. An objective test that focuses only on placement of the transactional or relationship content at the beginning of the message is proper because Congress identified this content as being important to consumers.[141] Based on the record, the Commission does not believe

the placement standard is appropriate for dual-purpose messages that combine commercial content and non-commercial, non-transactional/relationship content. In this context, an objective placement standard would give spammers the ability to easily structure even primarily commercial e-mail messages in a way to evade CAN-SPAM. For example, if the sender placed paragraphs of random words at the beginning of a message, and then followed them with a one-line link to a commercial Web site, under a placement analysis, this message would not be commercial. However, under the more flexible net impression test, a reasonable recipient would likely conclude that the primary purpose of the message is commercial. Therefore, the Commission continues to believe that the net impression standard will be a more effective means of determining the primary purpose of messages that contain commercial and "other" content, and therefore, declines to make the suggested modification.

Experian suggested making the test conjunctive by joining the subject line and net impression criteria clauses with an "and" rather than an "or." For this type of dual-purpose message to be considered commercial under Experian's proposal, a reasonable recipient would need to interpret the subject line of an e-mail message as demonstrating that a message is commercial *and* conclude that the primary purpose of the body of the message is the commercial advertisement or promotion of a commercial product or service. The Commission declines to frame the test in this way, because it believes that the subject line is of independent importance to recipients as they review the e-mail they receive. As noted in the NPRM, recipients rely upon the content of the subject line in determining whether to open and read a message, or delete it.[142] Therefore, the final Rule retains the two-part test for evaluating the primary purpose of e-mail messages containing both commercial and "other" content.

4. Criteria for E-mail Messages Containing Only Transactional or Relationship Content

As discussed in detail above, the proposed Rule included a provision addressing how to determine the primary purpose of an e-mail message that contains only commercial content, as well as provisions dealing with two types of dual purpose messages: (1) Those containing commercial plus

transactional or relationship content, and (2) those containing commercial plus "other," non-transactional or relationship content.[143] The proposed Rule, however, did not include a provision addressing how an e-mail message containing only transactional or relationship content would be treated under the Rule.

A small number of commenters raised this omission, and sought clarification regarding the treatment of an e-mail message that contains only transactional or relationship content.[144] In response, the final Rule contains an additional provision that focuses specifically on those e-mail messages that contain only transactional or relationship content. Specifically, section 316.3(b) of the final Rule states:

In applying the term "transactional or relationship message" defined in the CAN-SPAM Act, 15 U.S.C. 7702(17), the "primary purpose" of an electronic mail message shall be deemed to be transactional or relationship if the electronic mail message consists exclusively of transactional or relationship content as set forth in paragraph (c) of this section.

By including this provision, the Commission believes at least two purposes are served. First, the mandate of the CAN-SPAM Act is carried out. The Act requires that the Commission set forth regulations defining the criteria by which the primary purpose of an e-mail message may be discerned. This "primary purpose" language is found in the Act in both the definition of "commercial electronic mail message"[145] and the definition of "transactional or relationship message."[146] Therefore, for the sake of symmetry, the Commission has included parallel provisions in the final Rule that address both purely commercial and purely transactional or relationship messages.

Secondly, the inclusion of this provision is directly responsive to commenters who expressed concern that, without it, certain transactional messages could be mis-categorized as commercial under the dual purpose test for commercial plus transactional messages.[147] The text of section 316.3(b) of the final Rule clarifies for industry members their obligations when sending messages that contain exclusively content that falls into one or more of the

---

[140] MBNA.

[141] Because these senders have a business relationship with their recipients, the likelihood of consumer harm is reduced. *See* NPRM, 69 FR at 50096.

[142] NPRM, 69 FR at 50095.

[143] *See* proposed Rule sections 316.3(a)(1) (commercial only); 316.3(a)(2) (commercial plus transactional or relationship) and 316.3(a)(3) (commercial plus "other," non-transactional or relationship).

[144] *See, e.g.*, NetCoalition.

[145] 15 U.S.C. 7702(2).

[146] 15 U.S.C. 7702(17).

[147] *See, e.g.*, NetCoalition; NRF.

transactional or relationship categories set forth in section 316.3(c) of the final Rule. Specifically, such messages are deemed to have a primary purpose that is transactional or relationship and, thus, are subject to only the Act's prohibition against false or misleading transmission information.[148] The Commission believes that this clarification will ease the compliance burden for those senders who transmit exclusively transactional or relationship content, and will better effectuate the mandate of the Act.

Therefore, the final Rule includes section 316.3(b) to ensure that messages containing only transactional or relationship content are categorized as such.

5. Commenters' Constitutional Challenges to the Commission's Criteria Facilitating the Determination of an e-mail Message's Primary Purpose

Commenters' constitutional arguments addressed two primary aspects of CAN-SPAM's regulation of e-mail messages: whether the *Act's regulation* of e-mail is constitutional, and whether the *Commission's criteria* for determining whether the primary purpose of an e-mail message is commercial under CAN-SPAM are constitutional.

a. The Constitutionality of CAN-SPAM

Some commenters claimed that CAN-SPAM cannot withstand First Amendment scrutiny.[149] In *Central Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of New York,* 447 U.S. 557 (1980), the Supreme Court established the applicable analytical framework for determining the constitutionality of a regulation of commercial speech that is not misleading and does not otherwise involve illegal activity. Under that framework, the regulation: (1) Must serve a substantial governmental interest; (2) must directly advance this interest; and (3) is not more extensive than necessary to serve the government's interests[150]—that is, there must be "a 'fit' between the legislative ends and the means chosen to accomplish those ends * * * a fit that is not necessarily perfect, but reasonable * * * that employs not necessarily the least restrictive means but * * * a means narrowly tailored to achieve the

desired objective." [151] Three commenters argued that CAN-SPAM fails to satisfy any part of this test.[152] These commenters, and others, argued that CAN-SPAM must meet the "strict scrutiny" First Amendment standard.[153] According to NAA, under that standard, a regulation must identify a compelling government interest and must be the least restrictive means of satisfying that interest.

CAN-SPAM regulates commercial e-mail messages, and it does not regulate non-commercial e-mail.[154] The proper standard to assess the Act's regulation of e-mail, therefore, is *Central Hudson*'s test, not strict scrutiny. CAN-SPAM's regulation of commercial e-mail messages clearly satisfies the *Central Hudson* test. First, as explained in section 7701 of the Act, CAN-SPAM addresses two substantial government interests that the Supreme Court has recognized: it protects individuals' privacy,[155] and it protects individuals from fraudulent and deceptive marketing.[156] In addition, CAN-SPAM advances another interest specifically articulated by Congress: it promotes the effectiveness of e-mail as a valuable means of communication.[157] No

commenter argued that these are not substantial government interests.

Second, CAN-SPAM directly advances these substantial government interests. CAN-SPAM protects consumers' privacy by allowing individual e-mail recipients to choose whether to opt-out of receiving additional commercial e-mail messages from any particular sender and by requiring commercial e-mail messages to clearly and conspicuously disclose the opt-out mechanism. CAN-SPAM protects consumers from fraudulent or deceptive e-mail marketing by prohibiting false, misleading, or deceptive transmission or subject line information. In addition, CAN-SPAM advances the governmental interest in promoting e-mail as a communication tool by allowing individual recipients to opt-out of future unwanted commercial messages, thus reducing the likelihood that wanted electronic mail messages "will be lost, overlooked, or discarded amidst the larger volume of unwanted messages." [158]

Third, CAN-SPAM is not more extensive than necessary to serve the government's interests.[159] "The Government is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest—'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.' " [160] The Act protects consumers' privacy by giving e-mail recipients the chance to opt-out of future commercial e-mail messages from a particular sender; CAN-SPAM does not give this control to the government, and it does not prohibit any marketer from sending a commercial e-mail message to any recipient until a recipient submits an opt-out request. CAN-SPAM protects consumers from fraud and deception by prohibiting misleading transmission information and subject lines, and by requiring disclosure that the message is an advertisement and disclosure of the sender's address. CAN-SPAM promotes e-mail as a communications tool by allowing recipients to stop unwanted commercial messages one sender at a time. No commenter argued that the fit between these measures and these interests is unreasonable. Thus, CAN-SPAM's regulation of commercial e-mail

---

[148] *See* 15 U.S.C. 7704(a)(1), which applies equally to "commercial electronic mail messages" and "transactional or relationship messages." The Act's other requirements and prohibitions are targeted at "commercial electronic mail messages."

[149] *See* EFF; MPA; MPAA; NAA; PMA.

[150] *Central Hudson,* 447 U.S. at 566.

[151] *Bd. of Trs. of State Univ. of N.Y.* v. *Fox,* 492 U.S. 469, 480 (1989).

[152] *See* MPA; MPAA; NAA.

[153] *See* EFF; MPA; MPAA; NAA; PMA.

[154] 15 U.S.C. 7701(b).

[155] *See Rowan* v. *Post Office Dept.,* 397 U.S. 728 (1970) (The government has a substantial interest in protecting the privacy of individuals in their homes.); *Frisby* v. *Schultz,* 487 U.S. 474, 485 (1988) ("Individuals are not required to welcome unwanted speech into their own homes and the government may protect this freedom."); *see also Mainstream Mktg. Servs.* v. *FTC,* 358 F.3d 1228 (10th Cir. 2004) (holding that protecting the privacy of individuals in their homes and protecting consumers against the risk of fraudulent and abusive solicitation are "undisputedly substantial government interests").

[156] *See Watchtower Bible and Tract Soc'y* v. *Village of Stratton,* 536 U.S. 150 (2002) (noting that precedents establish that prevention of fraud, prevention of crime, and protection of residents' privacy are important interests that the government may seek to safeguard through some form of regulation); *Schaumburg* v. *Citizens for Better Env't.,* 444 U.S. 620, 637 (1980) (protecting the public from fraud, crime, and undue annoyance are indeed substantial); *see also Mainstream,* 358 F.3d 1228.

[157] Section 7701(a) (1) and (2) of CAN-SPAM states: "Electronic mail has become an extremely important and popular means of communication, relied on by millions of Americans on a daily basis for personal and commercial purposes. Its low cost and global reach make it extremely convenient and efficient, and offer unique opportunities for the development and growth of frictionless commerce. The convenience and efficiency of electronic mail are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail. Unsolicited commercial electronic mail is currently estimated to account for over half of all electronic mail traffic, up from an estimated 7 percent in 2001, and the volume continues to rise. Most of these messages are fraudulent or deceptive in one or more respects." 15 U.S.C. 7701(a)(1) and (2).

[158] 15 U.S.C. 7701(a)(4).

[159] *See Central Hudson,* 447 U.S. at 566.

[160] *Greater New Orleans Broadcasting Assoc., Inc.* v. *United States,* 527 U.S. 173, 188 (1999) (quoting *Bd. of Trs. of State Univ. of N.Y.,* 492 U.S. at 480).

messages satisfies *Central Hudson*'s test for regulations addressing commercial speech.

b. The Constitutionality of the Commission's Criteria

Commenters responding to the Commission's proposed criteria in the NPRM also argued that the Commission's criteria—as opposed to the Act itself—were unconstitutional.[161] These commenters claimed that the criteria would improperly subject non-commercial speech within e-mail messages to CAN-SPAM's regulation of commercial e-mail messages. These commenters—mostly representing periodical publishers—typically requested a blanket exemption from CAN-SPAM for all *bona fide* newsletters and other periodicals delivered via e-mail.[162] The Commission believes that the final Rule's criteria facilitating the determination of an e-mail message's primary purpose likely serve to exclude *bona fide* newsletters and other such publications from regulation as commercial e-mail messages. Therefore, the Commission declines to create a special blanket exemption for any particular group of e-mail messages.

The Supreme Court has articulated its understanding of what constitutes commercial speech in various ways in various decisions. For example, the speech at issue in *Bolger* v. *Youngs Drug Products Corp.*,[163] was deemed commercial where the speech was conceded to be an advertisement, the speech referred to a particular product, and the speaker had an economic motive. In *Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*,[164] the speech at issue was deemed commercial because it did no more than propose a commercial transaction. The Commission believes that the concept embodied in section 7702(2) of CAN-SPAM and incorporated in the final Rule's "primary purpose" provisions is consistent with the general principles underlying these precedents. At any rate, the Commission wishes to emphasize in the strongest possible terms that it does not intend for the criteria it is adopting to result in the regulation of non-commercial speech as commercial e-mail under the CAN-SPAM regulatory scheme. To make this intention as express and as clear as possible, the Commission has added the following as footnote 1 in section 316.3(a) of the final Rule: "The Commission does not intend for these

criteria to treat as a 'commercial electronic mail message' anything that is not commercial speech." The Commission intends that the rules it adopts under CAN-SPAM be consistent both with Congress's intent regarding the scope of the Act, and with applicable First Amendment decisions.[165]

As it developed its "primary purpose" criteria, the Commission was mindful of judicial holdings governing the regulation of periodicals. As set forth above,[166] one criterion for assessing messages containing both commercial content and content that is neither commercial nor transactional or relationship (*e.g.*, unsolicited periodicals) is whether a recipient reasonably interpreting the message would likely conclude that the message's primary purpose is commercial. That standard must be evaluated against relevant precedent. Two cases cited by commenters offer useful guidance.[167] In *Hays County Guardian* v. *Supple*,[168] the court held that a newspaper was not commercial speech even when it included advertising matter because it also contained matters of highest public concern. In *Ad World, Inc.* v. *Township of Doylestown*,[169] the court held that the line between commercial and non-commercial speech for First Amendment purposes cannot be drawn by some magic ratio of editorial to advertising content. The Commission does not intend for its "net impression" standard for determining the primary purpose of e-mail messages containing both commercial content and content that is neither commercial nor transactional or relationship to treat *bona fide* newsletters and other periodicals as commercial e-mail messages. On the other hand, the Commission cannot, as some commenters insisted, grant a blanket

exemption to all messages that are "*bona fide* newsletters." As the Commission noted in the NPRM, one of its concerns in this proceeding has been that "spammers not be able to structure their messages to evade CAN-SPAM by placing them outside the technical definition of 'commercial electronic mail message.' A typical example is a hypothetical message, unrequested by the recipient, that begins with a Shakespearean sonnet (or paragraphs of random words) and concludes with a one-line link to commercial Web site." [170] As the Commission noted, a recipient of such a message could reasonably conclude that the message's primary purpose is commercial.[171]

Commenters advocating a *bona fide* newsletter exemption offered no adequate explanation of how such an exemption could be limited. Most importantly, they failed to explain how CAN-SPAM could continue to treat as "commercial" the "Shakespearean sonnet" spam (unsolicited messages coupling informational content—such as a Shakespearean sonnet, aphorisms, or random words and phrases—with a sales pitch). To preserve the protections against unwanted commercial speech that CAN-SPAM grants, the Commission has determined to subject all messages containing commercial content and content that is neither commercial nor transactional or relationship to the same standard.

*D. Section 316.4—Sexually Explicit Labeling Rule*

This provision of the final Rule is retained from the proposed Rule. Section 316.4 of the proposed Rule included the Sexually Explicit Labeling Rule. In the August 13, 2004, NPRM, the only change proposed to the Sexually Explicit Labeling Rule was to renumber it as section 316.4. The Sexually Explicit Labeling rule was originally numbered section 316.1 when it was promulgated on April 19, 2004. The Commission requested comment on this proposed change and did not receive any responsive comments.

*E. Section 316.5—Severability*

This provision of the final Rule is retained from the proposed Rule. The Commission did not receive any comment on this provision in response to the NPRM. This provision, which is identical to the analogous provision included in the Sexually Explicit Labeling Rule, provides that if any portion of the final Rule is found invalid, the remaining portions will

---

[161] *See* Courthouse; EFF; MPAA; NAA.

[162] *See* Courthouse; MPA; NAA.

[163] 463 U.S. 60 (1983).

[164] 425 U.S. 748 (1976).

[165] There are several statements in the legislative history expressing the intentions of members of Congress that CAN-SPAM not encroach on transactional or relationship e-mail communications, or on fully-protected non-commercial speech. For example, Senator Wyden expressed his intent that CAN-SPAM not interfere "with a company's ability to use e-mail to inform customers of warranty information, provide account holders with monthly account statements, and so forth." 149 Cong. Rec. S5208 (Apr. 10, 2003). Similarly, Representative Sensenbrenner stated that "the legislation concerns only commercial and sexually explicit e-mail and is not intended to intrude on the burgeoning use of e-mail to communicate for political, news, personal and charitable purposes." 149 Cong. Rec. H12193 (Nov. 21, 2003).

[166] Part II C 3 of this Statement of Basis and Purpose.

[167] *See* MPA; NAA.

[168] 969 F.2d 111 (5th Cir. 1992).

[169] 672 F.2d 1136 (3rd Cir. 1982).

[170] 69 FR at 50101 (Aug. 13, 2004).

[171] *Id.*

survive. This provision pertains to the entirety of the final Rule.

## III. Paperwork Reduction Act

In accordance with the Paperwork Reduction Act of 1995, 44 U.S.C. 3506 ("PRA"), the Commission reviewed the proposed and final Rule. The Rule does not impose any recordkeeping, reporting, or disclosure requirements, nor does it otherwise constitute a "collection of information" as defined in the regulations implementing the PRA.[172]

## IV. Regulatory Flexibility Act

The NPRM included an initial regulatory flexibility analysis ("IRFA") under the Regulatory Flexibility Act ("RFA"),[173] even though the Commission did not expect that the proposed Rule would have a significant economic impact on a substantial number of small entities. In addition, the Commission invited public comment on the proposed Rule's effect on small entities to ensure that no significant impact would be overlooked.[174]

This Final Regulatory Flexibility Analysis ("FRFA") incorporates the Commission's initial findings, as set forth in the August 13, 2004, NPRM; addresses the comments submitted in response to the IRFA notice; and describes the steps the Commission has taken in the final Rule to minimize its impact on small entities consistent with the objectives of the CAN-SPAM Act.

### A. Succinct Statement of the Need for, and Objectives of, the Final Rule

The final Rule was created pursuant to the requirement imposed by the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM" or "the Act") that the Commission, not later than 12 months after December 16, 2003, "issue regulations pursuant to section 7711 [of the Act] defining the relevant criteria to facilitate the determination of the primary purpose of an electronic mail message."

### B. Summary of Significant Issues Raised by the Public Comments in Response to the IRFA

In the IRFA, the Commission sought comment regarding the impact of the proposed Rule and any alternatives the Commission should consider, with a specific focus on the effect of the Rule on small entities. The public comments on the proposed Rule are discussed

above throughout the Statement of Basis and Purpose, as are the minor changes that have been made in the final Rule. After reviewing the comments, including the very small number that specifically addressed the impact of the Rule on small entities, the Commission does not believe that the final Rule will unduly burden the entities who send commercial electronic mail messages or transactional or relationship mail messages.[175]

### C. Explanation as to Why No Estimate Is Available Regarding the Number of Small Entities to Which the Final Rule Will Apply

Determining a precise estimate of the number of small entities subject to the proposed Rule, or describing those entities, is not readily feasible for two reasons. First, there is insufficient publicly available data to determine the number and type of small entities currently using e-mail in any commercial setting. As noted in the IRFA, the Rule will apply to "'senders' of 'commercial electronic mail messages,' and, to a lesser extent, to 'senders' of 'transactional or relationship messages.'"[176] Thus, regardless of size, any entity that sends commercial e-mail messages containing the commercial advertisement or promotion of a commercial product or service,[177] or transactional or relationship messages meeting one of the specific categories set forth in the Rule for e-mail messages sent to recipients with whom a sender has a prior relationship,[178] will be subject to the Rule. In the IRFA, the Commission set forth the few sources of data publicly available to approximate the number of entities that send commercial e-mail messages or transactional or relationship messages, noting that "[g]iven the paucity of data concerning the number of small businesses that

send commercial e-mail messages or transactional or relationship messages, it is not possible to determine precisely how many small businesses would be subject to the proposed Rule."[179] None of the comments provided information regarding the number of entities of any size that will be subject to the Rule.

The second reason that determining a precise estimate of the number of small entities subject to the proposed Rule is not readily feasible is that the assessment of whether the primary purpose of an e-mail message is "commercial," "transactional or relationship," or "other" turns on a number of factors that will require factual analysis on a case-by-case basis. Thus, even if the number of entities who use e-mail in commercial dealings were known, the extent to which the messages they send will be regulated by the Rule depends upon the primary purpose of such messages, a determination which cannot be made absent factual analysis.

### D. Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Final Rule, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirements of the Final Rule and the Type of Professional Skills That Will Be Necessary To Implement the Final Rule

The final Rule sets forth the criteria for determining the primary purpose of a commercial e-mail message and, thus, does not itself impose any reporting, recordkeeping, or other compliance requirements within the meaning of the Paperwork Reduction Act. Indeed, because the final Rule imposes no substantive requirements, it is unlikely to impose any costs whatsoever. Any costs attributable to CAN-SPAM are the result of the substantive requirements of the Act itself—such as the requirement that commercial e-mail messages include an opt-out mechanism and certain disclosures—not the Commission's interpretive final Rule. While one commenter expressed concerns about the additional costs that may be associated with implementing the requirements of the Rule,[180] the commenter did not provide specific justification or data to support such a concern. Thus, the Commission continues to believe that the requirements of the Rule will not create a significant burden on persons or entities, including small entities, who initiate commercial e-mail messages or transactional or relationship messages.

---

[172] See 5 CFR 1320.3(c).

[173] 5 U.S.C. 601–612.

[174] NPRM, 69 FR at 50103–04.

[175] The Commission received only a half-dozen comments responding to the questions posed in the proposed Rule regarding the impact of the Rule on small entities. See ACLI; Schwartz; State Farm; Adknowledge; Mattathil. The thrust of the comments is that the Commission should take care not to impose burdens on legitimate sellers, but rather should focus on reining in senders of bulk unsolicited e-mail messages. None addressed with specificity the harms that would accrue from the Commission's proposed criteria for determining the primary purpose of a commercial e-mail message.

[176] NPRM, 69 FR at 50103 (explaining that the CAN-SPAM Act's structure and definitions were imported into the proposed Rule.)

[177] Final Rule, 316.2(c) (definition of "commercial electronic mail message") and 316.3 (setting forth the criteria by which the primary purpose of an e-mail message is determined.)

[178] Final Rule, 316.2(n) (definition of "transactional or relationship message") and 316.3 (setting forth the criteria by which the primary purpose of an e-mail message is determined.)

[179] NPRM, 69 FR at 50104.

[180] Schwartz.

The Rule sets forth criteria by which the primary purpose of an e-mail message is determined. The Commission has not received any comments that necessitate modifying its previous views of projected compliance requirements or costs.

*E. Discussion of Significant Alternatives the Commission Considered That Would Accomplish the Stated Objectives of the CAN–SPAM Act and That Would Minimize Any Significant Economic Impact of the Final Rule on Small Entities*

Through the NPRM, the Commission sought to gather information regarding the economic impact of CAN–SPAM's requirements on all businesses, including small entities. The Commission requested public comment on whether the proposed Rule would unduly burden either entities who use e-mail to send messages defined as ''commercial'' or ''transactional or relationship'' messages under the Act and the FTC's CAN–SPAM Rule; whether this burden is justified by offsetting benefits to consumers; what effect the Rule will have on small entities that initiate messages the primary purpose of which is commercial or transactional or relationship; what costs will be incurred by small entities to ''implement and comply'' with the Rule; and whether there are ways the Rule could be modified to reduce the costs or burdens for small entities while still being consistent with the requirements of the Act.[181] This information was requested by the Commission in an attempt to minimize the final Rule's burden on all businesses, including small entities.

As explained earlier in the statement of basis and purpose, the Commission has considered the comments and alternatives proposed by such commenters, and continues to believe that the final Rule will not create a significant economic impact on small entities or others who send or initiate commercial e-mail messages or transactional or relationship messages. The criteria adopted in the final Rule for determining the primary purpose of a commercial e-mail message reflect the Act's express requirements, which the Commission has no authority to waive, as well as its determination that these criteria entail a reasonable and relatively minimal compliance burden, when balanced against the offsetting benefit of allowing e-mail recipients to choose to limit further unwanted commercial electronic mail messages from particular senders. The

Commission has not received any comments that lead it to believe that the final Rule will unduly burden either the entities who sell, or those consumers who purchase, commercial products and services through e-mail messages.

**List of Subjects in 16 CFR Part 316**

Advertising, Business and industry, Computer technology, Consumer protection, Labeling.

■ Accordingly, for the reasons set forth in the preamble above, the Commission amends title 16, Chapter I, Code of Federal Regulations, by revising part 316 to read as follows:

## PART 316—RULES IMPLEMENTING THE CAN–SPAM ACT OF 2003

Sec.
316.1   Scope.
316.2   Definitions.
316.3   Primary purpose.
316.4   Requirement to place warning labels on commercial electronic mail that contains sexually oriented material.
316.5   Severability.

**Authority:** 15 U.S.C. 7701–7713.

### § 316.1   Scope.

This part implements the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (''CAN–SPAM Act''), 15 U.S.C. 7701–7713.

### § 316.2   Definitions.

(a) The definition of the term ''affirmative consent'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(1).

(b) ''Character'' means an element of the American Standard Code for Information Interchange (''ASCII'') character set.

(c) The definition of the term ''commercial electronic mail message'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(2).

(d) The definition of the term ''electronic mail address'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(5).

(e) The definition of the term ''electronic mail message'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(6).

(f) The definition of the term ''initiate'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(9).

(g) The definition of the term ''Internet'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(10).

(h) The definition of the term ''procure'' is the same as the definition

of that term in the CAN–SPAM Act, 15 U.S.C. 7702(12).

(i) The definition of the term ''protected computer'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(13).

(j) The definition of the term ''recipient'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(14).

(k) The definition of the term ''routine conveyance'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(15).

(l) The definition of the term ''sender'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(16).

(m) The definition of the term ''sexually oriented material'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7704(d)(4).

(n) The definition of the term ''transactional or relationship message'' is the same as the definition of that term in the CAN–SPAM Act, 15 U.S.C. 7702(17).

### § 316.3   Primary purpose.

(a) In applying the term ''commercial electronic mail message'' defined in the CAN–SPAM Act, 15 U.S.C. 7702(2), the ''primary purpose'' of an electronic mail message shall be deemed to be commercial based on the criteria in paragraphs (a)(1) through (a)(3) and (b) of this section: [1]

(1) If an electronic mail message consists exclusively of the commercial advertisement or promotion of a commercial product or service, then the ''primary purpose'' of the message shall be deemed to be commercial.

(2) If an electronic mail message contains both the commercial advertisement or promotion of a commercial product or service as well as transactional or relationship content as set forth in paragraph (c) of this section, then the ''primary purpose'' of the message shall be deemed to be commercial if:

(i) A recipient reasonably interpreting the subject line of the electronic mail message would likely conclude that the message contains the commercial advertisement or promotion of a commercial product or service; or

(ii) The electronic mail message's transactional or relationship content as set forth in paragraph (c) of this section does *not* appear, in whole or in substantial part, at the beginning of the body of the message.

(3) If an electronic mail message contains both the commercial

---

[181] NPRM, 69 FR at 50103–50105.

[1] The Commission does not intend for these criteria to treat as a ''commercial electronic mail message'' anything that is not commercial speech.

advertisement or promotion of a commercial product or service as well as other content that is not transactional or relationship content as set forth in paragraph (c) of this section, then the "primary purpose" of the message shall be deemed to be commercial if:

(i) A recipient reasonably interpreting the subject line of the electronic mail message would likely conclude that the message contains the commercial advertisement or promotion of a commercial product or service; or

(ii) A recipient reasonably interpreting the body of the message would likely conclude that the primary purpose of the message is the commercial advertisement or promotion of a commercial product or service. Factors illustrative of those relevant to this interpretation include the placement of content that is the commercial advertisement or promotion of a commercial product or service, in whole or in substantial part, at the beginning of the body of the message; the proportion of the message dedicated to such content; and how color, graphics, type size, and style are used to highlight commercial content.

(b) In applying the term "transactional or relationship message" defined in the CAN-SPAM Act, 15 U.S.C. 7702(17), the "primary purpose" of an electronic mail message shall be deemed to be transactional or relationship if the electronic mail message consists exclusively of transactional or relationship content as set forth in paragraph (c) of this section.

(c) Transactional or relationship content of e-mail messages under the CAN-SPAM Act is content:

(1) To facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender;

(2) To provide warranty information, product recall information, or safety or security information with respect to a commercial product or service used or purchased by the recipient;

(3) With respect to a subscription, membership, account, loan, or comparable ongoing commercial relationship involving the ongoing purchase or use by the recipient of products or services offered by the sender, to provide—

(i) Notification concerning a change in the terms or features;

(ii) Notification of a change in the recipient's standing or status; or

(iii) At regular periodic intervals, account balance information or other type of account statement;

(4) To provide information directly related to an employment relationship or related benefit plan in which the

recipient is currently involved, participating, or enrolled; or

(5) To deliver goods or services, including product updates or upgrades, that the recipient is entitled to receive under the terms of a transaction that the recipient has previously agreed to enter into with the sender.

**§ 316.4   Requirement to place warning labels on commercial electronic mail that contains sexually oriented material.**

(a) Any person who initiates, to a protected computer, the transmission of a commercial electronic mail message that includes sexually oriented material must:

(1) Exclude sexually oriented materials from the subject heading for the electronic mail message and include in the subject heading the phrase "SEXUALLY–EXPLICIT:" in capital letters as the first nineteen (19) characters at the beginning of the subject line; [2]

(2) Provide that the content of the message that is initially viewable by the recipient, when the message is opened by any recipient and absent any further actions by the recipient, include only the following information:

(i) The phrase "SEXUALLY–EXPLICIT:" in a clear and conspicuous manner; [3]

(ii) Clear and conspicuous identification that the message is an advertisement or solicitation;

(iii) Clear and conspicuous notice of the opportunity of a recipient to decline to receive further commercial electronic mail messages from the sender;

(iv) A functioning return electronic mail address or other Internet-based mechanism, clearly and conspicuously displayed, that—

(A) A recipient may use to submit, in a manner specified in the message, a reply electronic mail message or other form of Internet-based communication requesting not to receive future commercial electronic mail messages from that sender at the electronic mail address where the message was received; and

(B) Remains capable of receiving such messages or communications for no less than 30 days after the transmission of the original message;

(v) Clear and conspicuous display of a valid physical postal address of the sender; and

(vi) Any needed instructions on how to access, or activate a mechanism to

access, the sexually oriented material, preceded by a clear and conspicuous statement that to avoid viewing the sexually oriented material, a recipient should delete the e-mail message without following such instructions.

(b) *Prior affirmative consent.* Paragraph (a) of this section does not apply to the transmission of an electronic mail message if the recipient has given prior affirmative consent to receipt of the message.

**§ 316.5   Severability.**

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, it is the Commission's intention that the remaining provisions shall continue in effect.

By direction of the Commission, Commissioner Leibowitz not participating.

**Donald S. Clark,**
*Secretary.*

**Note:** The following appendix will not appear in the Code of Federal Regulations.

**List of Commenters and Acronyms—August 13, 2004 CAN-SPAM NPRM**

AAM—American Association of Museums
AAMFT—American Association for Marriage and Family Therapy
ABM—American Business Media
ACA—ACA International
ACB—America's Community Bankers
ACLI—American Council of Life Insurers
Adknowledge—Adknowledge, Inc.
Administrative—Administrative Systems, Inc.
AE—Association Enterprise, Inc.
AeA—AEA—American Electronics Association
AFP—Association of Fundraising Professionals
AGSES—Association of Girl Scout Executives Staff
AHQI—Association Headquarters, Inc.
AIA—American Insurance Association
Almeida—Almeida, E
AMP—AMP Management Services
AMR—AMR
AMS—Alternative Management Solutions, Inc.
Amri—Amri, Joyce
Anast—Anast, Dave
AMGR—Association Management Resources
ASAE—American Society of Association Executives
ASM—Association & Society Management, Inc.
ASMI—Association and Society Management International, Inc.
Assoc-SG—Association Services Group
Assoc-Mgmt—Association Management Specialists
Associations—Group of Associations
Bahn—Bahn, William
Baker—Baker & Hostetler LLP
BofA—Bank of America Corporation
Beneteau—Beneteau, Rick
Bihl—Bihl, Thomas

[2] The phrase "SEXUALLY–EXPLICIT" comprises 17 characters, including the dash between the two words. The colon (:) and the space following the phrase are the 18th and 19th characters.

[3] This phrase consists of nineteen (19) characters and is identical to the phrase required in section 316.4(a)(1).

Blake—Blake, Tammy
BLF—BLF Management
BMI—Broadcast Music, Inc.
Boock—Boock, Jeff
Brenner—Brenner, Mary Jane
Bronkema—Bronkema, Dawn
Cantrall—Cantrall & Associates
Cap—Cap, Eric
CASRO—Council of American Survey Research Organizations
CBA—Consumer Bankers Association
CIPL—Center For Information Policy Leadership
Clarion—Management Clarion Resources
Cleaver—Cleaver, Jack
CMOR—Council for Marketing and Opinion Research
Colman—Colman, Heather
Comerica—Comerica Incorporated
Cook—Cook, Jim
Courthouse—Courthouse News Service
Cullom—Cullom, Randy
CUNA—CUNA & Affiliates
Declined—declined4privacy
Dickert—Dickert, Don
Dietetic—American Dietetic Association
DiMarzo—DiMarzo, James
DMA—Direct Marketing Association, Inc.
DMA–NF—DMA Nonprofit Federation
Donahue—Donahue
Dotson—Dotson, Lloyd
DoubleClick—DoubleClick Inc.
Dunham—Dunham, David
Easter—Easter Associates, Inc.
Edge—Edge, Ronald D
EDI—Executive Director Incorporated
EFF—Electronic Frontier Foundation
Elliott—Elliott, LuAnn
Y. Elliott—Elliott, Yank
ECFCU—Empire Corporate Federal Credit Union
Entomological—Entomological Society of America
ERA—Electronic Retailing Association
ESPC—e-mail Service Provider Coalition
Evans—Evans, Neal
Experian—Experian Marketing Solutions
Fenlason—Fenlason, James
Fernley—Fernley & Fernley
Figg—Figg
Fraser—Fraser
French—French, Walt
Friesen—Friesen, Ruth Marlene
Frontline—Frontline Public Strategies Inc.
Frost—Frost, William
Fuller—Fuller, David
Gasser—Gasser, Charles
Geer—Geer, David
Goff—Goff, Cheryl
Harrington—Harrington Company
Harte—Harte-Hanks, Inc.
Hatcher—Hatcher, Clarence
Heywood—Heywood, Pamela
Hopkins—Hopkins, Richard
Hudson—Hudson, Ed
IAAMC—International Association of Association Management Companies
ICC—Internet Commerce Coalition

ICOP—International Council of Online Professionals
Incentive—Incentive Federation, Inc.
Independent—Independent Sector
Internomics—Internomics, Inc.
ITAA—Information Technology Association of America
Jack—Jack, James
JMP—JMP Productions
Johnson—Johnson, David
Katz—Katz, Max
Kellen—Kellen Company
Kemp—Kemp, Steven
Kempner—Kempner
Kershner—Kershner, Richard
KeySpan—KeySpan Energy Delivery New York and KeySpan Energy Delivery Long Island
Krueger—Krueger, Jan
Krzyzak—Krzyzak
Lathrop—Lathrop, Paul
Lee—Lee, Paul
Macfarlane—Macfarlane, Jaye
MPA—Magazine Publishers of America
Major—Major, Harmony
MAM—Milti-Association Management
MasterCard—MasterCard International
Mattathil—Mattathil, George
Mattice—Mattice, Charles
MaxPatch—MaxPatch Services Inc.
MBA—Mortgage Bankers Association
MBNA—MBNA America Bank, N.A.
Melson—Melson, Diana
Merlby—Merlby, Cameron & Hull
Midway—Midway Publishing, Inc.
Montgomery—Montgomery, Marvin
MPAA—Motion Picture Association of America
Mullins—Mullins
MultiService—MultiService Management Company
Murray—Murray, Russell
NAA—Newspaper Association of America
NADA—National Automobile Dealers Association
NAEDA—North American Equipment Dealers Association
NAEMSP—National Association of EMS Physicians
NAR—National Association of Realtors
NATCO—Organization for Transplant Professionals (North American Transplant Coordinators Organization)
NatureLiving—NatureLiving Company
NBC—National Business Coalition On E-Commerce And Privacy
NCA—National Club Association
NCL—National Consumers League
Nelson—Nelson, Ralph
NetCoalition—NetCoalition
Nevins—Nevins, Jeri
NFCU—Navy Federal Credit Union
NNA—National Newspaper Association
NonProfit—NonProfit Team, Inc.
NRF—National Retail Federation
OEI—OEI
Parker—Parker, Cynthia
Payton—Payton, Marianne

PCUA—Pennsylvania Credit Union Association
Peters—Peters, James
PMA—Promotion Marketing Association
Pollock—Pollock, Duncan
Porter—Porter
Proctor—Proctor, Colleen
Quattromani—Quattromani, Renee
Reardon—Reardon, Dale
Recognition—National Association for Employee Recognition
Reed—Reed Elsevier Inc.
REM—REM Association Services
Resource—Resource Center for Associations
Ressler—Ressler, Ronald
Richard—Richard
Ringin—Ringin, Robert
Robbins—Robbins
Robson—Robson, Joe
Robstan—Robstan Group, Inc.
Rossbauer—Rossbauer, Richard
Roth—Roth, Martin
Rothman—Rothman, Andrew
Russell—Russell, Karin
Ryall—Ryall, Carol
Rygiol—Rygiol, John
Satchell—Satchell, Stephen
Schomaker—Schomaker
Schwartz—Schwartz & Ballen LLP
Shepperd—Shepperd, Steven
Sheridan—Sheridan, Mary
Shickle—Shickle, Don
Shiny—Shiny Apple Inc.
SIA—Securities Industry Association
SIIA—SIIA—Software & Information Industry Association
Silkensen—Silkensen, James
Smith—Smith, Mark
Solutions—Solutions for Associations, Inc.
Spriet—Spriet, Dennis
Sprint—Sprint Corporation
State Farm—State Farm Mutual Automobile Insurance Company
T–Team—T–Team Management
Talley—Talley Management Group, Inc.
THM—THMgmt, Inc.
Time Warner—Time Warner, Inc.
Tincher—Tincher
Triad—Triad Apartment Association
Truste—TRUSTe
Turner—Turner, Carsten
R. Turner—Turner, Russell
VCU—Virginia Credit Union, Inc.
Verizon—Verizon
Visa—Visa USA Inc.
Wachovia—Wachovia Corporation
Wanner—Wanner Associates
Watts—Watts
Wells Fargo—Wells Fargo & Company
Wemett—Wemett, Thomas
Westlake—Westlake, Randy
Weston—Weston, Rex
White—White, Mary
Yermish—Yermish, Aimee
Zeni—Zeni, Craig

[FR Doc. 05–974 Filed 1–18–05; 8:45 am]

**BILLING CODE 6750-01-P**