1          IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2                  TAMPA DIVISION

3

4  VASSILIOS KUKORINIS,              )
   individually and on behalf of     )
5  all others similarly situated,    )
                                     )
6          Plaintiff,                ) Case No.
                                     )
7      vs.                           ) 8:22-cv-02402-VMC-TGW
                                     )
8  WALMART, INC.,                    )
                                     )
9          Defendant.
   _____

10

11

12

13              **FAIRNESS HEARING**
      **BEFORE THE HONORABLE VIRGINIA M. COVINGTON**

14

              **June 12th, 2024**
15                **10:03 a.m.**

16

17

18
   (Proceedings recorded by mechanical stenography, transcript
19  produced by computer-assisted transcription.)

20

21

22

23
                    **REPORTED BY:**
24          SUSIE K. CAYLER, FCRR, RPR
              Federal Official Court Reporter
25      (515)778-5008 | reportercayler@gmail.com
       801 North Florida Avenue, Tampa, Florida 33602

```
 1                              APPEARANCES

 2
     FOR THE PLAINTIFF:
 3
          NICHOLAS CHIMICLES
 4        KIMBERLY DONALDSON-SMITH
          Chimcles Schwartz Kriner & Donaldson-Smith, LLP
 5        361 West Lancaster Avenue
          Haverford, Pennsylvania 19041
 6        610.642.8500
          nec@chimicles.com
 7        kds@chimicles.com

 8
     FOR THE DEFENDANT:
 9
          CHRISTOPHER TORRES
10        Greenberg Traurig, P.A.
          101 East Kennedy Boulevard, Suite 1900
11        Tampa, Florida 33602
          813.318.5721
12        torresch@gtlaw.com

13        NAOMI BEER
          Greenberg Traurig, P.A.
14        1144 15th Street, Suite 3300
          Denver, Colorado 80202
15        303.572.6500
          beern@gtlaw.com
16

17

18

19

20

21

22

23

24

25
```

```
 1                               ~~~~~
 2         (Open court.)
 3         (Proceedings began at 10:03 a.m.)
 4              THE COURT:  Good morning.
 5              We're here for a fairness hearing in Vassilios
 6    Kukorinis -- I hope I didn't mispronounce that -- versus
 7    Walmart.  Case 22-civil-2402.
 8              And I'll begin by having counsel state their
 9    appearances.
10              Who do we have for the plaintiff?
11              MS. DONALDSON-SMITH:  Good morning, Your Honor.
12              Kim Donaldson-Smith on behalf of the plaintiff and
13    the settlement class.  I'm with --
14              THE COURT:  Can you put the microphone up a little
15    bit.  Yes, that's better.  Thank you.
16              It's Donaldson-Smith?
17              MS. DONALDSON-SMITH:  Correct, Your Honor.  Thank
18    you.
19              And with me today I have Mr. Chimicles and
20    Mr. Kukorinis.
21              THE COURT:  Is at the end.  Very good.  Thank you.
22              And who do we have for the defense?
23              MR. TORRES:  Christopher Torres, Greenberg Traurig,
24    Tampa, Florida, representing Walmart.  And I'm here with my
25    partner, Naomi Beer, who will be handling any issues today.
```

1          THE COURT:  Thank you.

2          So we're here on an unopposed motion -- well,

3    unopposed between the plaintiff and the defendant.

4          I didn't know how many, if anybody, would show up

5    today.  We have gotten a lot of phone calls.

6          Magaly, can you -- I mean, you've personally gotten a

7    number of phone calls and inquiries in the clerk's office.

8          COURTROOM DEPUTY:  Yes, Your Honor.

9          THE COURT:  It's 10:10.  This hearing was scheduled

10   at 10:00 a.m., and there's nobody here, other than the Court

11   interns who are watching, and you folks.  So I'm a little

12   surprised.  I really didn't know what to expect from people

13   wanting to opt out, or raising an objection.

14         I really was prepared, you know, for all of those

15   things, because I've had fairness hearings where I've had a

16   full house, believe it or not, of people objecting to the

17   settlement.

18         So I'm a little surprised, quite frankly, that it's

19   just us here in the courtroom.  But I just make that note for

20   the record that this has been duly scheduled.  We have received

21   a lot of inquiries.  And, Magaly, just yesterday, I think you

22   asked me if somebody said they could appear and be heard, and I

23   said, of course, it's a public forum, and you conveyed that

24   message to the person.

25         COURTROOM DEPUTY:  That's correct, Your Honor.

1          THE COURT:  So, as I said, I'm really taken aback

2    that there's nobody else here.

3          So this is an unopposed motion for the final approval

4    of the class action settlement in granting of attorneys' fees

5    and expenses.

6          So what I'd like to do is just -- as I go through

7    this, just make certain that what I'm saying is correct.  So if

8    I say something that is incorrect, please speak up.  Just stand

9    up if I say something that's incorrect.

10          MS. DONALDSON-SMITH:  Certainly, Your Honor.

11          And if I just may, I wanted to just say --

12          THE COURT:  You know, and I am really sorry.

13          On that microphone, I'm going to have to ask you to

14    come up to the podium.  I can hear you very well from the

15    podium.  Those mics just kind of are not the best.  So from the

16    podium is better for me.

17          Go ahead.

18          MS. DONALDSON-SMITH:  Sure, Your Honor.

19          I just wanted to take a moment to, in light of your

20    comments as well today, to thank Your Honor and the staff for

21    assisting with the claims that had been erroneously sent to

22    your office.  We do appreciate your handling those and we know

23    it took time to do that.

24          THE COURT:  Yes.

25          MS. DONALDSON-SMITH:  So we just wanted to express

1      our appreciation for that.

2              THE COURT:  That is true.  That would be the law

3      clerks that were tasked with sending it to you.  But there are

4      various ways of handling it, but I thought, I'll just say, the

5      fairest and the easiest way of handling it.  So no problem.

6              MS. DONALDSON-SMITH:  Thank you, Your Honor.

7              THE COURT:  If you don't mind standing, or you can go

8      back but --

9              MS. DONALDSON-SMITH:  Your Honor, no, I don't mind

10     standing.  I just want to grab my papers.

11             THE COURT:  They say it's actually healthier to stand

12     so it's not that big a deal, I hope, for you.

13             So here's what we have.  As of June 3rd of this year,

14     the claims administrator had received approximately -- is this

15     correct? -- 3.9 million claims?  Is that what you have in your

16     record as well?

17             MS. DONALDSON-SMITH:  Yes, Your Honor.

18             THE COURT:  Okay.  3.9 million claims.

19             I've received six objections to the proposed

20     settlement and motion for attorneys' fees.

21             And as of June 2nd, the claims administrator had

22     received 152 opt-out requests.

23             As far as you know, those numbers are still correct?

24     I just want to double-check that my latest numbers are

25     consistent with your latest numbers as well,

1    Ms. Donaldson-Smith.

2                MS. DONALDSON-SMITH:  Certainly.

3                So the number of objections, that's correct.  Five

4    were filed with the Court.  One we submitted with our June 5th

5    filing.

6                And in terms of the number of opt-outs, we did submit

7    a supplemental declaration earlier this week adding a few

8    additional opt-outs.

9                THE COURT:  When did you -- would that have been --

10   was that yesterday that you filed that?

11               MR. CHIMICLES:  It was Monday afternoon.

12               MS. DONALDSON-SMITH:  Monday afternoon, Your Honor.

13               THE COURT:  So how many opt-outs do you know of?

14               MS. DONALDSON-SMITH:  I think --

15               THE COURT:  I know that one was recently received.

16   So that must be -- we must be talking about the same one then.

17               MS. DONALDSON-SMITH:  I think it was 162, but I'll

18   have to check my notes.  I did not --

19               THE COURT:  162 or 152?  Go ahead.

20               I think one is -- let's see.  Going through my notes

21   here, Catherine Leahy -- you know, we did receive a letter from

22   her.

23               I don't think she wishes to be joined as a plaintiff

24   in the case.  I think it's more or less a claim that she wants.

25   I don't know if you have her.

```
 1              Why don't you take a moment.  I know it's a lot to
 2   ask when you're trying to stand up here and do these things.
 3              MS. DONALDSON-SMITH:  Mr. Chimicies to the rescue.
 4   He had the filing for Monday.
 5              This is in docket -- our filing was docketed at 127
 6   and this is the notice of filing, the second supplemental
 7   declaration of Steven Weisbrot, and this provides a current
 8   status of the opt-outs.  And we provided an updated opt-out
 9   list as Exhibit D1 to that filing.
10              THE COURT:  Okay.
11              MS. DONALDSON-SMITH:  And the number of opt-outs,
12   160.
13              THE COURT:  160.  Thank you.
14              MS. DONALDSON-SMITH:  You're welcome.
15              THE COURT:  So here's my -- again, my calculations --
16   if I'm saying something incorrect, I'm counting on you to
17   correct it.  All right?
18              So it appears that the settlement would provide
19   recovery of 11 to 14 percent of the total value of the
20   potential nationwide recovery.
21              The estimated 4 percent claim rate is low, but it
22   does not appear out of line with other class action
23   settlements.  A lot of people will throw these away.  They
24   don't pursue it so -- and I think probably the majority of
25   people, unless it's a substantial recovery, that's what a lot
```

1    of people do do.  So I'm not surprised that it's -- you know,

2    that it's 4 percent claim rate.

3              MS. DONALDSON-SMITH:  If I may, Your Honor.

4              THE COURT:  Yes, please.

5              MS. DONALDSON-SMITH:  I've actually -- I think it

6    might matter, but I've actually calculated it at a little

7    higher than that, just under 5 percent, about 4.87.

8              THE COURT:  Thank you.

9              MS. DONALDSON-SMITH:  That would be 3.9 out of 80

10   million emails because some of the emails were returned so I

11   did not include those.

12             THE COURT:  3.9 out of?

13             MS. DONALDSON-SMITH:  80 million.

14             THE COURT:  My gosh.  Those are staggering numbers

15   then.  Okay.

16             The claims administrator implemented a wide-ranging

17   notice plan that provided direct email notice to over 81

18   million potential class members, notifying them of the

19   opportunity to participate in the settlement.

20             Again, I'm getting these numbers from what you

21   submitted.  So if there's been an adjustment or a change in

22   these numbers, again, I'm totally counting on you to let me

23   know.

24             The attorneys' fees requested are $9 million.  You

25   know, that is -- it's a staggering number.  I've done my own

1   research on that.  It is 20 percent of the common fund created

2   by the settlement.  20 percent is not out of line.  It's

3   considered fair in class actions, but not all class actions

4   have a $45 million settlement.

5           So tell me why -- even though 20 percent is

6   absolutely in line and is not a staggering number in any way,

7   shape, or form; it's quite appropriate -- tell me why $9

8   million is appropriate here, given the amount of work that's

9   been done, given the risk that you've taken, et cetera, et

10  cetera.

11          I mean, you've analyzed that in the filings and I've

12  also independently researched it.  But I'm just looking at that

13  number.  And I mean, it's a tremendous amount of money.  It's

14  just a tremendous amount of money.

15          Tell me why in this circumstance, with the $45

16  million settlement, something like 10 percent is not more

17  appropriate.

18          What's your response to that question?

19          MS. DONALDSON-SMITH:  Certainly, Your Honor.

20          So it is a $45 million settlement.  It is not a mega

21  fund, it's not a billion dollars, it's not half a billion, and

22  it's not a six-figure settlement.

23          THE COURT:  Well, I haven't had any of those in my

24  court, and I've probably handled, I don't know, I'm guessing,

25  20 to 25 fairness hearings in my 20-year career, maybe 20,

1  something in that range.  I probably do an average of about one

2  a year.

3          This is one of the funds that's at the higher end.

4  I've had lower funds -- let's just say if you have $100,000,

5  the lawyer wants a third of that.  That is not a problem.  I

6  understand he or she has taken a risk.  I understand all that.

7  I have no problem with that.

8          Tell me why under these circumstances the $45

9  million, 20 percent, is fair, because -- not the 20 percent is

10  fair, that the $9 million is fair.

11          MS. DONALDSON-SMITH:  Understood, Your Honor.

12          And my reference to the other funds, those are

13  circumstances where courts may apply a sliding scale fee

14  depending on the size of the fund.

15          So in terms of the research that we did within the

16  Eleventh Circuit, we did not see that type of comparable

17  applicability to a $45 million settlement fund.  We did look at

18  the benchmark being 25 percent, but certainly it ranges up to

19  higher than that, 30 percent often.

20          THE COURT:  Right.  But you've got to balance that

21  with a lower amount; right?  I mean, generally speaking,

22  that's -- that's what you have.

23          I mean, continue with your argument, but give me your

24  best case.  Refer me to your best case that when you have $45

25  million at issue -- or in the recovery, that $9 million is an

1    appropriate amount in attorneys' fees.

2              MS. DONALDSON-SMITH:  Certainly, Your Honor.

3              I don't have a case specifically stating that at the

4    ready.  And to your initial question, to continue responding to

5    that.  Why is $9 million fair?  Because we did take on the risk

6    of this litigation.  We did, actually, a significant amount of

7    work on an expedited basis.  You know, govern and following

8    Your Honor's scheduling orders, we were in the position of not

9    just dual tracking; I would say triple tracking the case.

10             We were working simultaneously on not only the

11   settlement, but also discovery, expert work, motions to

12   dismiss.  We went through two rounds of motions to dismiss, and

13   we also filed an amended complaint.  So all of that was

14   happening at the same time.

15             So we were --

16             THE COURT:  Okay.

17             MS. DONALDSON-SMITH:  I'm sorry, Your Honor.

18             We were committing significant resources at a very

19   early stage, so to speak, of the litigation to the matter.

20   That's reflected by the staffing.

21             Myself and Mr. Chimicles, we are two senior partners

22   of the firm, and we along with our associate, Mr. Beatty, did

23   primarily all of the work in the litigation.  We have a

24   combined 75 years of experience conducting class action

25   litigation.  And we think that also contributed to the

1  efficiencies.

2       I know that the Eleventh Circuit is not a --

3  necessarily a lodestar cross-check jurisdiction, but courts do

4  sometimes reference that, and I think particularly in the

5  context of Your Honor's question, I may not have on the ready a

6  case specifically referencing the 45 million and a 20 percent

7  of the 45 million as a fee award.

8       Here our lodestar was 3.4 million.  And that

9  represents a 2.6 multiplier, which is, as a cross-check, a

10  reasonable fee and within the range of fees that are awarded.

11       So I think here the cross-check does support the $9

12  million fee award.

13       THE COURT:  But you understand where I'm coming from.

14  You know, I have a -- you know, the defendant is in a very

15  different position.  They've made a business decision to put

16  this money aside.  And so where it goes is of less consequence

17  to them.  I mean, really the person who's looking out for these

18  class members -- I mean, I think to a certain extent, I would

19  hope you are, and I would think you are, but there's a bit of

20  tension there, as you understand.  There's a tension there

21  between you and the members of the class.

22       So it really just falls on my shoulders.  There's

23  nobody else right now.

24       MS. DONALDSON-SMITH:  Well, I understand, Your Honor.

25  Absolutely.

1          And I think here what's very important, and maybe I
2   should've led with this, but what's very important is the
3   result that was achieved here for the class.
4          So we looked at and talked about, and Your Honor
5   referenced already, that the recovery of $45 million represents
6   an 11 to 14 percent recovery of the estimated damages, and
7   that's significant.
8          THE COURT:  Tell me why that's significant.
9          MS. DONALDSON-SMITH:  Because often, and we cited to
10  some cases, the recovery is 10 percent or less of the estimated
11  damages.
12         Our estimated damages here, we provide what we feel
13  is significant -- a significant amount of detail to the Court
14  to show how we derived those damages.  We didn't just slap over
15  it in our papers.  So we have -- we conducted a significant
16  amount of discovery.  We received billions of transaction data
17  from Walmart.  And from that data, we came up with a very solid
18  estimate of damages for this case.  And again, that's part of
19  the work that was done on an expedited, efficient track in the
20  case.
21         We also, as Your Honor is aware, we have our, what we
22  call plan of allocation or the claims process.  And as part of
23  that claims process, we put together what we believe is a very
24  fair and reasonable way to get the money to the class members
25  here.  So we wanted to be first fair and wanted to be realistic

1   and we wanted to do it in a cost effective way because we

2   didn't want the $45 million to be eaten up by claims

3   administration costs or reviewing thousands of pages of

4   receipts, and things like that.

5         THE COURT:  No.  And I've seen it in a different

6   context, for instance, where you have victims of, I'll say,

7   securities fraud.  And, you know, when I worked for the U.S.

8   Attorney's Office, virtually everything that was recovered went

9   back to victims of fraud.

10        But when you have to use outside parties, there are

11  certain agencies that don't have that ability.  They don't have

12  assistant U.S. attorneys doing the groundwork.  For instance,

13  I'll just -- this isn't what I'm talking about, but I'll just

14  say SEC.  And so they have to contract out with lawyers to do

15  that work.  And I get sticker shock, quite frankly, when I see

16  the amount of money that is spent on trying to recover money.

17        I mean, you still do recover money.  I guess, it's

18  better than nothing, but it's a lot of money in the hands of

19  third parties.

20        So I just feel a moral obligation here, a

21  professional obligation to make certain that this is fair and

22  appropriate under the circumstances.

23        I will tell you one -- the answer -- you haven't said

24  it or maybe you haven't gotten to it yet, but I posed that

25  question to somebody, and it was really an eye-opening

1    experience.  It was a matter such as this, probably about 15

2    years ago.  And I asked the guy, why should so much money go to

3    the lawyers, why should more money not go to the victims.  And

4    in essence what he said was, unless an incentive is there for

5    me as a lawyer to take this case, there will not be class

6    actions.  There will not be recovery for victims.  There's got

7    to be an incentive.

8         And even though you're talking to somebody who has

9    only worked for the government, I certainly have friends that

10   are in private practice and do these kinds of actions.  There

11   has to be an incentive.  Otherwise, why take it?

12        And so even though the recovery was a different

13   scenario, even though the recovery and the amount of money

14   involved was less, it made me -- or reemphasized for me the

15   need for these actions and, of course, if there isn't a

16   recovery at the end of the day, why bother.  Right?

17        I mean, there are lawyers -- wonderful lawyers that

18   do things out of the kindness of their heart, but generally

19   speaking, these are business decisions, business actions, and

20   there's got to be a recovery at the end of the day.  So I most

21   certainly understand that.

22        MS. DONALDSON-SMITH:  And if I may, Your Honor.

23        THE COURT:  Yes, please.

24        MS. DONALDSON-SMITH:  Absolutely.  And I think one of

25   the objectors, I think it was Mr. Anderson, had made the

1   counterpoint to that, that we should be given less fees so we

2   are disincentivized from filing these lawsuits.  And our point

3   is that is that just going counter to Rule 23 jurisprudence and

4   these cases and the recoveries that they do get.

5          THE COURT:  Right.  It's just that it's a lot of

6   money.  That's all.  I'm just telling you, it is a lot of

7   money.

8          MS. DONALDSON-SMITH:  Your Honor, I have one other

9   point on that.

10          THE COURT:  Sure.

11          MS. DONALDSON-SMITH:  It goes to the significance and

12   the substantial and excellent recovery here.

13          You know, now that we have an idea of how many

14   claims -- we have approximately 3.9 million claims in the

15   Weisbrot supplemental declaration.  The claims administrator

16   has identified about 1.2, 1.3 million of those claims as

17   suspected fraudulent claims, and that is something that is

18   common and becoming more and more common in class actions with

19   online filing.

20          You try to facilitate claims and then it

21   unfortunately also brings in fraud and fraudulent claims, but

22   claims administrators are hired to detect those and deal with

23   them.

24          THE COURT:  All right.  You need to sum up your

25   argument on why I should approve this amount of money, the $9

1    million.  Don't focus on the 20 percent.  Focus on the --

2    because 20 percent doesn't bother me in the least, that's a

3    very fair percentage.  Nobody is going to have a problem with

4    20 percent.

5           It's that in this case, 20 percent happens to be $9

6    million.  I wish you had a case, one case that was squarely on

7    all fours.  We don't have one either.  Okay?  Our research

8    didn't show one either.  Believe you me, I also looked for it.

9           I tended to focus on the Eleventh Circuit.  I don't

10   know if you've got anything from someplace else.

11          That's the only thing that -- honestly, that causes

12   me pause here.

13          MR. CHIMICLES:  Your Honor, may I approach the podium

14   and address that final question?

15          THE COURT:  Normally, when one person starts, that

16   person finishes.  So she's speaking.  Normally we don't do this

17   kind of thing where one starts and the other one takes it up.

18          So she's the speaker.  She can consult with you, but

19   she's going to be the speaker.  So you can go back there and

20   see what he needs to say but you're the person addressing the

21   Court.

22          MS. DONALDSON-SMITH:  Thank you, Your Honor.

23          Certainly.  And I just wanted to conclude, in terms

24   of the -- why the 9 million is fair here.

25          THE COURT:  Okay.

1        MS. DONALDSON-SMITH:  Because if we were -- we had

2  done -- in preparation for the hearing today, we had done a

3  calculation of what the net settlement fund would be if we were

4  awarded the 9 million in fees and the expected costs for claims

5  administration and all that were deducted.  The net settlement

6  fund, when allocated to the potential legitimate claimants,

7  results in a 60 to 65 percent recovery of their damages.

8        So for those individuals who had $25 worth of damage,

9  they're going to receive 60 to 65 percent of that.  That is --

10  we start at the 11 to 15 percent number because we're looking

11  holistically at the entire class.  But now that we're at the

12  point where we have the number of claims -- and there was a lot

13  of claims here, a lot of claims.

14        THE COURT:  That's true.

15        MS. DONALDSON-SMITH:  So on its face it may seem that

16  it has reduced the amount, but in actuality, when you look at a

17  per-claimant basis, the claimants here are going to recover and

18  expected to recover around 60 to 65 percent, based on your

19  estimates of the claims administration cost and if we were to

20  be awarded the fee requested and the expense fee reimbursement

21  requested.

22        THE COURT:  Why don't you take a moment to talk to

23  your colleague while I see if -- there's somebody that's in the

24  courtroom.  I don't know if you're in the right courtroom.

25  Sometimes we have people that come into the wrong courtroom.

1    But this is what's called a fairness case hearing in the

2    Walmart case.

3            Why don't you come forward, one or both of you, and

4    you need -- if you want to say something to the Court.  If you

5    just want to watch it, it's fine.  But if you want to say

6    something, then you need to tell me who you are.

7            Are you fine just watching?

8            THE WITNESS:  Yes.

9            THE COURT:  Both of you are fine just watching,

10   terrific.

11           If you change your mind later on, you've got to speak

12   up because I won't know.

13           Go ahead.

14           Normally, I don't do -- it's one person per side.

15           MS. DONALDSON-SMITH:  Thank you, Your Honor.

16           Mr. Chimicles was just emphasizing and wanted me to

17   emphasize the efficiency of having class counsel with the many

18   years of experience that we both have individually and

19   collectively and the lodestar cross-check, which I did

20   reference earlier.

21           THE COURT:  Okay.  Very good.  No, you're doing a

22   fine job.  No problem at all.

23           Anything else you wish to say?

24           Of course I've reviewed your memoranda, but I think

25   these are things that are important that they be fleshed out.

1          Okay.  Right now I'm going to continue with the items
2     I'd like to put on the record.
3          And again, if I say something that's incorrect,
4     please speak up.
5          The attorneys' fees requested, as I said, $9 million
6     or 20 percent of a common fund created by the settlement,
7     that's $45 million.  That's generally speaking -- 20 percent is
8     considered fair in class actions.
9          Plaintiff's counsel has requested $114,870.41 in
10    litigation expenses, and the claims administrator shares that
11    as of April 30th, 2024, $1,425,365.70 has been incurred in
12    costs to provide notice in administrative services.
13         Plaintiff's counsel anticipated that the claims
14    administrator will be paid a total of 2.4 to 2.6 million.
15         So as I've discussed, the attorneys' fees here is
16    significant, but when -- based on a percentage of the
17    settlement value placed in the common fund, and that's the
18    predominant approach in the Eleventh Circuit -- that it is --
19    it does appear to be appropriate.  The percentage is lower than
20    the typical percentage awarded in these kinds of cases.
21         This case was settled prior to class certification.
22         The parties briefed two rounds of motions to dismiss
23    and plaintiff's counsel worked extensively with experts to
24    collect and analyze data from Walmart.
25         So the amount of attorneys' fees does appear to have

1   been reasonably necessary for counsel to obtain release --

2   relief -- excuse me -- for the class members.

3           Additionally, in the final settlement agreement,

4   Mr. Kukorinis, the class representative, provides a broader

5   release than other class members, but he is not receiving any

6   individual or additional compensation in exchange for this

7   relief.

8           I know the Eleventh Circuit has spoken on this not

9   that long ago -- within the past five years or so -- with

10  respect to the class representative.  Any additional amount,

11  you know, has to be appropriate and fair.  It's not like it was

12  maybe 10 years ago, where they were able to receive in excess.

13          MS. DONALDSON-SMITH:  Your Honor, on that --

14          THE COURT:  Yes.

15          MS. DONALDSON-SMITH:  -- that's the *Johnson* case from

16  the Eleventh Circuit.

17          THE COURT:  Yes, absolutely.  I'm familiar with it as

18  well.  So this does not in and of itself raise any issues.

19          I know that in your motion you did disclose that

20  Mr. Kukorinis had recently raised some concerns about a broader

21  release.

22          Have you -- so at this juncture I'd like to see if

23  you've had the opportunity to discuss this with Mr. Kukorinis.

24  It's a little bit uncomfortable for me to approach him directly

25  on this.  He is your client.  On the other hand, you know, you

1  raised it to me.

2          So what is the situation today with respect to

3  Mr. Kukorinis and the issues with respect to the broader

4  release?

5          MS. DONALDSON-SMITH:  Certainly, Your Honor.

6          So, yes, as we put in our June 5th filing,

7  Mr. Kukorinis had requested, on May 21, that we file for him a

8  notice of intent to appear at this hearing to speak about the

9  release.  And on May 22nd, we filed that notice of intent.

10          We did not speak -- after that time, we did not speak

11  with Mr. Kukorinis, and have not spoken to him about his email

12  and his notice of intent to appear.

13          We thought that -- in light of the timing of it, the

14  manner in which it was conveyed, and the substance, we thought

15  it was most prudent for class counsel to respond in our June

16  5th filing, and so that's what we did.  We did not want there

17  to be any misunderstandings.

18          So we attached his email to the June 5th filing, and

19  we believe that we've addressed the matters raised in his email

20  in the June 5th filing.  And we believe that Walmart's filing

21  on that same day also addressed the matters raised by

22  Mr. Kukorinis.

23          We view -- we understand he's expressing frustration,

24  but we view his concerns about freedom of speech, about should

25  he shut up, can he not post on social media, we believe we

1   responded to that.  We pointed out, and Walmart also pointed

2   out, which is important, in their filing that there is no

3   non-disparagement clause.  So if he wanted to post pictures to

4   the Internet, he's not precluded from doing that.

5           We have, Your Honor, throughout the litigation

6   commended, and he should be commended, for his advocacy and for

7   his commitment to advocating for consumers and other Walmart

8   shoppers.

9           The settlement here, as we noted in our June 5th

10  filing, it achieved a significant amount of press.  It achieved

11  education.  It educated millions of consumers, Walmart

12  consumers and consumers of other retailers, about overcharges

13  and the types of overcharges.  I mean, this settlement website

14  alone had 13 million unique views.

15          And if Mr. Kukorinis chooses to continue to shop at

16  Walmart, he may do that.  He may -- there is, again, no

17  non-disparagement clause.  But otherwise, we feel that we

18  responded to that issue and Mr. Kukorinis did sign -- as we

19  noted in our June 5th filing, he did sign the stipulation of

20  settlement, and everything that proceeded after that has

21  occurred as we noted.

22          THE COURT:  So was Mr. Kukorinis involved in the

23  settlement discussions during which the individual release was

24  developed?

25          MS. DONALDSON-SMITH:  Yes.

1          So we spoke with Mr. Kukorinis throughout the

2   mediation.  And I reference this in the June 5th filing.  And

3   by "we," I'm referring to myself and Mr. Chimicles spoke to

4   Mr. Kukorinis.  We expressed that Walmart wanted this release.

5   It was a material part of the settlement.

6          We provided him with a draft of the release in the

7   beginning of November, November 6th.  We discussed the release

8   and the exact same form of release, no changes is what was

9   filed -- is what he signed on the 15th and what was filed with

10  the Court thereafter.

11         THE COURT:  Did Mr. Kukorinis understand the

12  implications of the individual release provision at the time he

13  signed the settlement agreement?  I mean, did he -- did you

14  least -- explicitly discuss those implications with him prior

15  to signing the agreement?

16         MS. DONALDSON-SMITH:  Your Honor, yes, we did discuss

17  it.  And Mr. -- because Mr. Kukorinis expressed an

18  understanding of what it would mean, in terms of -- for

19  example, he would not be able to sue again.  And he expressed

20  to us that he was not happy about that, and I think his email

21  reflects those discussions, that those discussions were had

22  prior to him signing the agreement, and then he signed the

23  agreement.

24         THE COURT:  Okay.  And I think Walmart considered the

25  individual-release provision to be a material term of the

1  agreement; correct?

2           MS. DONALDSON-SMITH:  That's my understanding, yes,

3  and that's what they've stated.

4           THE COURT:  That's my understanding as well.

5           Did -- was Mr. Kukorinis told that?  Did he

6  understand that?  Do you know?

7           MS. DONALDSON-SMITH:  My understanding is yes.

8  Myself and/or Mr. Chimicles had expressed and told him

9  expressly that this settlement required the general release and

10 the release that he was signing, as reflected in 12.9.

11          THE COURT:  And you said you did not communicate with

12 him anymore on this after what date did you say?

13          MS. DONALDSON-SMITH:  After -- with respect to the

14 release only?

15          THE COURT:  Yes.

16          MS. DONALDSON-SMITH:  After we filed the notice of

17 intent to appear on May 22nd.  Mr. Chimicles forwarded

18 Mr. Kukorinis a copy of that filing for his records.  And then

19 we did not communicate with him by phone after that.

20          We still subsequently sent him copies of filings, the

21 June 5th filing, sent him a reminder about the claims deadline,

22 things like that, but we did not communicate about the email.

23          THE COURT:  I mean, any additional information?

24 Because I'm going to see if there's anything he would like to

25 say.

1          You know, it's -- normally individuals speak through

2     their lawyers.  Normally that's what happens, but people have a

3     right to be heard.

4          So is there anything anybody else would like to say

5     with respect to this?

6          I'm going to start with you, Ms. Donaldson-Smith.  Is

7     there anything else you would like me to consider with respect

8     to this?  And then I'll see if anybody else wishes to be heard

9     on this.

10         MS. DONALDSON-SMITH:  Not at this time, Your Honor.

11         If I may -- if I do hear something I would like to

12    respond, if I may reserve to reply.  I think at this time I

13    think I've said everything.

14         THE COURT:  Let me see if the defendant wishes to say

15    anything.

16         Does Walmart wish to be heard on this?

17         Defense, Walmart, anything?

18         MS. BEER:  Very quickly, Your Honor.

19         THE COURT:  Please come up to the podium.  Then I'll

20    see if any individuals would like to say anything.

21         MS. BEER:  Thank you, Your Honor.

22         Naomi Beer on behalf of Walmart.  And I'll be brief.

23         I think Ms. Donaldson-Smith, frankly, covered it.  I

24    just wanted to confirm that it was and is a material term to

25    Walmart.  And we had number -- many discussions.  We certainly

1    didn't speak directly to Mr. Kukorinis, but many discussions

2    with Ms. Donaldson-Smith and Mr. Chimicles about the need to

3    have this release.  And it was material and understood that

4    they had communicated with him and the settlement agreement was

5    signed with it in it.  And we heard nothing further that this

6    was an issue or not until May 21.

7            So it is material to Walmart, it's important to

8    Walmart, and we believe is a common -- it's common in class

9    action settlements to have an individual release by the named

10   plaintiff.  And there's no reason why it shouldn't be approved

11   with it in it because he did agree to it many, many months ago.

12           THE COURT:  Thank you very much.  I appreciate that,

13   Ms. Beer.

14           Anybody else wish to be heard on this?

15           THE WITNESS:  (Indicating.)

16           THE COURT:  Yes.  Why don't you come up to the

17   podium.  And I know who you are, but it's better if you just

18   identify yourself so there's no doubt when the court reporter

19   takes this down who you are.

20           THE WITNESS:  My name is Vassilios Kukorinis, and I

21   am the class representative.

22           THE COURT:  Go ahead.

23           THE WITNESS:  To answer first, the class

24   representation.  Let's say in the memorandum response, both

25   attorneys -- that why I didn't respond, and I apologize for the

1  way I expressed myself, Your Honor, but I am under nerve block

2  medication through a work-related accident.  So whatever I had

3  in my mind does not come properly through my mouth.  So I

4  apologize for that.

5        So they say they have from previous class action they

6  had, I've been deceived and lied with all this negotiation

7  before and the things -- and differently then.

8        Both attorneys remind that in the previous class

9  action, again -- the special defendant attorney said that this

10  is about -- or tried to advertise somehow the settlement in the

11  same way.  It's not accurate because in the last class action,

12  I accused, actually, my attorney that his settlement will help

13  many others, and that was true, and he never actually prove

14  anything I said given all the discussion we have.  He never

15  said anything.  The media, the writers of the article, they

16  did.  But in order to continue and approve the class actions --

17  and the last time I signed a letter and I sent it which said

18  that in order to go ahead, the defendant is going to -- I

19  mean -- can I read it, if you don't mind?

20        THE COURT:  Sure.

21        But, Mr. Kukorinis, you did hear when the Walmart

22  lawyer said that this was a material part of the agreement;

23  right?  That this is really important to them, to Walmart, to

24  have this --

25        THE WITNESS:  Well, I had this discussion with my

1   attorney, Mr. Chimicles.  The way material term was not come

2   out.  She told me in and lied in a way, that the defendants

3   they like to stop going to the -- to their stores and shopping,

4   but you cannot create issues and investigate.  That's the way

5   -- the material term it's flattering but is not coming out to

6   the discussion.

7           And in the last class action, in order to approve and

8   continue, I sent a letter -- even if it's prepared then-

9   attorney, it says, it was filed based on my understanding that

10  the release agreement was to go and release defendant from the

11  other conduct relating to false advertising practices which are

12  not subject in this lawsuit.

13          Also I have been told by Mr. -- the attorneys that

14  the agreement does not and will not exclude the ability of

15  pursuing those other claims and it will be made clear on the

16  records.  This now both attorney says that the last time it

17  happened.

18          Regarding -- I include in the email I sent to them

19  the reason that I believe this 12.9 provisions, it's -- sounds

20  like been, like, I'm losing the right of the First Amendment.

21  And I use some quotes from a plaintiff's magazine.  I don't

22  know if you have it.  I have a copy, if you like it.  Which

23  explain why the plaintiff's attorneys should not accept this

24  kind of broad provisions.

25          THE COURT:  Let me ask you something, though.

1          You signed it; right?

2          THE WITNESS:  Yes.

3          THE COURT:  You signed it.

4          THE WITNESS:  Yes, I did.

5          And when -- before I signed it, I complain about

6   that.  I find that it's very not fair and somehow and us --

7   explain -- it's going to tie me down, the people own me.  And

8   I'm not going to be able to do not just for the matters that

9   litigate for this class action, but anything else, anything

10  else that happen in the future, in the past with my wives --

11  ex-wives, relatives, everybody, I have no communication.

12          I'm going to go to the store with my daughter or my

13  wife, and they see something that's been deceived, and they're

14  going to ask me, and I'm going to say I can't help you because

15  I signed this release.

16          And I have another reason because I didn't respond so

17  immediately or after I sign since I have reservations.

18          I was waiting until the last moment to see how many

19  people they're going to respond, participate in this class

20  action by claiming money from the -- not the net fund, the

21  gross fund, because that's up to $34 million now, even if it's

22  advertised.  Many people -- especially from the media, because

23  most of the media advertise 45 millions, from 35 to 500.  This

24  2 percent of the actual overcharges was not mentioned.

25          And so I was waiting to see how many people of this 8

1   million people that Walmart sent in the emails respond to that,

2   and that was 3.9 millions; right?

3           THE COURT:  I think so.

4           THE WITNESS:  How many of the rest of the 76 million

5   people know about this term that is the class action

6   settlement.  Do nothing.  Another line.  I'll let you --

7           THE COURT:  The court reporter needs to take down

8   everything.  It's really hard.  You just need to slow down.

9           THE WITNESS:  I apologize.

10          So this firm on the website of the class settlement.

11  Unless you exclude yourself from the settlement, you are

12  automatically part of the settlement.

13          If you do nothing, you will get no payment from a

14  settlement and you will give up the right to sue, continue to

15  sue, or be part of another lawsuit against Walmart related to

16  the legal claims resolved by this settlement.

17          So 80 million people, customers of the Walmart, 4

18  million people minus the one-sixth that they opt out, of that 7

19  million like me, they lose all their rights.  But only 13

20  millions visiting this website.  The other people don't know

21  about it.

22          So why would this be a provision to exclude 76

23  million people out of the rights to sue or claim about this

24  allegation -- which allegation I have to emphasize -- they

25  could continue.  They never stop after this moment.

```
 1              And I don't know if you see it, I touched some
 2    samples.  Just now I bought an item that was 500 percent
 3    overcharge online and in the store.  Nothing stopped, nothing
 4    changed, like in the last class action.
 5              So when I have this kind of provision to stop
 6    fighting for this.  I'm just -- they own me.  I cannot --
 7    nothing to do.  I'm not trying to sue them again.  It was very
 8    painful and expensive for me.  I spent over a hundred thousand
 9    dollars the last six years trying to expose this situations.  I
10    don't get a penny.  I didn't ask for a penny.
11              Even if I ask for something, I get my expense many
12    times from previous lawyers and this one.  I don't get
13    anything.  Why should I be excluded and lose all these rights
14    and the First Amendment right for the future?  I don't
15    understand that.
16              The other people are going to get 5 or $20.  We don't
17    know how much we're going to get finally.  I'm not going to get
18    anything.  Why?  I have since -- I ask, can I opt out to stop,
19    and they said without you there's no case.  That's what they
20    told me when I tried to emphasize that I'm upset with this
21    term.  They say without you -- you cannot opt out.
22              So instead everybody to get -- lose this chance to
23    get the pennies, I have to go ahead.  That's why I sign.  But
24    just now I realized that many people, because of that, they're
25    not going to be able to do anything in the future because also
```

1  this provision exclude things that is not even talked in the --

2  in this mediations.  So many things.

3       We just have four practices.  There's more than 50

4  different practices that should be, but I just said it was

5  going to be very complicate and we concentrate, focused on this

6  four only practices.  How about all the others within release?

7  Nobody can proceed.  Everything is excluded.

8       THE COURT:  So what -- what is your position on what

9  I should do at this juncture?  What would you like me to do?

10       THE WITNESS:  I agree not to sue them, but I don't

11  like a company to own me.  So the previous part that say I

12  cannot talk, I cannot aid, I cannot help, I think it should be

13  removed.

14       THE COURT:  Even though you signed it already?

15       THE WITNESS:  Yes.

16       THE COURT:  You agreed to it?

17       THE WITNESS:  I didn't have all the facts then.

18       THE COURT:  What facts did you not have?

19       THE WITNESS:  That so little people was going to

20  participate from the 80 million emails that they sent, which is

21  only people that are shopping online.  There are many other

22  millions of people that go to the store and shopping in the

23  Walmart and doesn't have email.  This people was not informed

24  about this class actions.  And the people shopping online they

25  cannot claim any of this settlement.

1          THE COURT:  Well, let me hear what the lawyers have

2    to say.

3          Normally, these are things that need to be discussed

4    before you sign a document.  I can understand if you had

5    hesitations or concerns or reservations, but that's before you

6    agree to it.

7          Once you agree to it, to say that you shouldn't be

8    bound by it and that you should change what you signed or

9    agreed to is a much more challenging situation.  It's much more

10   challenging, but let me hear what the lawyers have to say.

11         THE WITNESS:  Can I say one last thing, please.

12         THE COURT:  Of course, by all means.

13         THE WITNESS:  I did sign.  And they used the word "I

14   admit," like I never said that.  But also defendants sign and

15   promise they're going to take care of this, this alleged

16   discrepancies.  Never happened from the previous class actions,

17   it's not happening right now, and it's time for that.  They

18   promise they're going to get provision to stop this practice,

19   do something about it, as in the previous settlement.  They

20   keep doing it even if they sign.

21         THE COURT:  Are you talking about the case you filed

22   in the Southern District of Florida?

23         THE WITNESS:  Yes.

24         THE COURT:  Well, I mean, you do have experience, it

25   sounds like, with class actions and being a named plaintiff in

1    class actions; right?  Something very few people have

2    experience with.

3             THE WITNESS:  Ma'am, I was an investigator back in

4    the old country for many years on national TV.  So I can see

5    patterns.  I can find mistakes.  I'm real experienced and I can

6    see what's happening.  And it's not just the defendants; many

7    other retailers in the United States and all over the world

8    they put the pound on the scale.  It's a common practice.  Some

9    people a little, some people they go over the board.

10            So plaintiffs like me, they had to do something.  I

11   didn't gain anything and instead to say thank you that I didn't

12   get it the last time.  I mean I'm penalized to be -- not to

13   talk in the mouth or even complain.

14            If I complain now in the store -- it happened --

15   that's the way, the reason I write this letter.  The people

16   help me out that I was being overcharged, they treat me like a

17   dog.  I waited for 20 minutes, they said no, you are wrong, you

18   don't know what you're doing.  That's what happened in the

19   stores like that.

20            It's a lot of crazy things happening.  It's not just

21   this store.  I'm just repeating.  Who is going to do about this

22   situation and fraud?  The attorney general, the consumer

23   division, the Department of Agriculture.  They told me to go to

24   Better Business Bureau.  I went to police station.  I went to a

25   special intelligence unit.  Nobody did anything.  I did it in

1  other states and other nine attorney generals' office.

2  Somebody has to do something; right?  So why I have to be

3  penalized and not be able to talk?

4        Let's say I want to write a book about it for the

5  future plaintiffs, what to expect and what to be protected.

6        Let's say North Carolina, which one of the states

7  that actually do, who they cure a provision and sent me to the

8  stores, they want to hire me like investigator.  With this one,

9  I cannot find a job.  I've been stigmatized.

10        I put my name in Google, it's going to come in 400

11  pages about all this things that happened the last few months.

12        That's all I have to say.

13        THE COURT:  Well, thank you.

14        Let me hear what the lawyers have to say.

15        Ms. Donaldson-Smith.

16        MS. DONALDSON-SMITH:  Thank you, Your Honor.

17        Two primary points in response.  I think, again

18  listening to Mr. Kukorinis today, he is certainly an advocate.

19        He did reference, again, not being able to, for

20  example, help a friend in the store and tell them that they're

21  getting overcharged.  There is no non-disparagement clause.

22  I'm not even sure that that would be viewed as disparagement.

23  He's not banned from shopping in Walmart stores.  So I don't

24  view that as something he's prohibited from doing pursuant to

25  the 12.9.

1           Also, I just wanted to clarify, because Mr. Kukorinis

2    referred to the release.  And I just wanted the record to be

3    clear about the release in this case.

4           The release in this case is focused specifically on

5    weighted goods and bagged citrus.  In this case, those two

6    terms are defined and they're defined by references to UPC

7    numbers.  So there is no -- nothing vague, nothing unclear

8    about what is covered by this case.

9           In addition, specifically, claims related to online

10   purchases are not included.  They are not released.  Claims

11   related to a purchase of a cereal box back in 2022 that's an

12   overcharge for cereal, that is not included in this release.

13          This release is weighted goods, bagged citrus.

14   That's also important because there are other lawsuits out

15   there.

16          Mr. Kukorinis is not the only individual who sues

17   Walmart.  I think Walmart gets sued multiple times a day, but

18   other individuals are specifically suing Walmart for

19   overcharges.

20          There is the *Kahn* case that is pending in the

21   Northern District of Illinois.  That is a case that the parties

22   briefed as part of the motions to dismiss involving

23   overcharges.  There was a lawsuit filed earlier this year in

24   federal court in D.C. alleging overcharges related to

25   non-weighted goods or bagged citrus products.

1          And now, certainly millions of people are also

2  educated and those individuals are not blocked from bringing a

3  lawsuit even related to weighted goods and bagged citrus after

4  the end of the class period.

5          So if someone is overcharged today, they can bring

6  their lawsuit against Walmart, a class, an individual suit,

7  whatever the case may be.  We were very careful and clear about

8  the scope of this release.

9          And then with respect to the AGs.  The AGs are also

10 certainly -- also certainly pay attention to Walmart.  Back in

11 July of 2023, the AGs of Colorado and Nevada, they entered into

12 what's called an assurance of discontinuance with Walmart.

13 That assurance of discontinuance included things like changes

14 to policies at Walmart stores with respect to over -- trying to

15 prevent or discontinue, let's say, overcharges.

16         Those agencies, unlike class counsel and the court in

17 this type of litigation, are equipped to continue the oversight

18 that's necessary to see if Walmart is implementing that, but

19 this litigation, this Court, class counsel are not in the

20 position in a litigation to try to implement perspective

21 changes, policy changes across Walmart.  There are 30,000

22 Walmart stores nationwide.

23         Unless Your Honor has any other questions, I think

24 that covers what I'd like to say.

25         THE COURT:  No, I don't have any other questions.

```
 1              Let me see if the defense counsel would like to say
 2    anything.
 3              MS. BEER:   Thank you, Your Honor.
 4              Just two quick things.
 5              One, to clarify.  Ms. Donaldson-Smith, when she was
 6    talking about the release, was correct, but that's the
 7    classwide release.  Mr. Kukorinis's individual release, of
 8    course, is broader and not limited -- it's broader than the
 9    scope of the classwide release.  And to be clear, it doesn't
10    prevent him from helping a relative deal with an issue at a
11    store, but it does preclude helping that relative bring a
12    future lawsuit.
13              And the other thing I just wanted to note on the
14    point on the AGs.  They actually -- we heard from the AGs in
15    the context of this case.  We sent CAFA notice to the attorney
16    generals in all 50 states, and I think probably Puerto Rico
17    too, and of course the USAG.  And we heard from a consortium of
18    AGs, including the AG here in Florida, met with them -- this
19    was back in February or so of this year.
20              They satisfied any concerns that they had, and we
21    didn't hear from them again and they don't have any -- as far
22    as I know, don't have any concerns or objections with respect
23    to the settlement.
24              THE COURT:   Okay.  Thank you.
25              Anything else on this?
```

1          I'm just going to move forward, then, at this

2    juncture.

3          The other thing that counsel had asked for is for me

4    to retain jurisdiction.  Once a case is resolved, I don't

5    retain jurisdiction unless the United States or an agency of

6    the United States is a party to it.  So I'm not going to retain

7    jurisdiction on this matter at this juncture.

8          MS. DONALDSON-SMITH:  Your Honor, I'm sorry.

9          On that point, I just wanted to clarify, would you --

10   so from this point forward, if the final judgment is entered,

11   the claims process will continue.  And at the point when the

12   claims process, the administration of all the claims is

13   finalized, we would then come to the Court to seek to do that

14   distribution.

15         THE COURT:  Well, that's fine.  What I don't want --

16   and I certainly have no problem with that if you can give me a

17   time line.  What I don't want is to retain jurisdiction

18   forever.  If there's a certain time limit, you need to -- or

19   until a certain event happens, then you need to provide that to

20   me.  Okay?

21         MS. DONALDSON-SMITH:  Yes, Your Honor.  That would be

22   through the conclusion of the claims administration process.

23         THE COURT:  Okay.

24         MS. DONALDSON-SMITH:  We can provide Your Honor with

25   other language.

1          THE COURT:  Do we have a time line?  I mean, I

2   understand why you need me to do it in the short term.  I just

3   wanted to know, do you have a time line involved or what?

4          MS. DONALDSON-SMITH:  Not at this time from the

5   claims administrator.

6          I mean, as you can see from the declaration, they

7   have been doing a significant amount of work already in

8   bucketing the claims, identifying the fraudulent claims, but as

9   these things often go, they will, for example, identify

10  claimants who have deficient claims.  They will reach out to

11  those claimants.  It will take several months.  So I don't have

12  a time line to give.

13         THE COURT:  I'll come up with something that's

14  appropriate than -- rather than not retaining jurisdiction as

15  of the time the order's entered.

16         I'll come up with an idea that I think is

17  appropriate.  If you've got some language you want to submit to

18  me, I'll consider it.  I just don't want it to be three years

19  from now that there's an issue.  There needs to be an end in

20  sight, in other words.

21         MS. DONALDSON-SMITH:  Understood.  And we agree,

22  Your Honor.  Understood.

23         THE COURT:  Okay.  Okay.

24         But I'll -- if you've got some language, otherwise

25  I'll come up with something.  Let's keep on going then.

1            Let's just make certain that I've got the definition

2    of the class correct here for purposes of this hearing.

3            I know that that was -- the class definition did vary

4    from the definition of the nationwide class provided in the

5    amended complaint.  But I think it was made to clarify that

6    only customers who had purchased the specified products in

7    person at Walmart stores could seek recovery under the

8    settlement and to expand the settlement class period.

9            Can you tell me why you revised the definition of the

10   class?  Was there anything else there?

11           MS. DONALDSON-SMITH:  No, Your Honor.

12           I think you hit on the main points.  I mean, we

13   wanted to make sure that it was clear that we were including in

14   the class and also not releasing any other claims with respect

15   to any purchases, other than those that were in Walmart stores

16   by consumers who also -- for the specific weighted goods and

17   for the bagged citrus, as defined.  So there was nothing vague

18   about that.

19           THE COURT:  And just so we're clear on this, after

20   the claims are paid, none of the money is going to revert to

21   Walmart and none of it will revert to your law firm.  I know

22   you talked about giving people, again, to file, maybe notices.

23   I'm not certain.  Why don't you go through that, because you

24   also talked about, you know, donating what was left over to

25   charity.  But I want to hear about reaching out to individuals

1  again, what you propose be done with respect to that.

2          MS. DONALDSON-SMITH:  Certainly, Your Honor.

3          So with the number of claimants -- well, let me take

4  a step back.

5          Yes, Your Honor is correct.  The fund is -- no

6  portion of the fund reverts to Walmart nor goes to plaintiff's

7  counsel.  So Your Honor is correct about that.

8          With the number of claimants, the fund will be -- the

9  net settlement fund will be fully distributed to the claimants.

10          In the event, which often happens, some people do

11  not -- people requested checks -- not all people requested

12  Venmo or Zelle -- checks do not get cashed, money gets returned

13  for some reason.  So if there is any remaining balance due to

14  those types of returned money, uncashed checks, then if it is

15  economically feasible, we would do a pro rata distribution to

16  the number of eligible claimants who received in the first

17  round.

18          If that is not economically feasible, say, for

19  example, there is only a hundred thousand dollars left, that

20  would not be economically feasible to distribute to 2.1 million

21  individuals, that amount of money, we would then ask the Court

22  for permission to distribute that remaining amount to a

23  charity.

24          THE COURT:  Well, let's see.  I think that I don't

25  really have a problem with that.  I just want to make certain

1    that if there's an opportunity to notify people again -- for

2    instance, if a check has been issued to somebody and it's not

3    cashed, tell me again what you're going to do with respect to

4    that.

5              MS. DONALDSON-SMITH:  Oh, sure, I understand,

6    Your Honor.  I missed that part of your question.

7              So in connection with distributing the money, the

8    checks will have a note on them that they need to be cashed

9    within a certain number of days so things don't drag out

10   forever and someone finds a check two years later and then

11   there's no settlement fund to cash it against.  So that

12   notification will be prominently displayed.

13             And we also did provide for -- and I don't have the

14   exact numbers, but I believe that a majority of the class did

15   select to have the electronic payments.  So those payments

16   should go through without being returned.

17             THE COURT:  True.

18             MS. DONALDSON-SMITH:  In addition, because we do have

19   the contact information for the claimants, as long as it's

20   economically feasible, if there are, say, 10,000 checks that

21   have not been cashed, we can implement a -- as Your Honor

22   suggests, an email notice to them, because everyone submitted

23   an email with their claim form.

24             THE COURT:  I just ask a couple things and that is,

25   first of all, somebody to whom a check was sent, whether it was

1  electronic or whether it was a paper check and not cashed, that

2  you reach out to those individuals again.  Sometimes you may

3  catch somebody at a rough time in their life and they're not

4  able to deal with, or it gets lost in the mail, or the email

5  gets lost or misplaced, that you reached out to them.

6          And what you thought my original question was, with

7  respect to those people who don't respond at all, don't do

8  anything, tell me what you plan to do with them.

9          MS. DONALDSON-SMITH:  So the individuals who made a

10  claim were deemed eligible claimants and received an electronic

11  check payment, and then after a certain period of time passes,

12  let's call it 90 days, they haven't done anything, they don't

13  respond to Your Honor's point about the additional notice, then

14  that money reverts back into the settlement fund, again to the

15  extent that that amount it is economically feasible to

16  distribute it pro rata to all of the eligible claimants, that

17  would happen.  I think that's highly unlikely to happen here.

18          THE COURT:  Okay.

19          MS. DONALDSON-SMITH:  So that should be a relatively

20  small amount of money.  We would notify the Court and request

21  it then to be distributed to a charity.  And again, none of

22  that money reverts back to Walmart nor to class counsel.

23          THE COURT:  Okay.  So let's talk about opt-outs.

24          Any member of the class who did not wish to be bound

25  by the settlement agreement was required to opt out of the

1    settlement by mailing the opt-out notice to the settlement

2    administrator by May 22nd.

3           Mr. Weisbrot, who was the class claims administrator,

4    stated that as of June 10th, the claims administrator had

5    received timely -- or had timely received 160 opt-outs.  I

6    think you may have -- yeah, 160.  160 opt-outs.

7           Claims administrator also received two opt-outs with

8    late postmarks.  They were sent after the deadline.  The claims

9    administrator excluded these names from the opt-out list.  It

10   received a letter from Francis Coker seeking to opt out.

11          In his letter, he requested $7,500 for the

12   overcharges he experienced, additional damages.  He said he'd

13   file suit against Walmart if he did not receive a response.

14   That letter was postmarked after the opt-out deadline.  And so

15   the claims administrator did not add Mr. Coker initially.

16   However, he subsequently received a timely opt-out request.  So

17   Mr. Coker has been added to the opt-out list.

18          I'm not certain how that happened.  The subsequent

19   one was timely; the original one -- maybe there was a delay in

20   the mail or -- in any event, that one was considered timely.

21          In the supplemental brief that you filed, you shared

22   that you received communication from Julia Kapinos concerning

23   matters unrelated to this lawsuit.  And Ms. Kapinos and her

24   husband wish to be excluded.

25          The most recent version includes three people that

1  appear to be from the Kapinos family, Julia Kapinos, Jason

2  Ernest Kapinos, and Ernest Joseph Kapinos.  Okay.

3          MS. DONALDSON-SMITH:  Correct, Your Honor.

4          THE COURT:  So just confirming that those opt-outs

5  were received as to those three individuals, and that's

6  happened.  Okay.

7          I've received five objections, and I think you

8  received one additional objection.  So let's go through this.

9          Shena McHenry.  She objected to the class action

10  settlement because it doesn't allow people to submit receipts

11  for online shopping at Walmart.  Ms. McHenry notes that she

12  mostly shopped online during the relevant time period due to

13  concerns about COVID.

14          I mean, online purchases were excluded because

15  according to your allegations, the misconduct occurred at

16  Walmart stores and the terms and conditions for online

17  purchases from Walmart included an arbitration agreement and

18  class action waiver; correct?

19          MS. DONALDSON-SMITH:  That's correct, Your Honor.

20          THE COURT:  Well, if that's what it -- if it included

21  an arbitration agreement and class action waiver -- is

22  Ms. McHenry by chance in the courtroom?  Anything else from

23  Ms. McHenry or anybody on her behalf?

24          Then I'm going to overrule that objection based on

25  the fact that there was an arbitration agreement.

1        I'm sorry?

2        MS. DONALDSON-SMITH:  Certainly, Your Honor.

3        And I think in addition, just for the record, if

4   Ms. McHenry would like to file a claim, she is still free to do

5   that because the online claims are not included in the release.

6        THE COURT:  Okay.  All right.  Say that again,

7   they're not?

8        MS. DONALDSON-SMITH:  Online purchases are not

9   included in the --

10        THE COURT:  Are not included, right, so she can move

11   forward as she deems fit.  Absolutely.

12        Anything else?

13        MS. DONALDSON-SMITH:  No.

14        THE COURT:  Lerandle Pace.  Received an objection

15   from Lerandle Pace.

16        The settlement provides that if an approved claimant

17   has receipts or other documentation of their purchases they

18   will be entitled to receive 2 percent of the total costs of the

19   substantiated goods purchased capped at $500.

20        Mr. Pace objects to the 2 percent reimbursement and

21   the $500 limit as he believes that these values are too low,

22   and he raises concerns about the amount of documentation.  He

23   expresses concern about the online system for submitting a

24   claim form.  He did submit a claim form online.  He did not

25   receive a confirmation email and did not receive timely

1  security codes when he sought to later modify the claim form.

2          He had difficulty with the phone line.  He's reported

3  his concerns to Walmart employees.

4          Is Mr. Pace here or anybody on Mr. Pace's behalf?

5  All right.

6          Were there any other such concerns that you're aware

7  of, Ms. Donaldson-Smith, that were raised by Mr. Pace?

8          MS. DONALDSON-SMITH:  No.  I mean, I think Your Honor

9  covered those well.  Thank you.

10          THE COURT:  Well, any other class members raised

11  anything similar to what Mr. Pace raised?

12          Are you aware of anything else similar to this?

13          MS. DONALDSON-SMITH:  If a class member had an issue

14  submitting a claim, often -- often they would contact class

15  counsel and class counsel would facilitate communication with

16  the claims administrator, but the claims administrator had a

17  toll free number.  The settlement website had links to provide

18  emails, telephone numbers, and also a chat box to help

19  individuals with claims.

20          We added early on in the process some helpful

21  information, in terms of if someone is using a certain, like,

22  ISP address, then their claim might not be recognized because

23  it was showing from a foreign country.  So we told them to make

24  sure you fix that because then you'll be able to submit a

25  claim.  So to the extent we were notified, class counsel

1  addressed those with the individual and with the claims

2  administrator.

3      THE COURT:  I just wanted to make certain people

4  didn't have problems with this.  As far as you're aware of,

5  this was not a recurring issue with other people?

6      MS. DONALDSON-SMITH:  Correct.  Correct, Your Honor.

7      And we had the claims administrator look into

8  Mr. Pace's issues and they responded and put it as part of

9  their supplemental declaration.

10      THE COURT:  Terrific.  That's what I was hoping to

11  hear.  So I believe the 2 percent limit and $500 cap, under

12  these circumstances, are both appropriate, given that the class

13  members were, on average, overcharged by 2 percent.  So I'm

14  overruling that objection as well.

15      Next, Mr. Anderson.  Is Wayne Anderson or a

16  representative in the courtroom here who wishes to be heard?

17  Okay.

18      So I received an objection from Mr. Wayne Anderson.

19  He objects to the settlement because it does not require

20  Walmart to change its practices and because the settlement

21  value is most likely to benefit plaintiff's attorneys given the

22  comparatively small payout for each class member.

23      Mr. Anderson urges the Court to reject the

24  settlement.  He asked me that if I do approve the settlement,

25  the plaintiff's attorney receive very low compensation to

1  discourage similar lawsuits in the future.

2       He does talk about injunctive relief.  Why did you

3  not seek injunctive relief in this case?  You've only sought

4  damages.  Why did you not pursue that remedy?

5       MS. DONALDSON-SMITH:  Certainly, Your Honor.

6       That was something -- first, injunctive relief does

7  not need to be part of a settlement in order for the settlement

8  to be viewed as fair, reasonable, and adequate.

9       But in addition, specifically here, we viewed the

10  fact that class members can continue to sue an excellent

11  deterrent to the threat of future lawsuits.  And also there's a

12  very practical reason here, and I think I alluded to it at

13  least a little bit earlier in my comments.

14       Walmart has 3,000 stores nationwide.  Class counsel

15  and the Court cannot for a defined period of time, no less an

16  indefinite period of time, police and monitor whether or not

17  Walmart is implementing changes that may impact whether or not

18  there was an overcharge at the store as to a certain

19  individual.

20       So, for example -- and these are the types of things

21  that are referenced in the Denver -- excuse me -- the Colorado

22  and the Nevada assurance of discontinuance filing.

23       For example, implementing a policy where a store

24  clerk needs to make sure a shelf sticker is timely removed and

25  replaced with a new price -- right? -- which if it's not then

1   it could result in a discrepancy between the price that's on

2   the shelf sticker and the price that's charged at the register.

3   Implementing that as part of a class action settlement is not

4   feasible.  And we certainly wouldn't want to be in the position

5   of having to put some type of imprimatur on Walmart having done

6   that when, in fact, it cannot be policed by us.

7        There are regulators.  There are attorney generals'

8   offices.  Mr. Kukorinis referenced other regulators, the

9   weights and measures departments.  It can be at the local

10   county level.  They do inspections of all retailers, including

11   Walmart, to see if there are discrepancies between pricing at

12   the shelf and at the register.  That's the way that we view it

13   was most appropriate in this circumstance.

14        THE COURT:  I think your answer is -- addresses the

15   matter.

16        And with respect to the amount of attorneys' fees, I

17   addressed that earlier.  So Mr. Anderson's objection is noted

18   but overruled at this juncture because it's been addressed and

19   there are other reasons out there for approving this

20   settlement, although his concerns are duly noted.

21        Joan Johnson.  Is Joan Johnson in the courtroom or a

22   representative?  Okay.

23        Received an objection from Joan Johnson.  She raised

24   concern about the settlements requirement, that class members

25   submit receipts to receive reimbursements over a certain value.

1   She highlights people that use SNAP or EBT cards to purchase

2   food cannot view a history of their grocery purchases nor

3   itemized receipts beyond the last three months.

4         A lot of these folks don't have bank accounts, can't

5   request reimbursement.  She also requests that the settlement

6   value be increased to billions of dollars and the attorneys

7   fees be capped at 200,000 to 500,000.

8         I know that you objected -- or you noted, I should

9   say, that her objection did not include documentation that

10  she's within the settlement class.  She did provide a scan of

11  her EBT card.

12        Anything else you'd like to say with respect to that?

13        MS. DONALDSON-SMITH:  If it's okay with Your Honor, I

14  would refer to a prior -- first, our papers that discuss the

15  reasonableness of the process, including the no-receipt claim

16  option and why the no-receipt claim option adequately assumes

17  an estimated damages for these individuals to avoid people

18  having to try to find receipts.  So we think the claim process

19  is very fair.

20        THE COURT:  Ms. Johnson's objection is noted.  I

21  certainly understand her concerns, but it's overruled because

22  these matters have been addressed.

23        I think Ms. Sweet wanted to come to the hearing, I

24  think is what we heard.

25        Is Ms. Sweet in the courtroom?  Okay.

1             Received an objection from Angela Taylor Sweet.  It

2    appears to object to the value of the settlement as being too

3    low to motivate Walmart to use better practices in the future.

4             I mean, this has to do with product pricing not

5    product quality.  The objection did not comply with the rules

6    for submitting objection, did not include documentation that

7    Ms. Sweet is within the settlement class; so I'm going to

8    overrule her objection.

9             Also received an objection -- and I think that you

10   provided to us, counsel -- from Queen Akhenaten II Montgomery

11   Bey.  Ms. Bey appears to object that she was not provided with

12   a full reimbursement of groceries up to a value of $500 when

13   requested at a Walmart store.

14            I'm going to overrule that objection.  It did not

15   comply with the rules.  It did not provide documentation.  It

16   wasn't filed with the Court.

17            Anything else with respect to these objections?

18            Any other objections that I may have overlooked?

19            Those are the ones that I have.  Anything else that

20   you are aware of?

21            MS. DONALDSON-SMITH:  We did not receive any other

22   objections.  No, Your Honor.

23            THE COURT:  And I have the docket sheet here.  I

24   don't have any other objections as of this moment.

25            Magaly, we don't know of any other calls, anything

1   else, objections from anybody?

2             COURTROOM DEPUTY:  No, Your Honor.

3             THE COURT:  Received two motions filed by potential

4   class members.  Dana Albrecht, I granted in part, denied that

5   in part, was not willing to extend the deadline.

6             And I denied a motion for joinder from Ms. Johnson.

7   She was one of the objections that I've just discussed.

8             Kimberlee Curtis Parker.  Is Ms. Parker in the

9   courtroom?  Okay.  We received a notice to appear.  She said

10  she would be here.  Also, she had -- she was unable to submit

11  receipts in support of her claim.

12            Anything that you wish to say about that,

13  Ms. Donaldson-Smith?

14            MS. DONALDSON-SMITH:  Yes.

15            With respect to Ms. Parker, I think her -- I wouldn't

16  characterize her submission as an objection.  It is not an

17  objection.  She stated that the receipts had disappearing ink,

18  but indicated that she did submit a claim.  And she also noted

19  that that subject may be something for a separate lawsuit, but

20  she did commend counsel and the plaintiff for the work done.

21            THE COURT:  Then Mr. Kukorinis.

22            You know, Mr. Kukorinis, some of the things that

23  you've said are troubling to a certain extent.

24            There should be harmony between a lawyer and a

25  client, certainly in this kind of action.  I certainly hear

1  what you're saying to me.  I certainly -- I believe I

2  understand what your position is, but I've also looked at what

3  counsel -- what Ms. Donaldson-Smith has submitted to the Court

4  with respect to your conversations.  I've also heard what

5  Ms. Beer has said to the Court with respect to this being an

6  integral part of the settlement.

7          I'm sorry that these were matters that were not

8  discussed before you signed.  Generally speaking, when you

9  sign, you agree to something.  Even in retrospect, if you

10 determine it's not favorable or you don't like it, I mean, you

11 signed and you agreed to it.

12         It's not uncommon, you know, that you -- certain

13 things are confidential.  I -- as discussed, though, by --

14         Ms. Donaldson-Smith, I mean, certainly I think he's

15 taken a broad view of what he can do and can't do.  I'm not

16 here to give him legal advice about what he can do or can't do,

17 but you certainly dispute some of the things that Mr. Kukorinis

18 said with respect to what he can say, what he can do; correct?

19         MS. DONALDSON-SMITH:  Correct, Your Honor.

20         The example that he gave, if he was in a store and he

21 wanted to talk to a Walmart about being overcharged, that is

22 not prohibited by the release.  And there was no

23 non-disparagement clause in the release.

24         THE COURT:  Right.  I will say that in other

25 situations it's not uncommon to have a do-not-discuss agreement

1   where things are confidential.  That's actually pretty common

2   to have those agreements.

3            So, yes, indeed, we have First Amendment rights, but

4   we can agree to waive our rights to receive compensation in a

5   case, and people do it every day.  It's pretty common.  But I

6   think that your interpretation, Mr. Kukorinis, is broader than

7   what it needs to be.  Again, I'm not here to give you legal

8   advice.

9            Certainly, Ms. Donaldson-Smith, I imagine that you

10  don't mind discussing this with him further so that he

11  understands what the situation is.

12           So at --

13           THE WITNESS:  May I respond, please?

14           THE COURT:  To what?  What do you wish to respond to?

15           THE WITNESS:  About the harm that happened between

16  the lawyers and the reason that I sign, about that agreement in

17  the settlement.

18           THE COURT:  Sure.  Go ahead.

19           THE WITNESS:  I don't know how familiar most of the

20  people are, but when an attorney give you -- you have a

21  discussion and they give you some directions, you don't have

22  too many choices not to obey because you don't have too many

23  chances to find lawyers.  The first time I had a previous class

24  action, I was being black list.  No class-action lawyer in

25  Florida was willing to accept the case for a second time

1   because everybody was calling the previous one and I was

2   getting whipped, and say all this negative things about me.

3          Ms. Donaldson said that the attorney general's office

4   are satisfied with the information about the settlements

5   because the Department of Agriculture and the U.S. department

6   that inspect and keep the things in order; that's not true.

7          The last time there was an announcement about this

8   scale inspection, it was in 2004.  In the other states you hear

9   about that every week or every month.  And the way that they --

10  they never find actually what I found in the hundreds of

11  thousands of cases is that when they scan the QRC, that's the

12  matter of this litigation, been inspected, what do they do, the

13  inspectors just go get the product, and go get $20 and walk to

14  the checkout, they find that it's $20; so everything is okay.

15         But the problem here is the price per unit that is

16  deceiving.  Like I said before, I have -- I can show you a

17  picture if you like, a product that's 500 percent overcharged.

18  Now, people are getting 2 percent back and they're supposed to

19  be happy.  How that is fair?

20         THE COURT:  Well, there has to be finality to cases

21  here.  These are things that should and could have been

22  addressed beforehand.  So you're asking me, after you signed

23  something, to say, no, we're going to unwind things and we can

24  raise concerns about this, raise concerns about that.

25         Really, what I'm focusing on is did you understand

1  the agreement that you signed?  And I'm looking at the response

2  that counsel has filed.  And here's what both lawyers say.

3        They note that the individual release provision was

4  considered a material term of the settlement because you've

5  sued Walmart twice in three years.  Plaintiff's counsel state

6  they discussed the terms of the settlement and the individual

7  release with you frequently, including through emails, Zoom

8  video conferences, and telephone calls.

9        So I understand what you're saying to me today, but,

10  again, you signed it.  If you didn't like it, you didn't need

11  to sign it.  You had every chance to walk away and, you know,

12  you signed it.  So it's not uncommon to have plaintiffs --

13  named plaintiffs enter a broader or general release as part of

14  a class settlement.  And the assent of the named plaintiff is

15  not a prerequisite to approval of the settlement.

16        So, you know, I've certainly listened to what you've

17  had to say.  I've been very open during this proceeding to have

18  you be heard, but, again, the time to have done this was

19  before, not today.

20        And this isn't your first class action, as I've

21  mentioned.  You served as a named plaintiff in two lawsuits

22  against Walmart, where you accused the company of overcharging

23  its customers, in this case and in the case in the Southern

24  District.  So you similarly filed a declaration raising

25  concerns about the preliminarily approved settlement, notably

1  that you were not included in the settlement discussions;

2  that's in the Southern District of Florida.

3  The court struck the declaration and you withdrew the

4  declaration there.  But the court did hold a telephonic

5  conference to address the concerns raised and the court

6  approved the settlement after determining that the declaration

7  did not raise an inference of collusion between the parties.

8  So, you know, it is true Walmart, I think, noted that

9  the settlement agreement did not include an individual release

10  or covenant not to sue by you, but here we are down the road.

11  Walmart has said that it was very important to them -- right,

12  Ms. Beer? -- to have this.

13  MS. BEER:  Correct, Your Honor.

14  THE COURT:  So that's it.

15  I mean, I've certainly listened to what you have to

16  say, Mr. Kukorinis.  That's noted, but even if you don't

17  approve it today, I'm getting ready to approve it.  So that's

18  all there is to it.  I appreciate it.  And I'm sorry that

19  you're unhappy.

20  You know, you've certainly done a lot on this case,

21  but that's it.  I'm moving forward.

22  A class action may be settled only with Court

23  approval.  Approval of a class action settlement is proper upon

24  a finding that the settlement is fair, reasonable, and adequate

25  after considering whether the class representative and class

1    counsel have adequately represented the class.

2         The proposal was negotiated at arm's length.  The

3    relief provided for the class is adequate taking into account

4    the costs, risks, and delay of trial on appeal, the

5    effectiveness of any proposed method of distributing relief to

6    the class, including the method of processing class member

7    claims, the terms of any proposed award of attorneys' fees, and

8    any agreement required to be identified under Rule 23(e)(3),

9    and that the proposal treats the class members equitably

10   relative to each other.

11        There are a number of other factors that the Court

12   needs to include that my order will detail, but -- its

13   likelihood of success, range of possible recovery, you know,

14   and these are matters that have been identified at great length

15   in a variety of cases, but I'll talk primarily about -- the

16   *Bennett* case is one that we tend to look at here in the

17   Eleventh Circuit.

18        But I believe that the settlement here is fair,

19   reasonable, and adequate.  There's no indication of fraud or

20   collusion.  Class representative and class counsel, despite

21   these issues that we've addressed, have adequately represented

22   the class.  Counsel is experienced in these matters.  This

23   isn't the first time that they've handled this kind of case.

24        The relief provided for the class is adequate.  The

25   parties have agreed on $45 million.  I think we've talked about

1   the final number, Ms. Donaldson-Smith -- right? -- of claims.

2   Remind me the final number again.

3           MS. DONALDSON-SMITH:  In terms of the claims that

4   have been submitted?

5           THE COURT:  Yes.  As of June 5th, that was the

6   deadline?

7           MS. DONALDSON-SMITH:  Correct.

8           THE COURT:  What was the total number, please?

9           MS. DONALDSON-SMITH:  So the total number 3,905,158.

10           THE COURT:  Thank you very much.

11           The settlement value is -- I think you had said was

12   11 to 14 percent.  Let me just make certain that that's the

13   last number that I have here.

14           MS. DONALDSON-SMITH:  Yes.

15           THE COURT:  And you said earlier that you expect 60

16   to 65 percent recovery for settlement class members; is that

17   right?

18           MS. DONALDSON-SMITH:  Correct.  Of the recognized

19   loss as calculated.

20           THE COURT:  Those are certainly favorable numbers.

21   So taking into account the cost, risk, and delay of trial and

22   appeal, the effectiveness of the proposed method of

23   distributing relief to the class, and the terms of the proposed

24   award of attorneys' fees, I'm determining that the relief

25   provided for the class is adequate.

1            The settlement treats all class members equitably

2     relative to one another.

3            You do distinguish between the recovery available to

4     class members who can provide receipts to support their claims

5     and those who cannot.  This approach has been approved in other

6     class action settlements.

7            Again, there are a number of other matters under

8     *Bennett* factors that I will detail in more detail in my order,

9     but the class members' likelihood of success at trial is far

10    from certain.  And you've expressed those factors and arguments

11    in your motion.

12           As far as complexity, expense, and duration of

13    litigation, the issues raised in the case were complex,

14    including the potential to apply FDUPTA to a nationwide class.

15           The reaction of the class to the settlement is also

16    an important factor.  I've discussed the objections, you know,

17    in detail, certainly the amount of attorneys' fees, somebody

18    objected to that, the amount of settlement, other people

19    objected to, including the named plaintiff.  I've certainly

20    considered all of those factors, but we've -- when all is said

21    and done, we had six, plus Mr. Kukorinis.  And what he's

22    objecting to is his -- basically what he has agreed to,

23    although here he has voiced additional objections.  But when

24    all is said and done, this is small in the scheme -- it's the

25    low number in the scheme of things.

1          MS. DONALDSON-SMITH:  I'm sorry to interrupt,

2    Your Honor.

3          Just on that point with respect to Mr. Kukorinis.  He

4    did not file an objection in accordance with the preliminary

5    approval order.

6          So I just draw a distinction, because there is a

7    distinction to be made by that when you use term "objection."

8          THE COURT:  That is all true.  That is all true.

9          All right.  By the way, do you have a number on what

10   claim forms have been fraudulent?  Anything?  Any idea on that?

11         MS. DONALDSON-SMITH:  Yes.  So these are the

12   suspected fraudulent claims, and this is from the supplemental

13   Weisbrot declaration, docket 124-7, and it's paragraph 20.

14         And they have identified that approximately 1,240,998

15   claim form submissions have been preliminarily identified by

16   Angeion firm, which is their proprietary fraud detection

17   system, and/or Angeion's internal review as suspected fraud.

18         THE COURT:  And they're going to follow up on that?

19   What are they going to do?

20         MS. DONALDSON-SMITH:  Absolutely, Your Honor.  Yes,

21   that is part of the claim validation process.  After final

22   approval it will occur.

23         THE COURT:  Because just the fact that something is

24   preliminarily identified as fraud doesn't make it fraud.  So we

25   just want to make sure that those people's rights are

1    preserved.

2            Attorneys' fees, I -- one of the objectors noted it.

3    I mean, $9 million is a tremendous amount of money to go to

4    lawyers, to take it away from the people who have been wronged

5    and put it in the hands of the lawyers.  I'm very sensitive to

6    that.

7            I understand the objections, I understand the

8    concerns, but ultimately I yield to the fact that it's 20

9    percent of the recovery.  That's low in this -- that's a low

10   number, all things considered.  I mean, there's no getting away

11   from the fact that that's a very high number, $9 million.

12           THE WITNESS:  Your Honor, can I say something about

13   this?

14           THE COURT:  No, sir.

15           THE WITNESS:  It's not negative.  It's just actually,

16   if you had an hour to spend with me on the phone or emails.  So

17   it actually was a long time in this case that they worked, the

18   attorneys.

19           THE COURT:  Anyway, $9 million is a tremendous amount

20   of money.  I certainly recognize that, and I'm sensitive to

21   those who are also concerned of the amount.  But when all is

22   said and done, because it's 20 percent of the recovery, I --

23   it's something that I can -- my conscience can live with and

24   that I think that it is, when it's all said and done,

25   appropriate and fair.

1          These lawyers, you know, when they take on a

2   litigation, they take the risk, you know.  Even though this has

3   been successful, I imagine there are a lot of others that are

4   not successful, and so those are -- that's the way our system

5   works.  And there are risks in all that we do.  And this one

6   came in; there are others that don't come in.

7          So I think that it's appropriate and fair.  And

8   again, I've never been a plaintiff's lawyer, I've only worked

9   for the government.  So I am going to look at things a lot more

10  carefully than, maybe, somebody -- I shouldn't say more

11  carefully, with a jaundiced eye than somebody else might, but I

12  think when all is said and done, I think it's appropriate.

13         The costs are fine.  I don't have any objection to

14  the cost.  The expenses are all fine.  Everything else is

15  appropriate.

16         The claims administrator, that certainly is a very

17  large amount of money, $1.4 million, but, you know, I respect

18  the work that they do.  And, you know, sometimes you have to

19  spend money to bring money in.

20         Yes, what did you wish to say?

21         MS. DONALDSON-SMITH:  Sorry, Your Honor.  You said I

22  should mention to correct something.

23         THE COURT:  Go ahead.

24         MS. DONALDSON-SMITH:  The 1.4 was the amount expended

25  to date -- well, excuse me, not to date, but pursuant to the

```
 1   last report.  We're estimating up to approximately 2.4.
 2           THE COURT:  That's as of April 30th.  That's what was
 3   spent.
 4           MS. DONALDSON-SMITH:  Sorry.  I just wanted to
 5   clarify.
 6           THE COURT:  Oh, I know that.  And that was as of
 7   April 30th, correct.
 8           So I don't have any problem with that, with the cost
 9   of the claims administrator.  I think that that will eventually
10   increase to 25 -- to 26 percent, is the information you gave me
11   of the common fund -- is that not correct? -- with the
12   combination of attorneys' fees and the costs of the claim
13   administrator.  I think that's 25 to 26 percent.  I think
14   that's what you said?
15           MS. DONALDSON-SMITH:  I had not calculated that
16   number.
17           THE COURT:  But that's what we --
18           MS. DONALDSON-SMITH:  But the dollars --
19           THE COURT:  Right.  That's what we calculated.  So
20   it's still within the acceptable rate.
21           So I just don't have -- even though the number's very
22   high, I simply can't, you know, deny it.  I think it's
23   appropriate that it be granted.  So I am going to approve it
24   for all the reasons that I've discussed.
25           As I said, I will only very -- on a very limited
```

1    basis retain jurisdiction.

2          I really don't want to retain jurisdiction past the

3    end of this year.  So I will -- I'll tell you what.  I'm going

4    to retain jurisdiction until December 31st, 2024.

5          If I need, I will consider it past that, if I have

6    to.  But I'm only going to retain it until the end of this

7    year.  I think these matters should be resolved before the end

8    of this year.

9          MS. DONALDSON-SMITH:  Understood, Your Honor.

10         And we will be certain to provide you an update prior

11   to that.

12         THE COURT:  Just know I'm very disinclined -- I've

13   had other cases, for instance, to enforce the terms of the

14   settlement.  I'm very -- just know that I'm very disinclined,

15   other than the fact that we have claims outstanding, issues

16   outstanding, that's the only reason that I'm doing something

17   different here.

18         MS. DONALDSON-SMITH:  Correct, Your Honor.

19         We're currently mid-June right now.  And we will need

20   to give the claimants time to cash, to respond.  That does take

21   us very close to the end of the year, but I understand

22   Your Honor's concern and I think that's fair.  And we will

23   report back to Your Honor.

24         THE COURT:  Right.  Right.

25         Again, there has to be finality to these things.  The

1   same thing I told Mr. Kukorinis, there has to be finality.

2   These things just don't hang on forever.

3         So, anyway, I will enter an order on this.  It will

4   be entered in due course, but I've already outlined what the

5   order is going to say.  So I am approving the settlement for

6   the reasons I've already described.

7         I'm approving the attorneys' fees for the reasons

8   I've already described, but there will be an order entered

9   within the next week or so going into more detail about these

10   things.  Okay?

11         Anything else from counsel?

12         Ms. Donaldson-Smith, anything else?

13         MS. DONALDSON-SMITH:  First, thank you, Your Honor.

14   And thank you for all of your work.

15         THE COURT:  You are welcome.

16         MS. DONALDSON-SMITH:  Last night, I think around

17   midnight, there was a filing by Mr. Albrecht.  So we did not

18   know if Your Honor -- truly eleventh hour.

19         THE COURT:  Let me see that.  Give me a second there.

20         He filed a brief at 11:30 last night.  It was filed

21   after the objection deadline.

22         What he says is he questions how vigorously you

23   prosecuted the lawsuit.  He said you violated provisions of the

24   CAN-SPAM Act that govern commercial emails by improperly

25   identifying the sender of the email notices, failing to

1    disclose an advertisement, failing to provide a valid physical

2    postal address, not providing a working opt-out hyperlink, and

3    providing an invalid reply to email address.

4           The problem is, again, you have deadlines for these

5    things just like we've got statutory deadlines for things.

6           MS. DONALDSON-SMITH:  If I may, Your Honor.

7           THE COURT:  Yeah, that was Dana Albrecht, correct.

8           MS. DONALDSON-SMITH:  Correct.  And he had filed some

9    motions a few weeks ago that were noticed by the Court and the

10   magistrate judge.

11          THE COURT:  It's just there was a deadline here.

12   There was a deadline.  I'm overruling it because it was filed

13   after the deadline.

14          Is there anything else you -- you should respond to

15   it on the record.  Why don't you do that right now.

16          MS. DONALDSON-SMITH:  Certainly, Your Honor.

17          So we believe that the filing that Mr. Albrecht made

18   last night at around 11:30 p.m. was an improper filing.  It

19   came after any deadline.

20          We don't view it as an objection.  He doesn't use the

21   word "objection," but as Your Honor pointed out, he did raise

22   concerns after quoting from our declaration and from our

23   complaint and our former briefs as to whether or not -- how

24   thoroughly we did research, things like that.  Fundamentally,

25   the email that was sent out is not a commercial notice.

1            So we disagree with the statements that Mr. Albrecht

2    has made as to whether or not the -- the statements that he

3    made that the CAN-SPAM Act even applies.  Angeion is an

4    experienced claims administrator, handles thousands of class

5    actions claims administrations, sends over a billion emails

6    every year, and they have experience in these things.

7            So the form of the email, which was not a commercial

8    notice but a legal notice, we believe does not suffer from any

9    of the deficiencies that he identified.

10           THE COURT:  Okay.  So I'm overruling his objection.

11           MS. DONALDSON-SMITH:  Thank you, Your Honor.

12           THE COURT:  Anything else, Ms. Donaldson-Smith?

13           MS. DONALDSON-SMITH:  That's all, Your Honor.

14           Thank you again.

15           THE COURT:  You're welcome.

16           Anything from the defense side, Ms. Beer?

17           MS. BEER:  Nothing, Your Honor.

18           But I did want to thank you and your staff for how

19    you -- especially with all the claims that came in.  We got a

20    lot to our office as well; so I sympathize with you.

21           THE COURT:  You're welcome.

22           We're in recess.  Thank you very much.

23        (Proceedings adjourned at 11:52 a.m.)

24

25

1                        **CERTIFICATE OF REPORTER**

2    STATE OF FLORIDA

3    COUNTY OF HILLSBOROUGH

4        I, SUSIE K. CAYLER, FCRR, RPR, do hereby certify that I

5    was authorized to and did stenographically report the

6    foregoing proceedings; and that the foregoing pages constitute

7    a true and complete computer-aided transcription of my original

8    stenographic notes to the best of my knowledge, skill, and

9    ability.

10       I further certify that I am not a relative, employee,

11   attorney, or counsel of any of the parties, nor am I a relative

12   or employee of any of the parties' attorneys or counsel

13   connected with the action, nor am I financially interested in

14   the action.

15       IN WITNESS WHEREOF, I have hereunto set my hand at Tampa,

16   Hillsborough County, Florida, this 18th day of July, 2024.

17                              /s/ *Susie K. Cayler*
                                Susie K. Cayler, FCRR, RPR
18                              Federal Official Court Reporter
                                United States District Court
19                              Middle District of Florida

20

21

22

23

24

25